UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
BANGOR DIVISION

UNITED STATES OF AMERICA,

     Respondent,

vs.

                                  Civil Case No.: _____

                                  Criminal Case No.: 06-58-B-W-0001

MICHAEL PELLETIER,

     Petitioner. _____/

Before the Honorable John A. Woodcock, Jr., United States District Judge

## PETITIONER'S MOTION TO VACATE, CORRECT, OR SET ASIDE AN ILLEGAL SENTENCE PURSUANT TO 28 U.S.C. § 2255

Michael Pelletier #11109-036
United States Penitentiary
Post Office Box 33
Terre Haute IN 47808
**Petitioner, pro se**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
BANGOR DIVISION

UNITED STATES OF AMERICA,

     Respondent,

vs.                                    Civil Case No.: _____

                                       Criminal Case No.: 06-58-B-W-001

MICHAEL PELLETIER,

___Petitioner._____/

### PETITIONER'S MOTION TO VACATE, CORRECT, OR SET ASIDE

### AN ILLEGAL SENTENCE PURSUANT TO 28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255, Petitioner Michael Pelletier, pro se,[1] asks this honorable court to vacate, correct, or set aside an illegal sentence as being imposed in violation of the United States Constitution and the laws of the United States. Mr. Pelletier alleges he is being illegally detained and that he is entitled to relief, based upon the following grounds:

---

[1] NOTICE IS GIVEN that Mr. Pelletier was assisted in the preparation of this petition by Mr. R. Casper Adamson #20013-017 and Mr. Michael Martin #09221-033, non-attorneys who share the Petitioner's address. Mr. Pelletier is aware that Mr. Adamson and Mr. Martin are not attorneys and that they may not represent him in any court of law.

## (i) STATEMENT OF THE CASE

By secret grand jury indictment, Michael Pelletier was charged with conspiracy to import marijuana, in violation of 21 U.S.C. §§ 963, 952(a) (Count I); distribution and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(b)(1)(A) (Count II); conspiracy to engage in money laundering, in violation of 18 U.S.C. §§ 1957, 2 (Counts III, IV, V); money laundering, in violation of 18 U.S.C. §§ 1956(h), 2 (Counts VI, XI, XII); structuring, in violation of 31 U.S.C. §§ 5324(b)(3), 5324(d), and 18 U.S.C. § 2 (Count XIV);  conspiracy to engage in social security fraud, in violation of 42 U.S.C. § 408(a)(4) (Count XV), to which Petitioner entered pleas of not guilty. His alleged coconspirators were provided separate trials.[2]

Mr. Pelletier was represented at trial by Matthew S. Erickson, Smith Law Offices, P.A., 28 Main Street, Suite 1, Bangor ME 04401 (207) 989-3045. He was represented on appeal by Stephen D. Riden, 99 Summer Street, Suite 1600, Boston MA 02110.

---

[2] Pursuant to FRE 201(b), Mr. Pelletier asks the court to take judicial notice of the following connected cases: United States v. Pascucci, 664 F.Supp.2d 128 (D. ME Oct. 19, 2009) (attributing drug weight of 79.37 kilograms to coconspirator); United States v. Daigle, 564 F.Supp.2d 50 (D. ME July 3, 2008) ("straw man" acting as "escrow agent" for Pelletier); United States v. Pelletier, 517 F.Supp.2d 498 (D. ME Oct. 16, 2007) (denial of motion for judgment of acquittal); United States v. Pelletier, 490 F.Supp.2d 17  (D. ME June 18, 2007) (granting separate trial for Pelletier from coconspirators); United States v. Pelletier, 666 F.3d 1 (1st Cir. 2011) (direct appeal), cert. denied, 2012 U.S. LEXIS 4016 (U.S. May 29, 2012); and United States v. Fogg, 666 F.3d 13 (1st Cir. 2011). Another alleged coconspirator, Archie Ladner, was acquitted following a jury trial.

The United States was represented by AUSA Joel B. Casey, Office of the United States Attorney, 202 Harlow Street, Room 111, Bangor ME 04401 (207) 945-0373.

A six-day trial commenced on July 12, 2007, before the Honorable John A. Woodcock, Jr., in the District of Maine, Bangor Division.

The Government was permitted to dismiss Count IV midtrial. (335:28-29, 99).[3]

Mr. Pelletier was convicted of the remaining counts with a special jury verdict finding Petitioner responsible for more than 1000 kilograms of marijuana. (335:233)

On January 22, 2008, Mr. Pelletier was sentenced to life in prison to be followed by 10 years of supervised release and ordered to pay restitution in the amount of $83,847.55.

The United States Court of Appeals for the First CIrcuit affirmed the judgment and sentences in a published opinion. United States v. Pelletier, 666 F.3d 1 (1st Cir. 2011), cert. denied, 2012 U.S. LEXIS 4016 (U.S. May 29, 2012).

This petition for writ of habeas corpus timely and respectfully follows.

---

[3] The trial transcripts were transcribed for the purposes of appeal. References to these transcripts will be denoted by docket number followed by a colon then the page number(s) in parenthesis. For example, (338:18) refers to page 18 of document 338.

## (ii) STATEMENT OF THE FACTS

In the Readers Digest Condensed Books version, and in the light most favorable to the Government, the paralyzed Petitioner recruited people to swim across the St. John River carrying sacks of marijuana. Pelletier would personally ferry cash into Canada, concealed in the seat of his wheelchair, then his swimmers would mule the marijuana into the United States.

One swimmer who reached Olympic gold status with the Government was its star witness, Mr. Adam Hafford, who, fittingly enough for the comedy, could not swim.

Mr. Hafford, a convicted felon many times over (308:52), unwisely shot two moose with a firearm; his second blunder was to do it while wildlife officers were in the vicinity. (308:131-32)

Understandably not wanting to spend the rest of his life in prison, Mr. Hafford concocted a story that the Government helped him refine with the passage of time, first in a grand jury proceeding, then in the trial of Archie Ladner, who, it bears repeating, was acquitted. By the time Mr. Hafford testified against Mr. Pelletier, he pretty much had his story down pat. Fortunately for Mr. Pelletier, Mr. Hafford is not an especially talented liar.

Because of the issues presented herein, it is necessary to explore Mr. Hafford's testimony at all three proceedings. By the time these proceedings are completed, it is hoped that Mr. Hafford will have been found to have breached the terms of his plea agreement, that the Government will take appropriate steps to have Hafford resenteced, and Mr. Pelletier will either be free or afforded a new trial.

Mr. Hafford, like many of the Government's witnesses, entered into a plea and cooperation agreement with the United States. (308:53) Hafford's

-4-

substantial assistance resulted in Mr. Hafford receiving a federal prison sentence that was lesser than the statutorily required fifteen years. (308:54) In exchange for the Government's largesse, Mr. Hafford was required to completely and truthfully testify against his alleged coconspirators under pain of prosecution for other offenses. (308:55)

Hafford first met Mr. Pelletier "sometime between 2000 and 2004" at a correctional facility called Windham. (308:55) Pelletier offered Hafford a job and invited him to call him when he got out of jail. Hafford would be working around Pelletier's property or just trafficking pot. (308:67)

While at Windham, Hafford also met Michael Easler. The three amigos did not spend a lot of time together. Although Hafford and Easler talked quite alot, Hafford could not recall exactly what they talked about. Just before Hafford was released, Easler revealed to him that he used to work for Mr. Pelletier. (308:68)

Pelletier wrote down his address and phone number and gave it to Mr. Hafford shortly before Pelletier was released. (308:68) Hafford called Mr. Pelletier in June 2004, after his release, and they subsequently met at a Wal-Mart in Presque Isle. (308:70) Pelletier's girlfriend, Kendra Cyr, accompanied him, and Archie Ladner accompanied Hafford. Cyr and Ladner went inside the store while Pelletier and Hafford talked. (308:69)

According to Hafford, Mr. Pelletier wanted him to locate Mr. Easler and bring him to Pelletier's woodlot because he had stolen $310,000 from Mr. Pelletier. He also wanted Hafford to swim the St. John river. (308:70-71)

Mr. Hafford accepted both assignments. Approximately one week later, Hafford met with Mr. Pelletier at his house. (308:71) Archie Ladner was

also present. The trio discussed the logistics of swimming marijuana across the river. (308:72)

It was explained to Hafford that he would be swimming 60 pounds of pot across the river. Mr. Pelletier drove Hafford down Route 1 on the French-ville Road and showed him where he would cross. (308:72) Hafford swam pot across the river for the first time that very night. Pelletier drove him across the Canadian border in the back of his pickup truck (as a convicted felon, Hafford could not legally cross the border). (308:73)

Once safely across the border, they went to some unnamed bar in either Edmundston or Fredericton, right across from Madawaska. They met an unnamed person at the bar, and Hafford drove off with the stranger. The stranger had the weed in the back of his vehicle; he tossed it down the river bank, and our Olympian swam it across the river. The pot was packaged in half-pound bags, 30 pounds per duffel bag, two duffel bags. (308:74)

Because Mr. Hafford could not actually swim like Michael Phelps, he had the foresight to purchase a life jacket at Wal-Mart. (308:75) Conven-iently for Mr. Hafford, the 60 pounds of marijuana floated, and he was thus able to slip a duffel bag strap over each arm and swim the drugs across the river in a mere two or three hours. (308:76)

When he reached the American side of the river, Hafford produced a soda can he had on him and placed it on the side of the road as a signal for Archie Ladner, who picked him up half an hour later. Hafford tossed the duffel bags into the back of Ladner's pickup truck, and Ladner then drove the drugs to Pelletier's woodlot. (308:76) They threw the duffel bags into the woods once they were on Pelletier's property. (308:77)

-6-

In addition to the life jacket, Hafford was also encased in a wetsuit that had formerly belonged to Michael Easler. (308:77) When he complained that the neck was too tight, and after making five or six trips across the river, Mr. Pelletier generously gave him a sporting goods catalogue and invited him to order whatever he wanted. Hafford chose a new wetsuit, fins, boots, gloves, and a motorized water scooter. (308:78) Mr. Pelletier paid for these items with a credit card. (308:79)

Mr. Pelletier had a close call with the border patrol which induced him to let our Jaques Cousteau swim the money across the border. (308:80-81). Hafford would usually swim $60,000 at a time for 60 pounds of pot. (308:81) The money was wrapped in plastic  shopping bags. (308:81-82)

Mr. Hafford swam the river for Pelletier from June to November 2004. He would make the trip "every week or two weeks, whenever [Pelletier] needed it." Hafford would usually carry 60 pounds per trip, 30 pounds per bag, but he did not "know exactly [how much marijuana] was there." "A few times there was three [bags], and sometimes I had other [drugs] coming across for myself, too, at the same time." (308:82-83)

As near as Hafford could estimate, he probably swam 1500 pounds of pot across the river, but he didn't think it was less than 1000 pounds. "Plus some of my own[.]" (308:83)

Pelletier was paying Mr. Hafford $500 per trip, but he "actually never, ever took cash. I just got paid in pot." (308:83, 96-97) A half pound of pot per trip, to be exact. (108:83, 97)

Someone on the Canadian side of the border told Mr. Hafford that Mr. Pelletier was paying $1000 per pound for marijuana, and that Pelletier would sell it for $2200 to $2800. (308:84)

Hafford claimed that he, a guy nmaed Shawn, and a girl named Dube, Anthony Caparotta, and Rocky Fogg were all selling marijuana for Pelletier. (308:84) Archie Ladner was selling as well. (308:84-85) Ladner was paid $250 each time he trafficked pot downstate, and the emolument was deducted from the bill Ladner owed Pelletier for pot. (308:85)

Mr. Hafford, on only one occasion, trafficked five pounds of pot down-state, but he was not able to complete the delivery to the customer. Instead, Hafford dropped the drugs off in Winn. Mr. Hafford then testified that he took another load of pot to Portland, where it was supposed to go to John Pascucci, but another unknown mystery person relieved Hafford of the drugs without Hafford seeing him. (308:86)

Eschewing the opportunity to comment on the paucity of knowledge the Government's star witness had at trial in comparisson with his knowledge before the grand jury (a subject that will be discussed at length later), Hafford went on to state that Pelletier told him that Mr. Ladner was being paid $1000 for each trip to Portland. Hafford did not, amazingly, know how many trips were made to Portland and Winn. He did know, however, that Mr. Pelletier would personally travel to Portland to collect the money that was owed to him for the marijuana. (308:87)

Another mystery person stole five pounds of marijuana from Pelletier's woodlot. A month later, somebody called Mr. Pelletier and claimed to have stolen the weed from a freezer buried in the woods. The person claimed not to have known that the marijuana belonged to Pelletier, but now armed with that knowledge, the person wanted to do the right thing and return the marijuana to Pelletier. (308:87-88)

Mr. Hafford informed Pelletier that he smelled a setup. Nevertheless, Mr. Hafford accompanied Pelletier to the rendezvous on the Pit Road in

Connor where the repentant thief was to return the drugs. Hafford then instructed Mr. Pelletier to drive around the corner. Pelletier complied, and they espied a sheriff's cruiser parked on the side of the road. Pelletier kept on driving, and the duo returned to Mr. Pelletier's home. (308:88-89)

Mr. Hafford twice sold Mr. Pelletier's pot to Mr. Caparotta and then collected the money. (308:91) Hafford continued to turn over the cash proceeds to Mr. Pelletier until he went to jail, at which point Hafford gave the money to Kendra Cyr (308:92), a point that Ms. Cyr denied.

Archie Ladner, according to Hafford, would make trips to Winn, where he would deliver five to ten pounds of marijuana to Rocky Foff. (308:92) Hafford would prepackage the drugs and deliever it to the acquitted Ladner. (308:93) Hafford also provide Ben Dionne with weed twice. (308:94-95) Mr. Hafford collected that cash and also delivered it to Mr. Pelletier. (308:95)

Incredibly, Mr. Hafford claimed to have been present when Mr. Pelletier paid $50,000 in cash for a farmhouse that was put in Ricky Daigle's name. The deal was done at Pelletier's lawyer's office in Caribou. (308:98) Mr. Pelletier gave the cash to Daigle, "and he went in and signed some paperwork--or whatever they do to buy a house, and then he came back out, and the lady who was doing the real estate had Mike [Pelletier] sign some papers and pay the taxes for that year." (308:98-100)[4]  Hafford asserted that he was in Mr. Pelletier's pickup truck when the deal went down. (308:99)

---

[4]No one else testified that Mr. Hafford was present when this deal went down, and Mr. Pelletier, confronted with overwhelming evidence that he bought a piece of property and put it in Daigke's name, submits that Mr. Hafford was not present. Hafford gained his knowledge of this transaction from Mr. Pelletier.

Mr. Daigle owned a store in Frenchville, and Mr. Hafford went there with Mr. Pelletier to eat a few times. Pelletier used to go there to talk to Daigle, but Hafford did not know what they were talking about. (308:99) The deal went down in July or August. (308:101)

Pelletier bought three horse to keep on the property. (308:102-03)

Hafford would also prepackage 30-35 pounds of pot for Ladner to take to John Pascucci in Portland. (308:103)

In January 2007, afetr pleading guilty to his gun charge, Hafford started serving time in the Piscataquis County jail, in Dover. (308:109) Mr. Hafford was "kind of" surpised to find himself jailing with Michael Easler. (308:109)

No one asked or instructed Hafford to have any conversations with Mr. Easler. While passing time, Hafford and Easler had conversations. (308:109)

Defense counsel objected to the anticipated testimony from Hafford in which he claimed that Easler made statements against interest that implicated himself and Pelletier.[5] The Government asserted that the statements were admissible as statement's against Easler's penal interest. Moreover, the statements were not testimonial in nature because they were not made to law enforcement personnel. They were "[j]ust conversations between a couple of friends in jail." (308:110)

Defense counsel started to object on hearsay grounds because the statements were not made in furtherance of the conspiracy if Easler and Pelletier were both in jail, but he hadn't thought about the statements being against

---

[5] In light of the forthcoming arguments, Mr. Pelletier has no trouble asserting that Hafford threw Easler's name into the legal arena for the sake of convenience, to both reinforce his own credibility and to provide himself with another stooge to testify against.

penal interest and withdrew the objection. (308:111)

The Government added that a "statement against penal interest can be admissible against somebody who was a stranger to the conversation." (308: 111)

Defense counsel countered that the exception did not apply to jail inmates, because "there are reasons why somebody might bluff or puff or exaggerate things." (308:112)

A law clerk gratuitously pointed out that the declarant had to be unavailable pursuant to the rule. Defense counsel then agreed that Easler was unavailable (a subject of later discussion) because Easler's lawyer indicated Easler had no interest in testifying and that he would plead the Fifth if called. The prosecutor confirmed that he had had "extensive discussions" with Easler's attorney and Easler refused to testify or waive his Fifth Amendment privilege, which rendered him unavailable. (308:113)

Defense counsel admitted that he had not read the case that the prosecutor cited in support of his argument but nevertheless persisted in his objections. (308:114)

The court overruled the objections. (308:114)

Easler told Hafford that he was in jail for trafficking. Without any objection or curative instruction, Hafford stated that Easler told him that he, Easler, used to work for Pelletier as a swimmer. Easler did not state exactly how much marijuana he was bringing into the country, but he used to bring in the same size  duffel bags as Hafford. (308:115) During an unknown year, Easler swam the dope from "spring time until there was ice in the water." (308:116)

Mr. Easler (even while knowing Hafford would be testifying against

Pelletier,  and thus presumably might testify against him) told Hafford that he went across the border, got one of the shipments of marijuana, stole that, then went down to Portland and collected around $50,000 from John Pascucci, the took off to his mother's home in Oklahoma. (308:116-17)

Easler clarified that he actually stole $110,000 from Pelletier.[6] He next told Hafford that Mr. Pelletier told him that he, Pelletier, was delivering marijuana to Rocky Fogg and John Pascucci. (308:117)[7]

Hafford was using a telephone that was in the name of Kevin Peers or Vicki Cochran, whom Hafford lived with before moving into Mr. Pelletier's camp. (108:120)


Now it gets interesting. And fun.

During cross-examination, Hafford acknowledged that he was testifying under a grant of immunity pursuant to a plea agreement that would be breached if the Government could prove he lied under oath. (308:123) However, even after Mr. Hafford <u>admitted</u> that he lied to the grand jury and "exaggerated" about a few things (308:165-67), Mr. Hafford was never prosecuted for his perjury, nor did the Government seek to have him resentenced. Indeed, Mr. Pelletier believes that the Government sought a further sentence reduction

_____

[6]Assuming that there were two duffel bags containing 60 ponds of pot, purchased at the wholesale price of $60,000, and further assuming Easler actually collected $50,000 from Pascucci, the total price of the alleged theft comes to $110,000.

[7]The record makes it abundantly clear that Mr. Pelletier never person-ally delivered marijuana to anyone. (308:148, 162) However, this perjury is trivial given the stupendous magnitude of Hafford's other lies. It must be noted that no one but Hafford testified that this theft even occurred.

after he testified against Mr. Pelletier. The Petitioner thinks it is time for the Government to convene another grand jury.

Hafford was arrested on April 2, 2006, for using a firearm to shoot two moose, and it wasn't too long before he started raving about drugs that were being smuggled across the border. (308:134)

On April 18, 2006, Hafford signed a proffer agreement that required him to disclose his involvement in any criminal activity. At that time, he had not been charged with any drug offense. (308:135-37)

When Hafford and Pelletier jailed together in Windham, the talks they had did not involve drugs. (308:138-39) Pelletier could have been offering him a legitimate job, and Hafford actually cut timber for him. (308:139)

Pelletier told Hafford that Easler had stolen $310,000 from him. (308: 140)

When Pelletier's truck was searched by border patrol, Hafford was already in Canada. Pelletier picked him up two hours later and told him what happened at the border. (308:143) (How Pelletier, a four-time drug-trafficking loser prior to this trial, could evade being detained for trying to cross the border--a problem that Hafford allegedly avoided by hiding in the back of Pelletier's pickup truck--was not discussed.)

Hafford only swam money across the river twice. (308:145)

Defense counsel was aware that Hafford had testified against Archie Ladner and he actually cross-examined Hafford using that trial testimony. (308:153)

Once, Mr. Hafford swam 25 kilograms of cocaine into Canada that had nothing to do with Mr. Pelletier. Hafford set that deal up on his own and did not tell Pelletier about it because "[h]e didn't want nothing to do

-13-

with cocaine." (308:154)

During this time Hafford had his own customers that he was dealing with. (308:156)

Some weeks Hafford would not sell any pot at all, but on average he was selling $100,000 worth per week. (308:157) However, he was only making that kind of money the last two or three months before he went to jail. (308:157-58) Any business that involved Mr.Pelletier was over by Christmas. (308:158)

Mr. Hafford did not know how many trips he made back and forth across the river for Pelletier. (308:162) He estimated that he brought 1000-1500 pounds of marijuana into the country, but that was a rough estimate. (308: 163).

Hafford may have testified in the Ladner trial that he perhaps made more than $500,000 selling marijuana, but not all of that money came from working for Mr. Pelletier. (308:163)

Defense counsel was aware that Mr. Hafford testified before the grand jury and cross-examined him about some of that testimony. (308:164-65)

Hafford told the grand jury that he would swim the river at least once a week and sometimes as many as seven days a week. (308:165) However, Hafford admitted that he "exaggerated some things[,]" including the number of times he swam the river. (308:165-66) Hafford, in fact, never swam the river seven times in a week. (308:166)

Despite his lack of swimming skills, Hafford believed that he could swim more than 220 pounds of pot across the river at one time. However, the most he ever actually swam at one time was 120 pounds (a figure that Mr. Pelletier vigorously disputes). (308:166) Not all of that marijuana

was for Mr. Pelletier. Id.

Mr. Hafford, shockingly, or maybe not, admitted to further exaggerating to the grand jury when he claimed to have swum money across the river ten times: it was actually two times. (308:167)

He further lied to the grand jury when he claimed to have met Pelletier at the Presque Isle Wal-Mart parking lot two days after he got out of jail: it was actually closer to two weeks. (308:168)

He admitted that he might not have correctly identified Mr. Caparotta, one of Pelletier's alleged coconspirators Hafford claimed to have had drug dealings with, when he was in front of the grand jury. (308:169)

Mr. Hafford never got a look at the money he was swimming across and could not say if it was Canadian or American. (308:169) (Or Chinese yen, for that matter.)

Hafford, ever the go-getter, was also dealing methamphetamine. (308: 172)

On the two occasions that Hafford swam the money, he also obtained marijuana for himself; three bags the first time, 60 pounds the second time. (308:181)

Hafford clarified that he did not actually know Tony Caparotta; he only knew of him and claimed to have sold pot to Caparotta through yet another unnamed person. (308:183)

After Mr. Pelletier went to jail, Mr. Hafford never crossed the river again; instead, he hired other people to swim for him. (308:185)

It is now necessary for Mr. Pelletier to recount Mr. Hafford's tes-

-15-

timony in <u>United States v. Archie Ladner</u>, Case No. 06-79-B-9, on April 19, 2007, approximately four months before he testified against Pelletier. That transcript is attached hereto and incorporated by reference as Petitioner's Exhibit 2 (PE 2).  Mr. Pelletier, for the sake of brevity, will try to confine his references to those parts of the trial that are the most material to the issue of his guilt or innocence ... and the most entertaining.

In the Ladner trial, Mr. Hafford agreed to cooperate with the United States with the understanding that he could be prosecuted for perjury if he lied. (PE 2:14)

Hafford met Mr. Pelletier while they were serving time at Windham prison together. Pelletier told Hafford that he could "work for him and pretty much sell marijuana" when he got out of jail. (PE 2:15)[8]

Mr. Hafford looked up Mr. Pelletier when he got out of jail. They met at the Presque Isle Wal-Mart. Kendra Cyr was with Pelletier but she went inside the store. (PE 2:15-16) Archie Ladner was with Hafford. (PE 2:16) Hafford told Ladner that Pelletier was supposed to put him to work doing something, but he didn't know what kind of work he would be doing. (PE 2: 17) Mr. Ladner went inside the Wal-Mart to use the bathroom while Hafford

---

[8]During Pelletier's trial, Hafford admitted that when he and Mr. Pelletier jailed together, the conversations they had did not involve smuggling drugs. (308:138-39)

and Pelletier talked. (PE 2:17-18)

Pelletier and Hafford talked about a guy named Mike Easler and the possibility of Hafford muling weed across the border. Pelletier needed someone to swim across the river. Pelletier wanted to find Easler because he ripped Pelletier off for a lot of money. (PE 2:18)

Ladner returned from the bathroom and was introduced to Pelletier. Mr. Ladner was conveniently not present when Hafford and Pelletier were discussing Hafford's employment opportunities. (PE 2:20) However, Hafford related Pelletier's pot smuggling proposal to Ladner on the way back to Ladner's house. (PE 2:21)

Eventually, Hafford was crossing the river with marijuana "at least every other week." (PE 2:29) He had done it more than once in a week. (PE 2:29)

Mr. Pelletier would conceal drug money in the depths of his wheel-chair cushion. He would drive the money into Canada, where it would be traded for the drugs Hafford would swim into America. That practice changed when Customs agents searched Pelletier's vehicle. After that, Hafford started swimming the money across into Canada, exchange it for the weed, then swim the weed back into the United States without hardly pausing for breath. (PE 2:32-33)

Mr. Hafford claimed that he was with Mr. Pelletier when he paid $50,000 in cash for a piece of property that he put in Rick Daigle's name. (PE 2:50) Compare with (308:98-99) Hafford claimed also to have been present when Pelletier purchased purebred showhorses with cash. (PE 2:51)

During the time that he worked for Mr. Pelletier, Hafford was

-17-

was smoking a lot of marijuana and methamphetamine. (PE 2:75)

Hafford owned a 1994 teal green Thunderbird that he drove even though he did not have a driver's license. (PE 2:56)

This drug usage undoubtedly was the cause of Hafford's sudden memory problems regarding what he may or may not have told law enforcement and the grand jury. (PE 2:89-96) Nevertheless, Hafford had total recall about the conversations that occurred between himself and his "coconspirators" three years earlier while smoking refer and meth on a regular basis. (PE 2:97)

In a stellar display of ineffectiveness, Pelletier's attorney failed to cross-examine Mr. Hafford about the most remarkable statement Hafford made in Ladner's trial. There, Hafford--under oath, mind you--testified that Mr. Pelletier never told him that Pelletier had other people swim the river before Hafford (brace yourself) ... "because he never used to do it that way before." (PE 2:97)[10]

When asked how Mr. Pelletier used to smuggle marijuana into America before the ingenius Mr. Hafford came along, the enterprising lad serenely replied, "I have no idea. He just was talking about selling a lot of dope." (PE 2:98)

More? OK. Hafford next claimed that Pelletier agreed to put him to

_____

[10]Hafford, of course, testified at Pelletier's trial that Easler told him that he used to work for Pelletier as a swimmer. (308:115) Indeed, Mr. Hafford claimed that he used Easler's wetsuit to swim the river before Mr. Pelletier bought him a new one. (308:77, 116) Given that Pelletier had a rather large pond on his property and was paralyzed, defense counsel could have raised the possibility that the MantaRay scooter was purchased to help navigate his own waters and the wetsuit was likewise Pelletier's. This is what happens when defense counsel fails in his duty to properly cross-examine a Government witness. Ladner was primarily acquitted because his lawyer shredded Hafford on cross-examination, and the Government helped Hafford refine his testimony for Pelletier's trial.

work selling pot while they were in jail together. (PE 2:99) Hold the phone, Joan: This was the exact opposite of what Hafford testified to in Mr. Pelletier's trial. (308:138-39) Thank God for lying Government star witnesses.

Anyway, Hafford acknowledged that he told police that Pelletier was sitting on $180,000 in cash when he had his close call with the Customs agents, but in real life, Hafford did not know how much money Pelletier was sitting on. (PE 2:100)

During his direct examination, Hafford kinda neglected to mention he used a soda can as a signal for Ladner to pick him up after swimming the river. (PE 2:101) He also failed to disclose the fact that he swam 25 pounds of coke across the river. (PE 2:102) Speaking of which ...

Hafford crossed the border with Pelletier eight to ten times. (PE 2: 103) During one of his smuggling missions, Hafford took 25 pounds of coke into Canada. He was paid half a pound of coke for the trip.

Q Okay. Did you exchange the coke for pot?

A No.

Q What did you get in return for the coke?

A That wasn't my deal.

Q Who--

A I did that for somebody else. That was for Steve from Connecticut, the guy I did the first couple of runs for, and I was just going over to get dope for Mike, and I had made extra money taking the coke across.

(PE 2:104-05)

-19-

At Mr. Pelletier's trial, however, Mr.Hafford testified that he traded some of the cocaine for marijuana, then took the rest, placed it in a bowl, and had a party. (308:155) Defense counsel failed to cross Mr. Hafford on this point, and the Government, just as it did when Hafford testified that Easler had the swimming position before Hafford, failed to correct thisperjured testimony. This argument will be more fully explored later in this petition.

Mr. Hafford's memory became cloudy again when discussing who might when discussing who might have refreshed his testimony prior to trial with his grand jury testimony. (PE 2:135-38)

Hafford told Ladner's jury that Mr. Pelletier was on the Canadian side of the border each and every time Hafford went over to pick up marijuana. (PE 2:157) Hoever, we know this is not what he testified to in Pelletier's trial.

The paragon of candor exaggerated about how many guns Mr. Ladner had, but he was only off by several dozen guns. (PE 2:171-72)

Here's a major whopper: Mr. Hafford told Ladner's jurors that Pelletier never provided Hafford with any maps so he'd know how to locate people. Indeed, Pelletier never gave Hafford any maps at all. (PE 2:183) Naturally, this does not correspond with his testimony in Pelletier's trial. Defense counsel never obtained a handwriting specialist to verify that the documents Hafford produced were not written by Pelletier. This was an especially egregious omission given that Hafford had trouble distinguishing his handwriting from  Pelletier's (PE 2:60), even though Hafford claimed to be familiar with Pelletier's handwriting. (PE 2:57)

Let us turn now to the relevant portion of Mr. Hafford's grand jury testimony, which is attached hereto and incoporated by reference as Petitioner's Exhibit 1 (PE 1).

Mr. Hafford testified that he and Mr. Pelletier were in Windham jail together. Pelletier told Hafford that he could put him to work doing something when Hafford got out of jail. (PE 1:5)

Within three days of being released from jail, id., Hafford met Mr. Pelletier at a Wal-Mart in Presque Isle. (PE 1:6) Pelletier offered him a job swimming marijuana across the St. John river. Id. Hafford swam the river for the first time the very next night. (PE 1:7)

In this version, Hafford had been working for Pelletier for about two months when he began swimming the river both ways. (PE 1:10) Of course, during Pelletier's trial, Hafford switched up and said it was during the last two months before Pelletier went to jail, following his near miss with the border patrol, that Hafford began making the roundtrip. (308:80-82) Defense counsel failed to cross-examine the star witness on this point, and the Government apparently felt no need to correct the conflicting testimony.

Hafford told the grand jury that he was making the trip to Canada "[a]t least once a week, sometimes seven days a week." (PE 1:11) We now know, of course, that this was an "exaggeration." (308:165-66)

Hafford claimed to have smuggled 2000-2500 pounds of marijuana for Mr.Pelletier (PE 1:15), but by the time of Pelletier's trial, the United States got Hafford down to 1000-1500 pounds, some of which was Hafford's own weed. (308:83)

Once again, Mr. Hafford claimed to have been present when Pelletier

-21-

gave Rick Daigle $50,000 in cash to purchase what was known as the Lavertu Settlement. (PE 1:25-26) In this version, the money changed hands in the parking lot, and the lawyer's name was Pelletier. (PE 1:26) The main problems with this testimony (notwithstanding the fact that the lawyer's name was nowhere close to being Pelletier) is that no one--not the realtor, not the lawyer, and not Rick Daigle--ever testified that Mr. Hafford was present during this transaction. Mr. Pelletier (who cannot in good faith, given the overwhelming amount of evidence against him on the structuring charge, deny that the transaction took place) submits that Hafford was not present when this deal went down, and the information Hafford gleaned regarding the transaction came from Mr. Pelletier. Hafford did not have ant firsthand knowledge about the transaction because he was not present.[11]

Because Mr. Hafford's exaggerations, lies, and inconsistencies are too numerous for the average human being to keep track of, Mr. Pelletier has pointed out only the most blatant and material inaccuracies here. Mr. Pelletier reserves his right to point out other lies in the body of this petition and in any traverse to the Government's responsive pleading. Other facts that support Mr. Pelletier's arguments for relief will be set out herein.

---

[11] Hafford had a great propensity to take information garnered from parties to certain events and present the events to law enforcement as a way to enhance his credibility. The majority of the information Hafford had about certain events came directly from Mr. Pelletier. Mr. Hafford would then twist the information to suit his need to appease the Government and to solidify his drug-jellied memories.

<u>(iii) ARGUMENT</u>

<u>ISSUE I</u>

Whether the district court deprived Mr. Pelletier of his Fifth

Amendment right to due process and his Sixth Amendment right to

a fair trial by selecting the juror foreperson?

Before the jury was sworn, and without defense objection, Judge Wood-

cock asked Juror ███████ if she would be willing to be the forelady of

the jury. (518:2) Ms. ███████ agreed. (518:3)

Mr. Pelletier makes the seemingly novel argument that he was denied

his Fifth Amendment right to due process and Sixth Amendment right to a

fair trial when the judge selected the foreperson.[12]

The United States Constitution guarantees a criminal defendant the

right to "a fair trial by a panel of impartial, indifferent  jurors."

<u>Irvin v. Dowd</u>, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1981).

The Petitioner was entitled to "a jury capabale and willing to decide the

case solely on the evidence before it." <u>McDonough Power Equip., Inc. v.</u>

<u>Greenwood</u>, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984)

(citation omitted).

Mr. Pelletier contends that Ms. ███████ became a surrogate of the

trial judge that selected her, and that the remaining jurors, aware of

---

[12]The judge's selection of Ms. ███████ appears to have been a purely
random impulse, even though he did not explain his reasoning for the choice
of Ms. ███████ or the decision to select the foreperson. Mr. Pelletier does
not ascribe any evil motive for utilizing what appears to be a common
practice in this circuit. The judge was fair and impartial throughout the
trial and he should not find Pelletier's arguments to be a personal attack.

the seeming favortism, gave more weight to Ms. ███████ utterances and opinions regarding Mr. Pelletier's guilt or innocence that they would have without the judge's appointment. For her part, Ms. ███████ verdict may have been based on her perceptions and observations of the judge during trial. Stated differently, if Ms. ███████ perceived the judge's rulings on objections and motions to have been against Mr. Pelletier, this might have influenced her to vote for a guilty verdict. Ms. ███████ could have taken a mundane ruling  that was adverse to Mr. Pelletier and conveyed to the jurors that the ruling was proof of guilt (notwithstanding any instruction to the contrary). The jurors, cognizant of Ms. ███████ favored position, would naturally be inclined to adopt her reasoning.

Mr. Pelletier is cognizant that there is no federal statute, rule, or case that forbids the practice of a judge appointing the foreperson and that district judge's in the First Circuit routinely select the foreman. See United States v. Cannon, 903 F.2d 849, 857 (1st Cir. 1990) (no error for the judge to select foreperson **at the close of evidence** and taking judicial notice that is customary for district judges in the circuit to do so). Mr. Pelletier, however, submits that there is no federal statute or rule that expressly authorizes the practice.

Cannon is inapposite to the instant case for a variety of reasons. First, Cannon did not advance Pelletier's arguments. Also, unlike the district judge in Cannon, Judge Woodcock appointed Ms. ███████ before the jury was even sworn, long before the other jurors could evaluate her character without benefit of the judge's seeming favoritism. The judge's early selection of Ms. ███████ amounted to, in the jury's eyes, a voucher or her character, wisdom, and judgment.[13]

-23-

Pelletier further argues that defense counsel's failure to object to the judge's appointment deprived Petitioner of due process and a fair trial. Counsel's failure to o bject constituted a waiver of the issue and deprived Mr. Pelletier of meaningful appellate review of the issue on his direct appeal. The trial judge invaded the province of the jury when he appointed Ms. ███████ as the court's surrogate, and reasonably competent counsel would not have failed to interpose an objection.

Naturally, Mr. Pelletier is aware that federal law expressly allows a district judge to appint one **grand juror** as foreperson and another **grand juror** as deputy foreperson in a grand jury proceeding. See Fed. R. Crim. P. 6(c). However, the grand jury is an <u>accusatory</u> body and not an <u>adjud-icatory</u> body. See <u>In re Grand Jury Proceedings</u>, 219 F.3d 175, 189 (2nd Cir. 2000) (observing that the grand jury "is an accusatory body under the (almost) complete control of the prosecutor").

Because Mr. Pelletier was denied his Fifth Amendment right to due process and his Sixth Amendment rights to a fair trial with the effective assistance of counsel, the court should grant him a new trial.

---

[13] The jury selection proceedings were not transcribed. Mr. Pelletier presently is unable to comment on her qualifications to sit as a juror much less as the forelady. He therefore reserves the right to comment on her qualification if discovery is necessary to traverse the Government's reply.

## ISSUE II

Whether or not Mr. Pelletier was denied his Fifth Amendment right to due process and his Sixth Amendment right to a fair trial when the district judge permitted the jurors to separate on multiple occasions (including overnight and over a weekend) without extra admonishment.

---

Before the festivities commenced, Judge Woodcock gave the jurors exhautive instructions on how they should conduct themsekves throughout the trial. The jury was admonished: (1) not to talk about the case or anyone involved in the case amongst themselves until they retired to deliberate; (2) not to talk about the case with anyone else; (3) not to let anyone talk about the case with them; (4) not to speak to any of the parties, the lawyers, or the witnesses; (5) not to listen to or read any articles or stories or articles about the case; (6) not to conduct any research about the case; (7) not to directly speak to the judge; (8) to listen closely to the testimony; and (9) to keep an open mind until all of the evidence has been received. (518:17-19)

After Kendra Cyr testified, Judge Woodcock pointed out that there was a reporter for the Bangor Daily News present in the courtroom. (399:190) The judge again admonished the jury not to conduct research or listen to or read any news accounts of the trial. (399:190-91) The judge then told the jury:

> Now, I'm not going to every night go through this. You've already heard what I've had to say about your obligations as jurors, your obligation not to talk about the case, and that's what I'm going to tell you each day. Keep an open mind, that's what I'm going to tell you. Don't do any research. Don't read the Bangor Daily News or listen to the radio, or if you begin

to hear something on the radio, turn it off. If it's reported on the TV, shut it off, quick mute. I'm not going to say this to you every day.

(399:192)

True to his word, the judge permitted the jurors to separate on at least **nine** occasions (including once overnight and for a whole weekend) without further admonishment. (307:259; 308:50, 56, 174; 311:64; 312:232; 335:90, 98, 203)

Mr. Pelletier respectfully submits that he was denied his Fifth Amendment right to due process and his Sixth Amendment right to a fair trial when the judge failed to admonish the jurors in similar fashion as he first admonished them (518:17-19) when they separated, especially for the overnight (312:232) and weekend (307:259) recesses.

There is of course no _per se_ constitutional right for a trial judge to admonish a jury not to discuss the case or avoid media reports of the proceedings. Meggs v. Fair, 621 F.2d 460, 463 (1st Cir. 1980) (citations omitted). However, "[f]or more than a century it has been a common law principle that it is improper for jurors to discuss a case prior to its submisssion to them, a practice that safeguards the defendant's entitlement under the Fifth and Sixth Amendments to the Constitution to a fair trial [by] an impartial jury." United States v. Jadlowe, 628 F.3d 1, 5 (1st Cir. 2010); cert. denied, Jadlowe v. United States, 2011 U.S. LEXIS 2638 (U.S. April 4, 2011).

The First Circuit enumerated several reasons why jury admonishment protects a defendant's rights, Jadlowe, 628 F.3d at 18 (citations omitted), then nicely summarized its reasoning:

-26-

The jury's deliberative process--the collective, objec-
tive review of the evidence of record, evaluated as a whole,
and guided by the court's instructions--may be compromised
as a result of prematurely formed impressions. The potential
harm is unlike the erroneous introduction of a piece of
evidence or a flawed instruction that misstates or omits an
element of the crime.... [P]remature discussion raises the
possibility that the jurors will view all of the evidence
through a distorted lens, much like what occurs when the
jury is improperly instructed on reasonable doubt.... Where
the possibility exists that premature jury discussions
shifted to the defendant the burden of changing by evidence
the opinion thus formed, the possibility exists that the
trial was an unreliable vehicle for determining guilt or
innocence.

Jadlowe, 628 F.3d at 20 (collecting Supreme Court cases) (brackets and
ellipses added).[14]

Mr. Pelletier allegedly was the head of what was possibly the largest
marijuana conspiracy in Maine history (to hear Hafford tell it). The
newsworthy charges against Pelletier and his six-day trial, conviction,
and sentencing were covered nationally by the fourth estate. See samples
of the coverage in the newspapers, attached hereto and incorporated by
reference as Petitioner's Exhibit 3 (PE 3). Mr. Pelletier submits that the
judge's failure to admonish the jurors each time they separated (especially
overnight and for the weekend), coupled with the judge's conflicting and

---

[14] These exact arguments could be applied to Pelletier's complaint
that he was constitutionally disadvantaged by the trial judge's decision
to appoint the forelady, and Petitioner asks the court to apply the
reasoning in Jadlowe to that argument. Again, Mr. Pelletier does not, by
advancing the arguments herein, ascribe any evil motive to the judge's
oversight.

confusing initial instructions (518:17-19), permitted the jury to believe they were allowed to conduct computer research on the case and talk about it with their family members and friends, who in turn interjected their thoughts and opinions into the juror's deliberative process. These impermissible trespasses caused the jurors to form premature conclusions about the case and resulted in impermissible burden shifting. The prejudice to Mr. Pelletier should be presumed since he did not testify on his own behalf and he was the only person who could have corrected the jurors misimpressions.

The judge's failure to continually admonish the jury was not harmless given that the Government's star witness, Adam Hafford, was a self-avowed liar whose perjured testimony went uncorrected (if not encouraged) by the prosecutor.

Under the facts established in Jadlowe, the First Circuit concluded that a defendant claiming juror bias must demonstrate prejudice. That showing must be made in an evidentiary hearing, and "the district court acts with broad latitude in determining the nature and scope of the inquiry it will conduct into the matter." United States v. Rowe, 144 F.3d 15, 20 (1st Cir. 1998) (citations omitted).

Mr. Pelletier asserts that defense counsel rendered ineffective assistance by his failure to object to the jdge's failure to admonish the jury each time they separated, especially overnight and for the weekend. Counsel's omission deprived Mr.Pelletier of his Fifth Amendent right to due process and his Sixth Amendment rights to a fair trial and effective assistance of counsel. Mr. Pelletier requests a new trial on this claim.

-28-

## ISSUE III

Whether or not Mr. Pelletier was denied his Fifth Amendment
right to due process and his Sixth Amendment right to a fair
trial by one juror's nondisclosure, the trial judge's failure
to excuse an ailing juror, and defense counsel's failure to act
on both occasions.

———————————————————————

Two alternate jurors were selected for this trial. (      ) One juror
was excused after he voiced his concerns about his community's possible
reaction to him sitting as a juror. (399:4-9) That left one alternate.

Juror ██████████ had back problems and a note from her doctor asking
her to be excused. The trial judge explained that there was one alternate
left and he asked her to remain on the jury. Ms. ██████ agreed after the
judge promised to take frequent stretching breaks, a promise that the judge
kept. (307:6-12)

Later, an unnamed juror disclosed for the first time that he knew Kendra
Cyr's father. (308:6-7) The trial judge failed to ask the juror anything,
notably, whether the juror's association with Ms. Cyr's father would affect
his ability to remain fair and impartial. The whole problem was simply
swept under the carpet with no inquiry from the attorney's. Id.

A juror must be physically and mentally fit for jury service or the
juror must be excused. See 28 U.S.C. § 1865(B)(4). The Jury Selection and
Service Act sets forth five specific reasons a summoned juror may be
excused by the court. Relevantly, a juror may be excused based on his or
inability to render impartial service (e.g., the unknown juror who knew
Ms. Cyr's father) or when the court determines a juror's service would

-29-

be likely to adversely affect the integrity of the jury deliberations. 28 U.S.C. § 1866(c). No motion by counsel is required. 28 U.S.C. § 1866(c)-(2). The right to due process is satisfied as long as a criminal defendant is tried "before a qualified jury composed of individuals not challengeable for cause." Rivera v. Illinois, 556 U.S. 148, 157, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009).

With respect to allegations of nondisclosure, a party seeking a new trial must demonstrate actual bias or prejudice. The burden of proof must be sustained not as a matter of speculation but as a demonstrable reality. United States v. Levy-Cordero, 67 F.3d 1002, 1016 (1st Cir. 1995)(internal quotations and citations omitted). A defendant making a claim of juror bias must demonstrate actual bias, proof of which usually requires an evidentiary hearing. Smith v. Phillips, 455 U.S. 209, 215-18, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

Mr. Pelletier's attorney did not insist that Juror ▮▮▮▮ be excused because of her medical problems, something Mr. Pelletier would have insisted upon had he known that was an option. Common sense dictates that a person who is in enough pain as to seek out a note from her doctor is in too much pain to focus fully on the facts, the evidence, and the witnesses.

Likewise, defense counsel wholly failed to ask the court to inquire of the unknown juror how he knew Ms. Cyr's father, the juror's feelings about Ms. Cyr's father, and whether this association would affect the juror's ability to remain fair and impartial, among other things. These omissions deprived Mr. Pelletier of a fair trial and his right to the effective assistance of counsel. He is entitled to a new trial on this issue.

-30-

<u>ISSUE IV</u>

Whether the United States deliberately elicited perjured
testimony from Adam Hafford or willfully permitted such
testimony to go uncorrected knowing it was false.

AUSA Joel B. Casey represented the United States at all proceedings relevant to the instant petition. AUSA Casey placed Adam Hafford before the grand jury; examined Hafford during Archie Ladner's trial and Pelletier's trial; and was intimately familiar with every facet of Hafford's testimony. Mr. Pelletier alleges that AUSA Casey deliberately elicited testimony from Mr. Hafford that the Government knew or should reasonably have known was perjurous or willfully permitted such false testimony to go uncorrected, thereby depriving Mr. Pelletier of a fair trial. Pelletier's attorney was ineffective for failing to point out Hafford's material misrepresentations to the court and jury.

It is not humanly possible for one person to catch every lie, half-truth and inconsistency Hafford uttered to the various tribunals, but here follows some of the most material and egregious.

Let us begin with Hafford's grand jury transcript (PE 1).

In this version, Hafford testified that he and Pelletier were in the Windham jail together. Pelletier told Hafford that he could put him to work doing something once Hafford got out of jail. (PE 1:5)

Within three days of being released from jail, <u>id.</u>, Hafford met Mr. Pelletier at a Presque Isle Wal-Mart. (PE 1:6) Pelletier offered him a job swimming marijuana across the St. John river. <u>Id.</u> Hafford swam the river for the first time the very next night. (PE 1:7)

Hafford had been working for Pelletier for about two  months when he

-31-

began swimming the river both ways. (PE 1:10) Of course, during Pelletier's trial, Hafford switched up and said it was during the last two months before Pelletier went to jail, following his near miss with the Customs agents, that Hafford began making the roundtrip. (308:80-82) Defense counsel failed to cross-examine Hafford on this point, and the Government felt no need to correct this inconsistency.

Hafford told the grand jury that he was making the trip to Canada at least once a week and as often as seven days a week. (PE 1:11) We now know that this was an "exaggeration." (308:165-66)

Hafford told the grand jury that he had smuggled between 2000-2500 pounds of marijuana for Pelletier (PE 1:15), but by the time Pelletier went to trial, the United States got Hafford down to a more credible 1000-1500 pounds (the weight needed for a sentence enhancement), some of which was Hafford's own weed. (308:83)

Mr. Hafford claimed to have been present when Pelletier gave Rick Daigle $50,000 in cash to purchase the Lavurtu Settlement property (PE 1: 25-26). In this version, the money changed hands in the parking lot, and the lawyer handling the deal was named Pelletier. (PE 1:26) Not only was the lawyer's name not Pelletier, but no one--especially the realtor, lawyer, Rick Daigle, or Mr. Pelletier--ever testified that Hafford was present when this deal went down.

The lies became more damning when Hafford testified at the Ladner trial (PE 2). Hafford testified that he met Pelletier while they were doing

-32-

time at Windham. Pelletier told Hafford that he could "work for him and pretty much sell marijuana" when he got out of jail. (PE 2:15) By the time of Pelletier's trial, Hafford admitted that the conversations he had in jail with Pelletier did not involve drugs. (308:138-39)

Hafford looked Pelletier up when he got out of jail. They met at the Presque Isle Wal-Mart. Kendra Cyr was with Pelletier, but she went inside the store. (PE 2:15-16) Archie Ladner was with Hafford. (PE 2:16) Hafford told Ladner that Pelletier was supposed to put him to work doing something, but he didn't know what kind of work he would be doing. (PE 2:17) Ladner went inside the store to use the bathroom while Hafford and Pelletier talked. (PE 2:17-18)

They talked about a guy named Mike Easler and the possibility of Hafford muling weed across the border. Pelletier needed someone to swim the river. Pelletier wanted to find Easler because he had stolen a lot of money from Pelletier. (PE 2:18)

Ladner returned from the bathroom and was introduced to Pelletier. Mr. Ladner (who is now deceased) was not present when Hafford and Pelletier were discussing Hafford's employment opportunities. (PE 2:20) Hafford related Pelletier's pot smuggling proposal to Ladner on the way back to Ladner's house. (PE 2:21)

Hafford was crossing the river with marijuana at least once every week and sometimes more than once a week. (PE 2:29)

Mr. Pelletier would hide drug money in the depths of his wheelchair cushion, where it would then be driven into Canada and exchanged for the drugs Hafford would swim back into the United States. That practice was changed after Customs agents searched Pelletier's vehicle. (How Pelletier,

-33-

a four-time loser, was not taken into custody for trying to cross the border was not explained.) Following the search, Hafford began swimming the money into Canada then swam the drugs back into the United States. (PE 2: 32-33)

Hafford claimed that he was present when the property deal went down and that he was also present when Pelletier purchased purebred showhorses for cash. (Pe 2:50-51; cf., 308:98-99)

During the time Hafford worked for Pelletier, Hafford was smoking a lot of marijuana and methamphetamine. (PE 2:75) This drug usage undoubtedly contributed to Hafford's inability to recall what he might have told law enforcement personnel and the grand jury. (PE 2:89-96) Nevertheless, Mr. Hafford had total recall about the conversations that allegedly transpired between himself and his "coconspirators" three years ealier while smoking marijuana and meth on a regular basis. (PE 2:97)

In an unforgiveable display of ineffectiveness, defense counsel failed to cross-examine Hafford about the most remarkable claim Hafford made during the Ladner trial: There, Hafford testified under oath that Pelletier never told him that he (Pelletier) had other people swimming the river before Hafford came along, "because [Pelletier] never used to do it that way before." (PE 2:97) At Pelletier's trial, of course, Hafford testified that Michael Easler used to work for Pelletier as a swimmer. (305:115) Indeed, it was allegedly Easler's old wetsuit that Hafford wore until Mr. Pelletier bought him a new one. (308:77, 116) Mr. Pelletier never bought any swimming equipment for Hafford. Pelletier owned a large lake, and the equipment he purchased was for his personal use.

When asked how Mr. Pelletier used to smuggle marijuana into the

-34-

country before Hafford came along, he serenly replied, "I have no idea. He just was talking about selling a lot of dope." (PE 2:98) The Government, of course, made no effort to correct this obviously perjured testimony when it was served up at Pelletier's trial.

And let's not overlook the fact that Hafford testified at Ladner's trial that Peletier agreed to put him to work selling weed while they were in jail together (PE 2:99), but testified to the exact opposite at Mr. Pelletier's trial. (308:138-39)

Hafford admitted that he told police that Pelltier had been sitting on $180,000 in cash when he had his close encounter with Customs, but in real life, Hafford had no idea how much money Pelletier had been sitting on. (PE 2:100)

Hafford claimed that he crossed the border with Pelletier eight to ten times. (PE 2:103) During one of these smuggling excursions, Hafford took 25 pounds of cocaine across the border into Canada, for which he claims he was paid half a pound of coke. Or something.

Q Okay. Did you exchange the coke for pot?

A No.

Q What did you get in return for the coke?

A That wasn't my deal.

Q Who--

A I did that for somebody else. That was for Steve from Connecticut, the guy I did the first couple of runs for, and I was just going over to get dope for Mike [Pelletier], and I had made extra money taking the coke

across.

(PE 2:104-05)

At Pelletier's trial, without Government correction, Hafford testified that he traded some of the cocaine for marijuana, then took the rest, put it in a bowl, and had a party. (308:   ) Defense counsel failed to cross-examine Hafford on this point.

Alas, Mr. Hafford's memory clouded up again when discussing who might have rehearsed his trial testimony using his grand jury testimony. (PE 2: 135-38)

Hafford told the Ladner jury that Pelletier was on the Canadian side of the border each and every time Hafford went over to pick up marijuana. (PE 2:157) We now know, however, that this testimony was not consistent with his testimony in Pelletier's trial.

Hafford ever lied about how many guns Ladner had. (PE 2:171-72)

At Ladner's trial, Mr. Pelletier never provided Hafford with any maps so he would know how to locate people. Indeed, Pelletier never gave Mr. Hafford any maps at all. (PE 2:183) By the time of Pelletier's trial, Mr. Pelletier allegedly provided Hafford with maps so detailed as to be the envy of Google. (308:   ) Naturally, the Government did not bother to correct this inconsistent testimony, and defense counsel never crossed Hafford on the point.

A prosecutor's knowing use of perjured testimony is one of "the classic grounds for the issuance of a writ of habeas corpus." Rose v. Lundy, 455 U.S. 509, 544, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982) (Stevens, J., dissenting). If the prosecution case included prejured testimony that the Government knew or reasonably should have known was false, and that false

-36-

testimony was material to the issue of the defendant's guilt or innocence, the prosecutor's failure to correct the perjured testimony will result in a new trial. See Ouimette v. Moran, 942 F.2d 1, 11 (1st Cir. 1991) and the Supreme Court cases cited therein.

Here, the same prosecutor was present for Hafford's testimony before the grand jury and the Ladner and Pelletier trials. AUSA Casey knew or should reasonably have known that Hafford was lying yet failed to make even one single correction or clarification. Mr. Pelletier was denied a fair trial by the Government's misconduct as well as defense counsel's failure to catch the glaring inconsistencies.

Of additional concern is the fact that Hafford's testimony was used to calculate drug weight, which in turn led to Mr. Pelletier receiving a life sentence. When drug quantity is used to obtain an enhanced sentence, the quantity of the drugs becomes an element of the offense. Jones v. United States, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999); Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). An enhanced sentence cannot stand when it is based on the perjured testimony of a Government witness. Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). The court has already recognized that Hafford's lies necessitated resentencing in John Pascucci's case, 664 F. Supp. 2d 128, and it should do no less for Mr. Pelletier following any unsuccessful retrial. In the interim, because Hafford testified pursuant to an agreement that resulted in a reduced sentence or two, and Hafford clearly failed to fulfill his obligation to testify truthfully, the court and the United States may wish to consider resentencing in his case as well.

## ISSUE V

Whether defense counsel rendered ineffective assistance
when he failed to object to the introduction of tape
transcripts and recordings

The United States introduced, without defense object, taped conversations purporting to be between Mr. Pelletier and MDEA Agent John Darrell Ouellette. The conversation was in French. Agent Ouellette was pretending to be a person who stolen marijuana from Mr. Pelletier, not realizing who the drugs belonged to and, now armed with that knowledge, wanted to do the right thing and return the drugs. (311:121-26)

The Government provided what purported to be English language translations of the conversations. Defense counsel never had his own transcripts made. He did not question the accuracy of the Government's transcript. There was no mention of whom made the translation and under what conditions, what the translator's qualifications were, and the transcripts were not authenticated. The transcripts accompanied the jury during their retirement to deliberate without objection. Defense counsel rendered ineffective assistance.

The use of a transcript as a jury aid is left to the sound discretion of the trial judge. United States v. DeLeon, 187 F.3d 60, 65 (1st Cir. 1999) (citation omitted). The First Circuit has recognized the importance of ensuring that a transcript offered for use as a jury aid be authenticated by testimony as to how they were prepared, the sources used, and the qualifications of the person who prepared them. Id.

-38-

(citations omitted). "We will not require trial judges to screen tran-
scripts and to make objections where the parties themselves have raised
none; we leave such advocacy to counsel." Id. (footnote omitted)

Defense counsel's passive acceptance of this evidence was not in
the least harmless. The point of introducing these transcripts and the
recordings was to stack inference upon inference to prove Pelletier's
guilt. The United States intended to show the jury that Pelletier went
to the rendezvous set up by Agent Ouellette in order to retrieve the
marijuana allegedly stolen from him, thus showing Pelletier had a
propensity for selling pot, thus, he must be in a conspiracy to traffic
marijuana.

The tapes were of a conversation in French. It is not known how many
of Mr. Pelletier's jurors spoke or understood French, but he would be
willing to wager that not all of them did. Defense counsel permitted
the Government to introduce its own translation of what the conversation
was about with no effort to contradict the United States. Indeed, Mr.
Pelletier does not know if defense counsel even bothered to read the
transcript prior to trial. No reasonable attorney would have allowed
such damaging testimony to go unremarked without at least obtaining his
own translation of the tapes. Mr. Pelletier is entitled to a new trial
on this issue.

ISSUE VI

Whether defense counsel rendered ineffective assistance
for failure to investigate the law regarding introduction
of hearsay testimony under FRE 804(b)(3) and for
conceding that Michael Easler was not available to
testify at Mr. Pelletier's trial?

---

Adam Hafford testified that certain conversations transpired in jail
between himself and Michael Easler regarding Mr. Pelletier. Defense
counsel objected to these alleged conversations, which were overruled
following sidebar discussion. (308:109-115) The trail judge held that the
alleged statements were admissible as being against penal interest. (308:
112-114) During the bench conference, a law clerk gratuitously mentioned
that under FRE 804, the declarant had to be unavailable. (308:113)

The government stated that Mr. Easler was unavailable for trial in
that, if he were called, Easler would simply "plead the Fifth." Defense
counsel conceded that Mr. Easler was unavailable, and Mr. Pelletier now
claims that it was his attorney who was unavailable for trial.

The Government was in contact with Easler's attorney, and it was the
prosecutor's contention that Easler would "refuse to testify, refuses
to waive his Fifth Amendment privilege, and I have a confirmatory email
from [Easler's attorney] from last week on this very point, and that
constitutes unavailability under the meaning of [FRE 308(b)(3)], Your
Honor." (308:113) Defense counsel inexplicably concurred with this
flawed legal position.

The assertion of privilege against self-incrimination does not
axiomatically render the witness unavailable. See Hoffman v. United

-40-

States, 341 U.S. 479, 486 (1951) (citing Rogers v. United States, 340
U.S. 367 (1951) ("Assertion of the Fifth Amendment does not exonerate
person claiming privilege from answering.")).

> A witness is not exonerated from answering merely because
> he declares in doing so he would incriminate himself. It
> is for the court to say whether his silence is justified,
> and to require him to answer if it clearly appears to the
> court that he is mistaken.

Hoffman, 341 U.S. at 486.

The Court further noted that "this protection must be confined to
instances where the witness has reasonable cause to apprehend danger
from a direct answer." Id.

In the present case, defense counsel made no effort to call Easler
to testify, even after Mr. Pelletier vigorously informed counsel that
these alleged conversations implicating Pelletier ever took place
between Hafford and Easler. Defense counsel objected on hearsay grounds
to Hafford's fictitios conversation, then turned right around and
stipulated that Easler was not available to trial, nullifying his prior
objection, thereby impliciting agreeing with the United States's flawed
arguments. Defense counsel then failed to effectively challenge the
Government's introduction of hearsay testimony through Hafford, it's
star perjurer. In order for the hearsay statements of a coconspirator to
be admissible under FRE 804(b)(3), the Government had the burden of
demonstrating: (1) Easler was, in fact, unavailable; (2) that the
statements made by Hafford and attributable to Easler were genuinely
adverse to Hafford's penal interest; and (3) corroborating circumstances
clearly indicate the trustworthiness of the statement. Id.

Here, nothing out of Hafford's mouth was reliable. The man even

-41-

admitted lying to the grand jury. Mr. Hafford is the kind of subservient Government puppet who would have sworn under oath that he spotted Elvis flying a UFO down Main Street if that is what the Government wanted him to say :. This clown insinuated himself into situations where no one else testified he was present, allegedly sold dope to people that he could not identify to the grand jury, then claimed at the Ladner trial that he was the one who came up with the swimming-the-river scheme only to turn right around and testify at Mr. Pelletier's trial that Easler told him that he used to swim the river for Pelletier.

No reasonable attorney would have serenely allowed the Government to spout authority and rules unchecked. No rational lawyer would have permitted an avowed liar start trotting out alleged conversation between himself and another person without attempting to secure the other man's presence at trial. Especially when that other man, Easler, was someone that Pelletier alllegedly asked Hafford to locate for stealing money from him.

The Government attempted to characterize these conversations as being among jailhouse friends (308:115), but their putative relationship was not relevant to the determination as to whether Easler's alleged statements were against Hafford's penal interests. United States v. Lang, 589 F.2d 92 (1st Cir. 1972).

A reasonable attorney would have at least called Easler to see if he even knew who Hafford was. Counsel's omissions permitted the jury to find Mr. Pelletier guilty of his charges and allowed the court to find Pelletier responsible for more than 1000 kilograms of marijuana. No possible claim of "trial tactic" could survive scrutiny when counsel's

-42-

deficient performance resulted in a life sentence for Pelletier.

Had defense counsel investigated the law in relation to the facts, and vice versa, he would not have been at the Government's mercy. There was absolutely no independent corroberating evidence to support any of the alleged statements made by Easler to Hafford. Indeed, were it not for his extensive police record and fingerprint confirmation, Pelletier would not even trust the man to give his real name. Other than Hafford's word about the alleged conversations he had with Easler and a correction-al officer's testimony that Hafford and Easler were in a cellblock ]together, there is not one shred of evidence that the two men ever had a single conversation in their lives. Hafford obviously created situations where no previously existed in order to give himself something to plea bargain with. This man inserted himself into situations he never witnessed and claimed to have sold drugs to people he couldn't even identify before the grand jury, in order to increase his value to the Government.

In determining whether there were corroborating factors sufficient to justify a finding of trustworthiness, one must consider: (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement; (2) Hafford's motive in making the statement and whether there was a reason for the declarant to lie; (3) whether Hafford repeated the statements and did so consistently; (4) the party or parties to whom the statement was made; (5) Hafford's relationship with Pelletier; and (6) the nature and strength of independent evidence relevant to the conduct in question. See United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995). Sub judice, Mr.

Hafford had been indicted on various charges and clearly was predisposed toward helping the  government. Hafford actually told the Government in a letter to put him in, coach, let me extend my friendship the way you have extended yours. Given that Hafford allegedly told Easler that he was testifying against Mr. Pelletier, it is highly unlikely that Easler (who was no stranger to jail) would have told this rat anything that Hafford could use against him. And why, of the several hundreds of inmates that Easler was in jail with, would Easler ever confide **solely** with a snitch and no one else?

No rational, reasonably competent attorney would have sat back and accepted the Government's assertion, no matter how valid, that Easler was unavailable for trial without first having the court make that determin-]ation following an inquiry of Easler. No diligent attorney would have failed to cross-examine Hafford and impeach him with his prior inconsistent statements. Defense counsel could have won merely by quizzing Mr. Hafford about the following exchange during the Ladner trial:

MR. BROWN [Ladner's attorney]: You and Pelletier had made a deal for you to swim the river while you were in jail?

ADAM HAFFORD: No, never.

BRWON: Didn't come

HAFFORD: No.

BROWN: Now, while you were in jail with Pelletier, he told you that he had other people swim the river for him with drugs, didn't he?

HAFFORD: No, he didn't, because he never used to do it that way

-44-

before.

　　BROWN: Oh, he didn't. How'd he do it before?

　　HAFFORD: I have no idea. He just was talking about selling a lot of dope.

　　(PE 1 34)

　　Mr. Pelletier was entitled to have the court determine whether Mr. Easler was, in fact, unavailable, bearing in mind that the Fifth Amendment only protects against <u>self-incrimination</u>. There would have been nothing self-incriminating if Easler were compelled to state whether or not he knew Hafford, whether they had any conversations, and what thay talked about. All the jury heard was Hafford's self-serving, albeit incriminating, statements that defense counsel allowed in virtually without legal challenge and without effective cross-exaimination. Mr. Pelletier is entitled to a new trial on this issue.

## ISSUE VII

Whether appellate counsel rendered ineffective
assistance by failing to argue on direct appeal that
the district court's determination as to the drug
quantity was not in accordance with circuit precedent?

———————————————————————

Defense counsel failed to object to the district court's finding
of the higher estimate of drug quantity and the denial of his motion
for a judgment of acquittal. It is by now obvious that the United States'
star witness, Adam Hafford, "exaggerated" the amount of drugs that he
smuggled into the country. Hafford told the grand jury that he had
smuggled between 2000-2500 pounds of marijuana for Pelletier. (PE 1:15)
In the trial of Archie Ladner (the first of Pelletier's coconspirators
to be tried), the United States got Mr. Hafford down to 1000-1500
pounds, which sounded more credible. By the time Mr. Hafford appeared
in Mr. Pelletier's trial, the dope he allegedly smuggled was a bit more
uncertain: "Um, closest I can figure, somewhere probably around 1500,
maybe less." (308:83) Throughout Pelletier's trial, the Government
elicited testimony from Hafford that he smuggled between 1000-1500
pounds of marijuana. During Pelletier's JOA motion, the court ruled
that the jury could have attributed an equal amount of smuggled drugs
to Easler. The Government alleged that Hafford swam drugs for Mr.
Pelletier from June-November, 2004. However, Hafford testified in Mr.
Pelletier's trial that he was swimming marijuana across the river
"every week or two weeks, whenever he needed it." (308:82) The court
thus attributed 680.38 kilograms of marijuana to Pelletier for the time

Hafford allegedly swam the river for him. This finding was based on the reasoning that the jury could accept the higher estimate of drug quantity. The district judge determined at one point that the overall drug quantity was 1501.37 kilograms; however, at the sentencing, the court found Pelletier responsible for 1052.35 kilograms--a difference of 449.02 kilograms. The court's conclusion that the jury could have reasonably applied a finding that Easler could be held accountable for 680.38 kilograms of marijuana does not comport with the Government's position.

In closing arguments to the jury, AUSA Joel Casey told the jury that "[t]he evidence demonstrates that Mr. Easler was bringing in ... approximately 60 pounds a month of marijuana." (335:163) Based on the prosecutor's assertion, it would be virtually impossible for the jury or any judge to conclude that Mr. Easler smuggles 1500 pounds of pot during the time he participated in the alleged conspiracy. At most, if one assumed that Easler smuggled 60 pounds for the six months before Hafford "took over the job", this would total 360 pounds or approximately 163.08 kilograms. "Easler's" 163.08 kilograms combined with Mr. Hafford's 680.38 kilograms equals 843.46 kilograms, which falls well short of the 1000-kilogram threshold needed to trigger enhancements under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (mandatory life in prison).

The huge discrepancies in the testimonies regarding drug quantity requires the district court to resolve the conflicts by choosing "between plausible estimates of drug quantity, but the court must err on the side of caution." United States v. Marks, 365 F.3d 101, 105

-47-

(1st Cir. 2004).  <u>Sub</u> <u>judice</u>, had defense counsel objected to the trial judge's holding that the jury could have attributed the same amount of marijuana to Hafford that it attributed to Easler, counsel would have been able to demonstrate: (1) that Hafford's testimony regarding drug quantity varied wildly depending upon whom he was testifying before; (2) before the grand jury, Hafford claimed to have smuggled between 2000-2500 pounds of marijuana (PE 1:15); (3) at the Ladner trial, the drug quantity came down to 1000-1500 pounds (PE 2:35); and (4) this amount again changed to "somewhere around 1500 pounds, maybe less." (308:83)

It must be remembered that Easler did not testify. Hafford claimed that Easler told him that he had worked for Mr. Pelletier from "spring until ice was in the water." However, there was never any testimony as to how often Easler allegedly swam the river for Pelletier during this period of time. Oh, wait, that's right: Hafford invented the swimming trick--at least during the Ladner trial.  (PE 2:97)

Defense counsel's deficient JOA motion likewise neglected to argue that, during closing arguments, the Government conceded a specific drug quantity attributable to Easler (360 pounds) was insufficient to support the jury's finding of over 1000 kilograms of marijuana. (335:163) The failure to point out the weight discrepancies at sentencing resulted in Mr. Pelletier receiving a life sentence.

If Hafford swam the river from June-November 2004, and one credits the Government's inference throughout Pelletier's trial that Easler swam for six months as well, the assumed quantity would directly contradict the Government's concession. (335:163)  In other words, if one

-48-

credits Easler with 300 pounds (approximately 135.90 kilograms) and throws in the 680.38 kilograms Hafford claims credit for (during this trial, anyway), the drug quantity totals 816.26 kilograms of weed, which does not trigger the statutory mandatory life sentence. Any way you slice it, dice it, chop it or saute it, Mr. Pelletier should not have a life sentence.

Defense counsel failed to investigate the facts and the law in relation to drug quantity detrminations, a fact reflected in his closing arguments and JOA motion as well as his performance at sentencing. Due to counsel's deficent performance, the district judge did not "err on the side of caution" when making its weight findings. Marks, supra. As a result, Mr. Pelletier is now serving a life sentence based on the wholly unsupported testimony of a self-professed liar whose story was changed as often as his socks. These arguments could have been raised on direct appeal and evaluated under a plain error standard, but Mr. Pelletier was not even afforded this option as a result of appellate counsel's deficient performance. No reasonably competent attorney would have failed to bring these discrepancies and contradictions to the court's (any court's) attention. Because Mr. Pelletier was again denied his Sixth Amendment right to the effective assistance of trial and appellate counsel, and because Mr. Pelletier's sentence is plainly in excess of the maximum authorized by law, he is entitled to resentencing on this issue.

<u>ISSUE VIII</u>

Whether defense counsel rendered ineffective

assistance by failing to object to double

counting during the cash-to-drugs conversions?

———————————————

Hafford testified at Mr. Pelletier's trial that Mike Easler had muled marijuana for Petitioner before Hafford came along. Hafford also claimed that Easler stole a large sum of money (the amount was in dispute) while he was working for Pelletier. The following colloquy transpired at trial:

AUSA CASEY: Did Mr. Easler talk to you about ever stealing any money from Mr. Pelletier?

HAFFORD: Yes, he did.

AUSA CASEY: And what did he tell you in that regard?

HAFFORD: He had told me that he, ah, went across the border and got one of the shipments of pot and took that, and, ah, he had went down to Portland and collected $50,000 or somewhere right there--he said 50-something thousand, and they had taken off to Oklahoma to his mother's place.

(308:116-17)

Not surprisingly, Hafford's testimony before the grand jury was a mite different:

AUSA CASEY: So Mike Easler was doing your job for Mike Pelletier before you got out of jail?

HAFFORD: Yes.

-50-

AUSA CASEY: How do you know that?

HAFFORD: When I started working for Mike, he was actually looking for Mike Easler because he had ripped [Pelletier] off for **310 grand.**

AUSA CASEY: Mike Pelletier told you that?

HAFFORD: Yes.

AUSA CASEY: Did Mike Pelletier tell you where Mike Easler had gotten this money?

HAFFORD: He had collected all of the money from all the debts owed and, plus, went over and got more weed across the border and never paid for nothing.

(PE 1:34) (emphasis added)

The district judge ruled that the jury could have reasonably attributed up to 140.61 kilograms of marijuana to Mr. Pelletier by converting the amount of money stolen from him by Easler (up to $310,000) into pounds of marijuana. Defense counsel failed to object to the judge's conclusion on the ground that this formula constituted double-counting that impermissibly enhanced Pelletier's prison sentence to life. The district judge denied the defense JOA motion regarding the challenge to the sufficiency of the evidence regarding drug quantity based upon the conclusion that "a rational jury could have found that the amount of marijuana attributable to Easler was the same as the amount attributable to Hafford." (Acquittal Order at 3-4) The judge also determined that "the jury could have reasonably attributed up to 140.61 kilograms of marijuana to Pelletier by converting the amount of money stolen from him by Easler (up to $310,000) into pounds of marijuana (at $1000 per

pound)." (Acquittal Order at 5) (emphasis added).  The judge advanced
an alternative basis for upholding the jury's verdict: "the jury could
generally use Pelletier's substantial amounts of cash as a basis to
conclude that more than 1000 kilograms of marijuana was attributable
to Pelletier." Id.

Without digressing into arguments about the propriety  of the judge
basing a life sentence on what could have or might have happened in the
jury's deliberations, it is sufficient to note that counsel never made
an objection to this calculus based on impermissible double-counting or
a complete lack of reliable evidence to support the formula. The trial
judge, in reaching its factual and legal conclusions that the jury
could have attributed up to 680 kilograms to Pelletier via Hafford,
relied upon the following:

(1) That Hafford worked for Pelletier from June-November 2004;

(2) that Mike Easler previously worked for Pelletier from "spring-
time until there was ice in the water";

(3) that Hafford smuggled between 1000-1500 pounds of marijuana
(680.38 kilograms) for Pelletier;

(4) that the same amount could be attributed to Easler (680.38
kilograms);

(5) that Easler's theft of up to $310,000 from Pelletier (which
translates into 310 pounds of marijuana, or 140.61 kilograms) could be
converted into weight for enhancement purposes;  and

(6) based on the above estimates, the jury could attribute a total
of 1501.37 kilograms of marijuana to Mr. Pelletier.

The district court double-counted 310 pounds based on the alleged
theft of $310,000. The proof adduced at trial shows that the $310,000

-52-

would have counted in the marijuana already allegedly smuggled into the country. The claim that Easler allegedly stole a shipment of pot in Canada can safely be assumed to have been sixty pounds that was not reasonably foreseeable to Mr. Pelletier. Of major importance to this contention is the fact that Mr. Pelletier was already incarcerated at the time of the alleged theft.

The jury also heard testimony that Kendra Cyr (Mr. Pelletier's girlfriend) picked money up from downstate that belonged to Pelletier while he was incarcerated. The court allowed this cash to be converted into drugs. However, in coconspirator John Pascucci's case, the judge held that the cash picked up by Ms. Cyr "should not be counted as a separate delivery." Pascucci, 664 F.Supp.2d at 135. The Pascucci court further stated thst it was "reluctant to rest its findings on Mr. Hafford's testimony alone," id., but in Mr. Pelletier's trial, Hafford was the Government's only witness with putative knowledge concerning drug quantity, and Mr. Pelletier has more than adequately demonstrated that Hafford is not credible--something the judge in Pascucci's case obviously acknowledged.

Further double-counting occurred when the jury, without defense objection, was permitted to convert testimony regarding the cash found in Mr. Pelletier's possession into marijuana. The double-counting for the allegedly stolen $310,000 and the cash picked up by Kendra Cyr amounts to at least 150 kilograms of marijuana.

At sentencing, the court took into account the contents of the presentence report in determining Mr. Pelletier's sentence. The court

-53-

applied the base offense level from the underlying offense of convic-
tion, possession with intent to distribute [1052.35 kilograms of]
marijuana. (Doc. 521:15) If the court accepts that double-counting
occurred with the allegedly stolen $310,000 (or 140.61 kilograms of
marijuana], the finding that Mr. Pelletier possessed more than 1000
kilograms and the resulting life sentence could not stand.

Moreover, the trial judge's ruling that the jury could generally
use Pelletier's possession of substantial amounts of cash as a basis
for concluding that more than 1000 kilograms of marijuana was attribu-
table to Pelletier, if accepted as flawed, would result in resentencing
for Mr. Pelletier. It was incumbent upon the court to deduct from this
conversion the amount of cash from the marijuana previously counted in
the alleged smuggling.

In fairness, Mr. Pelletier acknowledges that vast sums of numbers
were floated about during trial so that a forensic investigator for the
IRS would have been hard pressed to keep track of it all. Nevertheless,
had defense counsel informed himself of the facts and the law prior to
sentencing, Mr. Pelletier would not now be serving a life sentence. He
was denied his right to effective assistance of trial counsel, and the
attorney's failure to object deprived Mr. Pelletier of meaningful
appellate review. He is entitled to resentencing on this issue.

ISSUE IX

Whether defense counsel rendered ineffective
assistance by failing to request a special
jury instruction to distinguish between
"pounds" and "kilograms" of marijuana?

Mr. Pelletier's indictment did not allege a specific drug weight
except to say "a detectable amount of marijuana." (Doc. 1) Throughout
the entire trial, especially during the Government's case in chief,
there was no testimony that Mr. Pelletier moved, sold, or possessed
any number of kilograms of marijuana. The Government did elicit the
testimony that both Hafford and Easler trafficked large amounts of pot
into the country, but that testimony focused on "pounds" and not
"kilograms." For example, Hafford testified that he and Easler were
"swimming pounds of marijuana across the St. John River"; that he sold
"pounds of marijuana for Pelletier"; and that Hafford brought between
1000-1500 pounds of marijuana from Canada. (308:83) It is reasonable
to believe that the jury inferred from this testimony that pounds and
kilograms were the same thing. Undoubtedly there was at least one juror
who could distinguish between the different weights, but no one can say
whether all of the jurors knew the difference.

Defense counsel should have requested a special instruction to the
jury that differentiated between pounds and kilograms. The Government
willfully misled and confused the jury by presenting its case in pounds
but asking for the instructions to be phrased in kilograms. During jury
selection, defense counsel could have asked the venire whether it knew

-55-

how many pounds equalled a kilogram and how much a kilogram weighs in pounds. Defense counsel could have requested the judge to instruct the jury on the difference between pounds and kilograms. Because counsel did neither, it cannot be said that the jurors were unanimous in their special verdict that Mr. Pelletier possessed more than 1000 kilograms of marijuana. Knowing what it knows now, and "erring on the side of caution," Marks, 365 F.3d at 105, no reasonable jurist could conclude that Mr. Pelletier possessed more than 1000 kilograms of marijuana. The jury's verdict is not compatible with the Government's proof so as to justify or support a life sentence. Counsel's omission permitted the jury and the court to make their decisions based on impermissibly infla-ted drug weight and resulted in a life sentence. Because Mr. Pelletier was denied due process and his right to effective assistance of trial counsel in this instance, he is entitled to be resentenced without any enhancements required by § 841.

## ISSUE X

Whether defense counsel rendered ineffective assistance
by failing to request a jury instruction regarding the
guilty pleas of Mr. Pelletier's "coconspirators"?

———————————————————

Adam Hafford, Michael Easler, and others involved in this case pled
guilty and decided to cooperate with the Government, and their immunity
letters and plea bargain agreements were entered into evidence. However,
defense counsel never requested a special instruction at the close of
all the evidence that these guilty pleas and immunity letters should
not be considered proof of Mr. Pelletier's guilt.

When a codefendant pleads guilty, the district court "may inform
the jury that a codefendant has entered a plea of guilty, provided the
jury is clearly instructed that such a plea cannot be considered as
evidence of the guilt of the remaining defendant or defendants." United
States v. Earley, 482 F.2d 53, 58 (10th Cir.), cert. denied, 414 U.S.
1111, 94 S. Ct. 841, 38 L. Ed. 2d 738 (1973). The importance of the
instruction is to ensure the jury does not use the codefendant's guilty
plea as evidence of the remaining defendant's guilt. United States v.
Baez, 703 F.2d 453, 455 (10th Cir. 1983).

Mr. Pelletier submits that defense counsel's failure to request an
instruction on this issue permitted the jury to infer Pelletier's guilt
as a result of his codefendants' guilty pleas, depriving him of a fair
trial and effective assistance of counsel. Pelletier is entitled to a
new trial on this issue.

-57-

## ISSUE XI

Whether defense counsel rendered ineffective assistance

by his failure to request a multiple conspiracy

jury instruction?

---

The indictment and the evidence presented at trial demonstrated that there was at least two conspiracies going on: one allegedly involving Mr. Pelletier and Adam Hafford, among others, and another one involving Hafford and others selling marijuana and other drugs while Hafford was muling pot for Mr. Pelletier. See grand jury indictment; compare with Hafford's trial testimony in the Pelletier and Ladner trials. There was also a variance between the conspiracy alleged in the indictment and the Government's evidence at trial in that alleged transactions and events involving the sale and possession of marijuana outside of the dates alleged in the indictment were presented.

One prime example is Hafford's testimony that he was muling cocaine into Canada while working for Pelletier, but the cocaine clearly did not belong to Mr. Pelletier. (308:155)

> It is true that a court should instruct on the issue [of multiple conspiracies] if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged.

United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004) (internal quotation marks and citations omitted).

There is a substantial probability that the independent acts of Adam Hafford and Michael Easler were attributed to Mr. Pelletier to

-58-

support the conspiracy conviction and undermined Pelletier's ability to demonstrate that he was not responsible for the amount of drugs that were attributed to him. "There is always reason for scrutiny when the government may appear to be sponsoring at different times two different versions of events," <u>United States v. Pagan-Santini</u>, 451 F.3d 258, 266 (1st Cir. 2006), and Hafford's contradictory, unchecked, "exaggerated" testimony demanded a multiple conspiracy instruction. Trial counsel's omission allowed Mr. Pelletier to be convicted for the charges in his indictment through the use of evidence accruing outside the indictment. Mr. Pelletier is entitled to a new trial on this issue.

## ISSUE XII

Whether Mr. Pelletier is entitled to the
return of illegally forfeited property?

---

Midway through the trial, the United States dismissed Count
relating to a garage allegedly purchased with drug proceeds. (335:28, 99)
Although the Government dropped that charge, Mr. Pelletier was still
forced to surrender his property as forfeit.

Pursuant to Fed. R. Crim. P. 41(g), Mr. Pelletier asks the court
to direct the United States to return his real property. Alternatively,
he asks the court to direct the Government to pay Mr. Pelletier the
fair market value for his property if it was auctioned or otherwise
sold.

Mr. Pelletier also asserts that his trial attorney rendered
ineffective assistance by his failure to ask that this property be
exempt from the forfeiture of his other real property at sentencing.
Had defense counsel moved for the return of this property, the motion
would have been granted (or the denial would have been preserved for
appeal) and Mr. Pelletier's property would not have been seized.

Finally, Mr. Pelletier notes that, in the record available to him,
there is no special verdict form regarding this property or any other
property that was forfeited. Under Fed. R. Crim. P. 32.2(5)(B) the
Government must submit a proposed pecial Verdict Form listing each
property subject to forfeiture. If there was no such form prepared,
Mr. Pelletier submits that all of his forfeited property and cash

-60-

should be returned to him on the ground that he was denied due process. Too, if no special verdict form exists, then Mr. Pelletier received ineffective assistance of trial and appellate counsel by his attorneys' failure to raise the issue before any court. This omission resulted in the forfeiture of substantial amounts of cash and real property that would not have occurred sans appropriate argument. Mr. Pelletier is entitled to a hearing on this claim. See United States v. Cardona-Sandoval, 518 F.3d 13, 17 (1st Cir. 2008) (evidentiary hearing required to determine disposition of seized property and appropriate remedy for unlawful forfeiture) (citations omitted); United States v. Pierre, 484 F.3d 75, 85 (1st Cir. 2007) (a forfeiture verdict must be supported by a preponderance of the evidence).

ISSUE XIII

Whether counsel's cumulative errors denied Mr. Pelletier

of his Sixth Amendment right to the effective

assistance of counsel and his Fifth Amendment right to

a fair trial?

For his final argument, Mr. Pelletier submits that his attorney's cumulative errors deprived the Petitioner of a fair trial and his right to have the effective assistance of counsel. These omissions, set out in the preceeding arguments, permitted the Government to obtain a conviction and a life sentence against Mr. Pelletier that it would not otherwise have earned.

The Government, through all means fair and foul, proceeded against Mr. Pelletier with a drug-addicted rat whose testimony the prosecutor sculpted through the trial and error process that began with the grand jury, tested in the Ladner trial, and perfected through Pelletier's trial. The prosecutor, AUSA Joel Casey, was present at every one of the proceedings and knew or reasonably should have known that Mr. Hafford was perjuring himself yet failed to correct the false testimony. Rather than bring Hafford's lies to the court's attention, the Government rewarded him with sentence reductions even after Hafford admitted that he "exaggerated" previous testimony. This false testimony violated the terms of his plea agreement and resulted in Mr. Pelletier receiving a sentence of life in prison. And defense counsel sat back and allowed it to happen with minimal intervention.

Mr. Pelletier does not lightly demean the integrity of a representative of the United States government, but he is forced to do so in

-62-

this case. These were not minor inconsistencies that Hafford was spouting to the jury. These were monster lies, and Mr. Pelletier can find no couteous way to say that the Government not only knew that Mr. Hafford was lying but actually encouraged him to do so. One need only compare the Ladner and Pelletier trial transcripts to see what has been done to Mr. Pelletier. The Government had a solemn duty to correct Mr. Hafford's perjury, and failed miserably.

The one lie that persistently nags Mr. Pelletier is Hafford's claim that no one swam the dope before he came along, but in Pelletier's trial, he complained that he inherited Easler's wetsuit and that it was too small for him. This complaint, he says, prompted Mr. Pelletier to provide Hafford with a sporting goods catalogue and unlimber his wallet to pay for new scuba gear and an underwater scooter. In truth, these items were purchased for the paralyzed Petitioner's use on his large lake, and Hafford stole these items from Pelletier after he went to jail and sold them.

Adam Hafford told so many lies to so many people that he could not keep his story straight on his own. However, his friend the prosecutor was there to guide him through the perilous rapids of perjury and, with the assistance of defense counsel, safely guided him to the dry harbor of a sentence reduction or two. This moose-shooting felon says he was regularly swimming heavy bags of weed across a river after he admitted he cannot swim. How he was able to make these three-hour dope swims was never questioned.

Mr. Pelletier has set out in previous arguments the many lies that the Government failed to correct, and there is nothing to be gained here by parroting every lick and blow and salving them with the balm of

bitter recrimination and vitriol. Suffice it to say, a great injustice has been effectuated by the Government with the placid assistance of an indifferent defense attorney, and Mr. Pelletier can only pray that the court will rectify this travesty.

This is the opportune moment to note that none of these arguments were raised on direct appeal. Claims of ineffective assistance are not generally cognizable on direct appeal. Where these argument otherwise could have been or should have been raised on direct appeal but were not, Mr. Pelletier submits that he was denied his Sixth Amendment right to the effective assistance of appellate counsel, and his arguments should be judged in that light.

## CONCLUSION

Based upon the foregoing arguments and citation of authority, Mr. Pelletier prays that the court will grant him a new trial.[15] Mr. Pelletier futher prays that steps will be taken to ensure that Adam Hafford's blatant perjury will not go unpunished. Mr. Pelletier also prays for such other relief as may be just and proper.


Respectfully submitted,

/s/ _Michael Pelletier_

Michael Pelletier #11109-036
United States Penitentiary
Post Office Box 33
Terre Haute IN 47808
**Petitioner, pro se**


## UNNOTARIZED OATH

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have read the foregoing and the facts stated in it are true. I also declare that this document and the accompanying Appendix was placed in the hands of prison officials for mailing by U.S. mail on this _24_ day of May 2013.

/s/ _Michael Pelletier_

Michael Pelletier, pro se


---

[15] Mr. Pelletier would be willing to consider resentencing should the court offer a reasonable sentence. Given the extent and number of lies told by Mr. Hafford, any reasonably competent attorney would be able to shred his testimony on retrial. Any resentencing offer should be generous and commiserate with Hafford and the Government's vile conduct during Mr. Pelletier's trial.