UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
BANGOR DIVISION

U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2013 JUL 15  P  4: 21

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
    Respondent, )
)
)
Vs. )  Civil No. 1:13-cv-000202-JAW
)
)  Criminal No. 1:06-cr-00058-JAW
MICHAEL PELLETIER )
)
    Movant. )

Before the Honorable John A. Woodcock, Jr.,
United States District Judge

MOTION TO VACATE, SET-ASIDE, OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255

Michael Pelletier
Federal Reg. No. 11109-036
United States Penitentiary
P.O. Box 33
Terre Haute, IN. 47808

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
BANGOR DIVISION

U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2013 JUL 15 ⏁ 4: 21

BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>      Respondent, )<br><br>Vs. )<br><br>MICHAEL PELLETIER )<br><br>      Movant. ) | Civil No. 1:13-cv-000202-JAW<br><br>Criminal No. 1:06-cr-00058-JAW |

## MOTION TO VACATE, SET-ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255, Michael Pelletier,  pro se,[1] asks this Honorable Court to vacate, set-aside, or  correct his sentence as being imposed in violation of the  United States Constitution and the laws of the United States. Mr. Pelletier alleges he is being illegally detained and that he   is entitled to relief, based upon the following grounds:

---

[1] **NOTICE IS GIVEN** that Mr. pelletier was assisted in the  preparation of this motion by Mr. R. Casper Adamson # 20013-017 and Mr. Michael Martin # 09221-033, non-attorneys who  share the movant's address. Mr. Pelletier is aware that Mr. Adamson and Mr. Martin are not attorneys and that they may not represent him in any court of law.

-1-

(i)

## STATEMENT OF THE CASE

By secret grand jury indictment, Michael Pelletier was charged with conspiracy to import marijuana, in violation of 21 U.S.C. §§ 963, 952 (a)(Count I); distribution and possession with intent to distribute marijuana, in violation of 21 U.S.C § 841 (b)(1)(A) (Count II); conspiracy to engage in money laundering, in violation of 18 U.S.C. §§ 1957, 2 (Counts III, IV,V); money laundering, in violation of 18 U.S.C. § 1956 (h), 2 (counts VI, XI, XII); structuring, in violation of 31 U.S.C. §§ 5324 (B) (3), 5324 (d) and 18 U.S.C. § 2 (Count XIV); conspiracy to engage in social security fraud, in violation of 42 U.S.C. § 408 (a)(4) (Count XV), to which movant entered pleas of not guilty.

His alleged coconspirators were provided seperate jury trials.[2]

Mr. Pelletier was represented at trial by Matthew S. Erickson, Smith Law Offices, P.A., 28 Main St., Suite 1, Bangor, ME. 04401, (207) 989-3045. He was represented on appeal by Stephen D. Riden, 99 Summer Street, Suite 1600, Boston, MA. 02110.

---

[2] Pursuant to Fed.R.Evid., Rule 201 (b), Mr. Pelletier asks the court to take judicial notice of the following connected cases: United States v. Pascucci, 664 F.Supp.2d. 128 (D.ME Oct. 19, 2009)(attributing drug weight of 79.37 kilograms to coconspirator); United States v. Daigle, 564 F.Supp.2d. 50 (D.ME July 3, 2008)("straw man" acting as "escrow agent" for Pelletier) ; United States v. Pelletier, 517 F.Supp.2d. 498 (D.ME Oct. 16, 2007)(denial of motion for judgment of acquittal); United States v. Pelletier, 490 F.Supp.2d. 17 (D.ME June 18,2007)(granting seperate trial for Pelletier); U.S. v. Pelletier, 666 F.3d. 1 (1st Cir.2011), cert. denied, 2012 U.S. LEXIS 4016 (May 29,2012); U.S. v. Fogg, 666 F.3d. 13 (1st Cir.2011); Another alleged co conspirator, Archie Ladner, was acquitted following a jury trial.

The United States was represented by AUSA Joel B. Casey, Office of the United States Attorney, 202 Harlow Street, Room 111, Bangor, ME. 04401, (207) 945-0373.

A six-day trial commenced on July 12, 2007, before the Honorable John A. Woodcock, Jr., in the District of Maine, Bangor Division.

The government was permitted to dismiss Count IV mid-trial. (335:28-29,99)[3]

Mr. Pelletier was convicted of the remaining counts with a special jury verdict finding movant responsible for more than 1000 kilograms of marijuana. (335:223)

On January 22, 2008, Mr. Pelletier was sentenced to Life in prison to be followed by 10 years of supervised release and ordered to pay restitution in the amount of $ 83,847.55.

The United States Court of Appeals for the First Circuit affirmed the judgment and sentences in a published opinion at United States v. Pelletier, 666 F.3d. 1 (1st Cir.2011), cert. denied, 2012 U.S. LEXIS 4016 (U.S. May 29, 2012).

This petition for writ of habeas corpus timely and respectfully follows.

---

[3] The trial transcripts were transcribed for the purposes of appeal. References to these transcripts will be denoted by docket number followed by a colon then the page number(s) in parenthesis. For example, (338:18) refers to page 18 of document 338.

## STATEMENT OF THE FACTS

In the Readers Digest Condensed Books version, and in the light most favorable to the Government, the paralyzed Petitioner recruited people to swim across the St. John River carrying sacks of marijuana. Pelletier would personally ferry cash into Canada, concealed in the seat of his wheelchair, then his swimmers would mule the marijuana into the United States.

One swimmer who reached Olympic gold status with the government was its star witness, Mr. Adam Haffor, who, fittingly enough for the comedy, could not swim.

Mr. Hafford, a convicted felon many times over (308:52), unwisely shot two moose with a firearm; his second blunder was to do it while wildlife officers were in the vicinity. (308:131-32)

Understandably not wanting to spend the rest of his life in prison, Mr. Hafford concocted a story that the Government helped him refine with the passage of time, first in a grand jury proceeding, then in the trial of Archie Ladner, who, it bears repeating, was acquitted. By the time Mr. Hafford testified against Mr. Pelletier, he pretty much had his story down pat. Fortunately for Mr. Pelletier, Mr. Hafford is not an especially talented liar.

Because of the issues presented herein, it is necessary to explore Mr. Hafford's testimony at all three proceedings. By the time these proceedings are completed, it is hoped that Mr. Hafford will have been found to have breached the terms of his plea agreement, that the Government will take appropriate steps to have Hafford resentenced, and Mr. Pelletier will either be free or afforded a new trial.

Mr. Hafford, like many of the Government's witnesses, entered into a plea and cooperation agreement with the United States. (308:53) Hafford's substantial assistance resulted in Mr. Hafford receiving a federal prison sentence that was lesser than the statutorily required fifteen years. (308:54) In exchange for the Government's largesse, Mr. Hafford was required to completely and truthfully testify against his alleged coconspirators under pain of prosecution for other offenses. (308:55)

Hafford first met Mr. Pelletier "sometime between 2000 and 2004" at a correctional facility called Windham. (308:55) Pelletier offered Hafford a job and invited him to call him when he got out of jail. Hafford would be working around Pelletier's property or just trafficking pot. (308:67)

While at Windham, Hafford also met Michael Easler. The three amigos did not spend a lot of time together. Although Hafford and Easler talked quite alot, Hafford could not recall exactly what they talked about. Just before Hafford was released, Easler revealed to him that he used to work for Mr. Pelletier. (308:68)

Pelletier wrote down his address and phone number and gave it to Mr. Hafford shortly before Pelletier was released. (308:68) Hafford called Mr. Pelletier in June 2004, after his release, and they subsequently met at a Wal-Mart in Presque Isle. (308:70) Pelletier's girlfriend, Kendra Cyr, accompanied him, and Archie Ladner accompanied Hafford. Cyr and Ladner went inside the store while Pelletier and Hafford talked. (308:69)

According to Hafford, Mr. Pelletier wanted him to locate Mr. Easler and bring him to Pelletier's woodlot because he had stolen

-5-

$310,000 from Mr. Pelletier.  He also wanted Hafford to swim the St. John river.  (308:70-71)

Mr. Hafford accepted both assignments.  Approximately one week later, Hafford met with Mr. Pelletier at his house.  (308:71) Archie Ladner was also present.  The trio discussed the logistics of swimming marijuana across the river.  (308:72)

It was explained to Hafford that he would be swimming 60 pounds of pot across the river.  Mr. Pelletier drove Hafford down Route 1 on the Frenchville Road and showed him where he would cross.  (308:72)  Hafford swam pot across the river for the first time that very night.  Pelletier drove him across the Canadian border in the back of his pickup truck (as a convicted felon, Hafford could not legally cross the border).  (308:73)

Once safely across the border, they went to some unnamed bar in either Edmundston or Fredericton, right across from Madawaska. They met an unnamed person at the bar, and Hafford drove off with the stranger.  The stranger had the weed in the back of his vehicle; he tossed it down the river bank, and our Olypian swam it across the river.  The pot was packaged in half-pound bags, 30 pounds per duffel bag, two duffel bags.  (308:74)

Because Mr. Hafford could not actually swim like Michael Phelps, he had the foresight to purchase a life jacket at Wal-Mart. (308:75)  Conveniently for Mr. Hafford, the 60 pounds of marijuana floated, and he was thus able to slip a duffel bag strap over each arm and swim the drugs across the river in a mere two or three hours.  (308:76)

When he reached the American side of the river, Hafford pro-

duced a soda can he had on him and placed it on the side of the road as a signal for Archie Ladner, who picked him up half an hour later. Hafford tossed the duffel bags into the back of Ladner's pickup truck, and Ladner then drove the drugs to Pelletier's woodlot. (308:76) They threw the duffel bags into the woods once they were on Pelletier's property. (308:77)

In addition to the life jacket, Hafford was also encased in a wetsuit that had formerly belonged to Michael Easler. (308:77) When he complained that the neck was too tight, and after making five or six trips across the river, Mr. Pelletier generously gave him a sporting goods catalogue and invited him to order whatever he wanted. Hafford chose a new wetsuit, fins, boots, gloves, and a motorized water scooter. (308:78) Mr. Pelletier paid for these items with a credit card. (308:79)

Mr. Pelletier had a close call with the border patrol which induced him to let our Jaques Cousteau swim the money across the border. (308:80-81). Hafford would usually swim $60,000 at a time for 60 pounds of pot. (308:81) The money was wrapped in plastic shopping bags. (308:81-82)

Mr. Hafford swam the river for Pelletier from June to November 2004. He would make the trip "every week or two weeks, whenever [Pelletier] needed it". Hafford would usually carry 60 pounds per trip, 30 pounds per bag, but he did not "know exactly [how much marijuana] was there". "A few times there was three [bags], and sometimes I had other [drugs] coming across for myself, too, at the same time". (308:82-83)

-7-

As near as Hafford could estimate, he probably swam 1500 pounds of pot across the river, but he didn't think it was less than 1000 pounds.  "Plus some of my own[.]"  (308:83)

Pelletier was paying Mr. Hafford $500.00 per trip, but he "actually never, ever took cash.  I just got paid in pot." (308:83, 96-97)  A half pound of pot per trip, to be exact. (308:83, 97)

Someone on the Canadian side of the border told Mr. Hafford that Mr. Pelletier was paying $1,000 per pound for marijuana, and that Pelletier would sell it for $2200 to $2800. (308:84)

Hafford claimed that he, a guy named Shawn, and a girl named Dube, Anthony Caparotta, and Rocky Fogg were all selling marijuana for Pelletier.  (308:84)  Archie Ladner was selling as well.  (308:84-85)  Ladner was paid $250 each time he trafficked pot downstate, and the emolument was deducted from the bill Ladner owed Pelletier for pot.  (308:85)

Mr. Hafford, on only one occasion, trafficked five pounds of pot downstate, but he was not able to complete the delivery to the customer.  Instead, Hafford dropped the drugs off in Winn.  Mr. Hafford then testified that he took another load of pot to Portland, where it was supposed to go to John Pascucci, but another unknown mystery person relieved Hafford of the drugs without Hafford seeing him.  (308:86)

-8-

Eschewing the opportunity to comment on the paucity of knowledge the Government's star witness had at trial in comparison with his knowledge before the grand jury (a subject that will be discussed at length later), Hafford went on to state that Pelletier told him that Mr. Ladner was being paid $1,000 for each trip to Portland. Hafford did not, amazingly, know how many trips were made to Portland and Winn. He did know, however, that Mr. Pelletier would personally travel to Portland to collect the money that was owed to him for the marijuana. (308:87)

Another mystery person stole five pounds of marijuana from Pelletier's woodlot. A month later, somebody called Mr. Pelletier and claimed to have stolen the weed from a freezer buried in the woods. The person claimed not to have known that the marijuana belonged to Pelletier, but now armed with that knowledge, the person wanted to do the right thing and return the marijuana to Pelletier. (308:87-88)

Mr. Hafford informed Pelletier that he smelled a setup. Nevertheless, Mr. Hafford accompanied Pelletier to the rendezvous on the Pit Road in Connor where the repentant thief was to drive around the corner. Pelletier complied, and they espied a sheriff's cruiser parked on the side of the road. Pelletier kept on driving, and the duo returned to Mr. Pelletier's home. (308:88-89)

Mr. Hafford twice sold Mr. Pelletier's pot to Mr. Caparotta and then collected the money. (308:91) Hafford continued to turn over the cash proceeds to Mr. Pelletier until he went to jail, at which point Hafford gave the money to Kendra Cyr (308:92), a point that Ms. Cyr denied.

Archie Ladner, according to Hafford, would make trips to Winn, where he would deliver five to ten pounds of marijuana to Rocky Foff. (308:92) Hafford would prepackage the drugs and deliver it to the acquitted Ladner. (308:93) Mr. Hafford collected that cash and also delivered it to Mr. Pelletier. (308:95)

Incredibly, Mr. Hafford claimed to have been present when Mr. Pelletier paid $50,000 in cash for a farmhouse that was put in Ricky Daigle's name. The deal was done at Pelletier's lawyer's office in Caribou. (308:98) Mr. Pelletier gave the cash to Daigle, "and he went in and signed some paperwork--or whatever they do to buy a house, and then he came back out, and the lady who was doing the real estate had Mike [Pelletier] sign some papers and pay the taxes for that year". (308:98-100)[4] Hafford asserted that he was in Mr. Pelletier's pickup truck when the deal went down. (308:99)

---

[4]No one else testified that Mr. Hafford was present when this deal went down, and Mr. Pelletier, confronted with overwhelming evidence that he bought a piece of property and put it in Daigle's name, submits that Mr. Hafford was not present. Hafford gained his knowledge of this transaction from Mr. Pelletier.

Mr. Daigle owned a store in Frenchville, and Mr. Hafford went there with Mr. Pelletier to eat a few times. Pelletier used to go there to talk to Daigle, but Hafford did not know what they were talking about. (308:99) The deal went down in July or August. (308:101)

Pelletier bought three horses to keep on the property. (308:102-03)

Hafford would also prepackage 30-35 pounds of pot for Ladner to take to John Pascucci in Portland. (308:103)

In January 2007, after pleading guilty to his gun charge, Hafford started serving time in the Piscataquis County jail, in Dover. (308:109) Mr. Hafford was "kind of" surprised to find himself jailing with Michael Easler. (308:109)

No one asked or instructed Hafford to have any conversations with Mr. Easler. While passing time, Hafford and Easler had conversations. (308:109)

Defense counsel objected to the anticipated testimony from Hafford in which he claimed that Easler made statements against interest that implicated himself and Pelletier.[5] The Government asserted that the statements were admissible as

---

[5]In light of the forthcoming arguments, Mr. Pelletier has no trouble asserting that Hafford threw Easler's name into the legal arena for the sake of convenience, to both reinforce his own credibility and to provide himself with another stooge to testify against.

statement's against Easler's penal interest.  Moreover, the statements were not testimonial in nature because they were not made to law enforcement personnel.  They were "[j]ust conversations between a couple of friends in jail."  (308:110)

Defense counsel started to object on hearsay grounds because the statements were not made in furtherance of the conspiracy if Easler and Pelletier were both in jail, but he hadn't thought about the statements being against penal interest and withdrew the objection.  (308:111)

The Government added that a "statement against penal interest can be admissible against somebody who was a stranger to the conversation."  (308:111)

Defense counsel countered that the exception did not apply to jail inmates, because "there are reasons why somebody might bluff or puff or exaggerate things."  (308:112)

A law clerk gratuitously pointed out that the declarant had to be unavailable pursuant to the rule.  Defense counsel then agreed that Easler was unavailable (a subject of later discussion) because Easler's lawyer indicated Easler had no interest in testifying and that he would plead the Fifth if called.  The prosecutor confirmed that he had had "extensive discussions" with Easler's attorney and Easler refused to testify or waive his Fifth Amendment privilege, which rendered him unavilable.  (308:113)

Defense counsel admitted that he had not read the case that the prosecutor cited in support of his argument but nevertheless persisted in his objections.  (308:114)

-12-

The court overruled the objections. (308:114)

Easler told Hafford that he was in jail for trafficking. Without any objection or curative instruction, Hafford stated that Easler told him that he, Easler, used to work for Pelletier as a swimmer. Easler did not state exactly how much marijuana he was bringing into the country, but he used to bring in the same size duffel bags as Hafford. (308:115) During an unknown year, Easler swam the marijuana from "spring time until there was ice in the water." (308:116)

Mr. Easler (even while knowing Hafford would be testifying against Pelletier, and thus presumably might testify against him) told Hafford that he went across the border, got one of the shipments of marijuana, stole that, then went down to Portland and collected around $50,000 from John Pascucci, then took off to his mother's home in Oklahoma. (308:116-17)

Easler clarified that he actually stole $110,000 from Pelletier.[6] He next told Hafford that Mr. Pelletier told him that he, Pelletier, was delivering marijuana to Rocky Fogg and John Pascucci. (308:117)[7]

_____

[6]Assuming that there were two duffel bags containing 60 pounds of pot, purchased at the wholesale price of $60,000, and further assuming Easler actually collected $50,000 from Pascucci, the total price of the alleged theft comes to $110,000.

[7]The record makes it abundantly clear that Mr. Pelletier never personally delivered marijuana to anyone. (308:148, 162) However, this perjury is trivial given the stupendous magnitude of Hafford's other lies. It must be noted that no one but Hafford testified that this theft even occurred.

-13-

Hafford was using a telephone that was in the name of Kevin Peers or Vicki Cochran, whom Hafford with before moving into Mr. Pelletier's camp.  (308:120)

Now it gets interesting.  And fun.

During cross-examination, Hafford acknowledged that he was testifying under a grant of immunity pursuant to a plea agreement that would be breached if the Government could prove he lied under oath.  (308:123)  However, even after Mr. Hafford admitted that he lied to the grand jury and "exaggerated" about a few things (308:165-67), Mr. Hafford was never prosecuted for his perjury, nor did the Government seek to have him resentenced. Indeed, Mr. Pelletier believes that the Government sought a further sentence reduction after he testified against Mr. Pelletier. The Petitioner thinks it is time for the Government to convene another grand jury.

Hafford was arrested on April 2, 2006, for using a firearm to shoot two moose, and it wasn't too long before he started raving about drugs that were being smuggled across the border. (308:134)

On April 18, 2006, Hafford signed a proffer agreement that required him to disclose his involvement in any criminal activity.  At that time, he had not been charged with any drug offense.  (308:135-37)

When Hafford and Pelletier jailed together in Windham, the talks they had did not involve drugs.  (308:138-39)  Pelletier could have been offering him a legitimate job, and Hafford

-14-

actually cut timber for him.  (308:139)

Pelletier told Hafford that Easler had stolen $310,000 from him.  (308:140)

When Pelletier's truck was searched by border patrol, Hafford was already in Canada.  Pelletier picked him up two hours later and told him what happened at the border.  (308:143) (How Pelletier, a four-time drug-trafficking loser prior to this trial, could evade being detained for trying to cross the border --a problem that Hafford allegedly avoided by hiding in the back of Pelletier's pickup truck--was not discussed.)

Hafford only swam money across the river twice.  (308:145)

Defense counsel was aware that Hafford had testified against Archie Ladner and he actually cross-examined Hafford using that trial testimony.  (308:153)

Once, Mr. Hafford swam 25 kilograms of cocaine into Canada that had nothing to do with Mr. Pelletier.  Hafford set that deal up on his own and did not tell Pelletier about it because "[h]e didn't want nothing to do with cocaine."  (308:154)

During this time Hafford had his own customers that he was dealing with.  (308:156)

Some weeks Hafford would not sell any pot at all, but on average he was selling $100,000 worth per week.  (308:157) However, he was only making that kind of money the last two or three months before he went to jail.  (308:157-58)  Any business that involved Mr. Pelletier was over by Christmas. (308:158)

-15-

Mr. Hafford did not know how many trips he made back and forth across the river for Pelletier. (308:162) He estimated that he brought 1000-1500 pounds of marijuana into the country, but that was a rough estimate. (308:163)

Hafford may have testified in the Ladner trial that he perhaps made more than $500,000 selling marijuana, but not all of that money came from working for Mr. Pelletier. (308:163)

Defense counsel was aware that Mr. Hafford testified before the grand jury and cross-examined him about some of that testimony. (308:164-65)

Hafford told the grand jury that he would swim the river at least once a week and sometimes as many as seven days a week. (308:165) However, Hafford admitted that he "exaggerated some things [,]" including the number of times he swam the river. (308:165-66) Hafford, in fact, never swam the river seven times in a week. (308:166)

Despite his lack of swimming skills, Hafford believed that he could swim more than 220 pounds of pot across the river at one time. However, the most he ever actually swam at one time was 120 pounds (a figure that Mr. Pelletier vigorously disputes). (308:166) Not all of that marijuana was for Mr. Pelletier. Id.

Mr. Hafford, shockingly, or maybe not, admitted to further exaggerating to the grand jury when he claimed to have swam money across the river ten times: it was actually two times. (308:167)

He further lied to the grand jury when he claimed to have met Pelletier at the Presque Isle Wal-Mart parking lot two days

-16-

after he got out of jail: it was actually closer to two <u>weeks</u>. (308:168)

He admitted that he might not have correctly identified Mr. Caparotta, one of Pelletier's alleged coconspirators Hafford claimed to have had drug dealings with, when he was in front of the grand jury. (308:169)

Mr. Hafford never got a look at the money he was swimming across and could not say if it was Canadian or American. (308: 169) (or Chinese yen, for that matter.)

Hafford, ever the go-getter, was also dealing methampheta-mine. (308:172)

On the two occasions that Hafford swam the money, he also obtained marijuana for himself; three bags the first time, 60 pounds the second time. (308:181)

Hafford clarified that he did not actually know Tony Cap-arotta; he only knew <u>of</u> him and claimed to have sold pot to Cap-arotta through yet another unnamed person. (308:183)

After Mr. Pelletier went to jail, Mr. Hafford never crossed the river again; instead, he hired other people to swim for him. (308:185)

It is now necessary for Mr. Pelletier to recount Mr. Hafford's testimony in <u>United States v. Archie Ladner</u>, Case No.

06-79-B-9, on April 19, 2007, approximately four months before
he testified against Pelletier.  That transcript is attached
hereto and incorporated by reference as Petitioner's Exhibit
2 (PE 2).  Mr. Pelletier, for the sake of brevity, will try to
confine his references to those parts of the trial that are the
most material to the issue of his guilt or innocence ... and
the most entertaining.

In the Ladner trial, Mr. Hafford agreed to cooperate
with the United States with the understanding that he could be
prosecuted for perjury if he lied.  (PE 2:14)

Hafford met Mr. Pelletier while they were serving time
at Windham prison together.  Pelletier told Hafford that he
could "work for him and pretty much sell marijuana" when he
got out of jail.  (PE 2:15)[8]

Mr. Hafford looked up Mr. Pelletier when he got out of
jail.  They met at the Presque Isle Wal-Mart.  Kendra Cyr was
with Pelletier but she went inside the store.  (PE 2:15-16)
Archie Ladner was with Hafford.  (PE 2:16)  Hafford told Lad-
ner that Pelletier was supposed to put him to work doing some-
thing, but he didn't know what kind of work he would be doing.
(PE 2:17) Mr. Ladner went inside the Wal-Mart to use the bath-

---

[8]During Pelletier's trial, Hafford admitted that when
he and Mr. Pelletier jailed together, the conversations they
had did not involve smuggling drugs.  (308:138-39)

room while Hafford and Pelletier talked.  (PE 2:17-18)

Pelletier and Hafford talked about a guy named Mike Easler and the possibility of Hafford muling weed across the border.  Pelletier needed someone to swim across the river. Pelletier wanted to find Easler because he ripped Pelletier off for a lot of money.  (PE 2:18)

Ladner returned from the bathroom and was introduced to Pelletier.  Mr. Ladner was conveniently not present when Hafford and Pelletier were discussing Hafford's employment opportunities.  (PE 2:20)  However, Hafford related Pelletier's pot smuggling proposal to Ladner on the way back to Ladner's house. (PE 2:21)

Eventually, Hafford was crossing the river with marijuana "at least every other week."  (PE 2:29)  He had done it more than once in a week.  (PE 2:29)

Mr. Pelletier would conceal drug money in the depths of his wheelchair cushion.  He would drive the money into Canada, where it would be traded for the drugs Hafford would swim into America.  That practice changed when Customs agents searched Pelletier's vehicle.  After that, Hafford started swimming the money across into Canada, exchange it for the weed, then swim the weed back into the United States without hardly pausing for breath.  (PE 2:32-33)

Mr. Hafford claimed that he was with Mr. Pelletier when he paid $50,000 in cash for a piece of property that he put in Rick Daigle's name. (PE 2:50) Compare with (308:98-99) Hafford claimed also to have been present when Pelletier purchased purebred showhorses with cash. (PE 2:51)

During the time that he worked for Mr. Pelletier, Hafford was smoking a lot of marijuana and methamphetamine. (PE 2:75)

Hafford owned a 1994 teal green Thunderbird that he drove even though he did not have a driver's license. (PE 2:56)

This drug usage undoubtedly was the cause of Hafford's sudden memory problems regarding what he may or may not have told law enforcement and the grand jury. (PE 2:89-96) Nevertheless, Hafford had total recall about the conversations that occurred between himself and his "coconspirators" three years earlier while smoking refer and meth on a regular basis. (PE 2:97)

In a stellar display of ineffectiveness, Pelletier's attorney failed to cross-examine Mr. Hafford about the most remarkable statement Hafford made in Ladner's trial. There, Hafford--under oath, mind you--testified that Mr. Pelletier never told him that Pelletier had other people swim the river before Hafford (brace yourself) ... "because he never used to

do it that way before." (PE 2:97)[10]

When asked how Mr. Pelletier used to smuggle marijuana into America before the ingenius Mr. Hafford came along, the enterprising lad serenely replied, "I have no idea. He just was talking about selling a lot of dope." (PE 2:98)

More? OK. Hafford next claimed that Pelletier agreed to put him to work selling pot while they were in jail together. (PE 2:99) Hold the phone, Joan: This was the exact opposite of what Hafford testified to in Mr. Pelletier's trial. (308:138-39) Thank God for lying Government star witnesses.

Anyway, Hafford acknowledged that he told police that Pelletier was sitting on $180,000 in cash when he had his close call with the Customs agents, but in real life, Hafford did not know how much money Pelletier was sitting on. (PE 2:100)

During his direct examination, Hafford kinda neglected to mention he used a soda can as a signal for Ladner to pick

_____

[10]Hafford, of course, testified at Pelletier's trial that Easler told him that he used to work for Pelletier as a swimmer. (308:115) Indeed, Mr. Hafford claimed that he used Easler's wetsuit to swim the river before Mr. Pelletier bought him a new one. (308:77, 116) Given that Pelletier had a rather large lake on his property and was paralyzed, defense counsel could have raised the possibility that the MantaRay scooter was purchased to help navagate his own waters and the wetsuit was likewise Pelletier's. This is what happens when defense counsel fails in his duty to properly cross-examine a Government witness. Ladner was primarily acquitted because his lawyer shredded Hafford on cross-examination, and the Government helped Hafford refine his testimony for Pelletier's trial.

him up after swimming the river.  (PE 2:101)  He also failed
to disclose the fact that he swam 25 pounds of coke across
the river.  (PE 2:102)  Speaking of which ...

Hafford crossed the border with Pelletier eight to ten
times.  (PE 2:103)  During one of his smuggling missions, Haf-
ford took 25 pounds of coke for the trip.

```
Q  Okay.  Did you exchange the coke for pot?
A  No.

Q  What did you get in return for the coke?
A  That wasn't my deal.

Q  Who--
A  I did that for somebody else.  That was for Steve
```
from Connecticut, the guy I did the first couple of runs for,
and I was just going over to get dope for Mike, and I had
made extra money taking the coke across.  (PE 2:104-05)

At Mr. Pelletier's trial, however, Mr. Hafford testi-
fied that he traded some of the cocaine for marijuana, then
took the rest, placed it in a bowl, and had a party.
(308:155)  Defense counsel failed to cross Mr. Hafford on
this point, and the Government, just as it did when Hafford
testified that Easler had the swimming position before Haf-
ford failed to correct this perjured testimony.  This argu-
ment will be more fully explored later in this petition.

-22-

Mr. Hafford's memory became cloudy again when discussing who might have refreshed his testimony prior to trial with his grand jury testimony.  (PE 2:135-38)

Hafford told Ladner's jury that Mr. Pelletier was on the Canadian side of the border each and every time Hafford went over to pick up marijuana.  (PE 2:157)  However, we know this is not what he testified to in Pelletier's trial.

The paragon of candor exaggerated about how many guns Mr. Ladner had, but he was only off by several dozen guns.  (PE 2:171-72)

Here's a major whopper:  Mr. Hafford told Ladner's that Pelletier never provided Hafford with any maps so he'd know how to locate people.  Indeed, Pelletier never gave Hafford any maps at all.  (PE 2:183)  Naturally, this does not correspond with his testimony in Pelletier's trial.  Defense counsel never obtained a handwriting specialist to verify that the documents Hafford produced were not written by Pelletier.  This was an especially egregious omission given that Hafford had trouble distinguishing his handwriting from Pelletier's (PE 2:60), even though Hafford claimed to be familiar with Pelletier's handwriting.  (PE 2:57)

Let us turn now to the relevant portion of Mr. Hafford's grand jury testimony, which is attached hereto and incorporated by reference as Petitioner's Exhibit 1 (PE 1).

-23-

Mr. Hafford testified that he and Mr. Pelletier were in Windham jail together.  Pelletier told Hafford that he could put him to work doing something when Hafford got out of jail.  (PE 1:5)

Within _three days_ of being released from jail, _Id._, Hafford met Mr. Pelletier at a Wal-mart in Presque Isle.  (PE 1:6)  Pelletier offered him a job swimming marijuana across the St. John river.  _Id._  Hafford swam the river for the first time the very next night.  (PE 1:7)

In this version, Hafford had been working for Pelletier for about two months when he began swimming the river both ways.  (PE 1:10)  Of course, during Pelletier's trial, Hafford switched up and said it was during the _last_ two months before Pelletier went to jail, following his near miss with the border patrol, that Hafford began making the round trip.  (308:80-82)  Defense counsel failed to cross-examine the star witness on this point, and the Government apparently felt no need to correct the conflicting testimony.

Hafford told the grand jury that he was making the trip to Canada "[a]t least once a week, sometimes seven days a week."  (PE 1:11)  We now know, of course, that this was an exaggeration."  (308:165-66)

Hafford claimed to have smuggled 2000-2500 pounds, some of which was Hafford's own weed.  (308:83)

Once again, Mr. Hafford claimed to have been present when Pelletier gave Rick Daigle $50,000 in cash to purchase what was known as the Lavertu Settlement.  (PE 1:25-26)  In this version, the money changed hands in the parking lot, and the lawyer's name was Pelletier.  (PE 1:26)  The main problems with this testimony (notwithstanding the fact that the lawyer's name was nowhere close to being Pelletier) is that no one--not the realtor, not the lawyer, and not Rick Daigle --ever testified that Mr. Hafford was present during this transaction.  Mr. Pelletier (who cannot in good faith, given the overwhelming amount of evidence against him on the structuring charge, deny that the transaction took place) submits that Hafford was not present when this deal went down, and the information Hafford gleaned regarding the transaction came from Mr. Pelletier.  Hafford did not have any firsthand knowledge about the transaction because he was not present.[11]

Because Mr. Hafford's exaggerations, lies, and inconsistencies are too numerous for the average human being to

_____

[11]Hafford had a great propensity to take information garnered from parties to certain events and present the events to law enforcement as a way to enhance his credibility.  The majority of the information Hafford had about certain events came directly from Mr. Pelletier.  Mr. Hafford would then twist the information to suit his need to appease the Government and to solidify his drug-jellied memories.

-25-

keep track of, Mr. Pelletier has pointed out only the most blatant and material inaccuracies here.  Mr. Pelletier reserves his right to point out other lies in the body of this petition and in any traverse to the Government's responsive pleading.  Other facts that support Mr. Pelletier's arguments for relief will be set out herein.

A R G U M E N T

ISSUE I

Whether the district court deprived Mr. Pelletier
of his Fifth Amendment right to due process and
his Sixth Amendment right to a fair trial by
selecting the juror foreperson?

---

Before the jury was sworn, and without defense objection,
Judge Woodcock asked Juror ███████ if she would be willing to be
the forelady of the jury. (518:2)  Ms. ███████ agreed. (518:3)

Mr. Pelletier makes the seemingly novel argument that he
was denied his Fifth Amendment right to due process and Sixth
Amendment right to a fair trial when the judge selected the
foreperson.[12]

The United States Constitution guarantees a criminal de-
fendant the right to "a fair trial by a panel of impartial, in-
different jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct.
1639, 6 L. Ed. 2d 751 (1981).  The Petitioner was entitled to
"a jury capable and willing to decide the case solely on the
evidence before it." McDonough Power Equip., Inc. v. Greenwood,
464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984)

---

[12]The judge's selection of Ms. ███████ appears to have
been a purely random impulse, even though he did not explain his
reasoning for the choice of Ms. ███████ or the decision to select
the foreperson.  Mr. Pelletier does not ascribe any evil motive
for utilizing what appears to be a common practice in this cir-
cuit.  The judge was fair and impartial throughout the trial
and he should not find Pelletier's arguments to be a personal
attack.

(citation omitted).

Mr. Pelletier contends that Ms. ███ became a sur-rogate of the trial judge that selected her, and that the remaining jurors, aware of the seeming favoritism, gave more weight to Ms. ███ utterances and opinions regarding Mr. Pelletier's guilt or innocence that they would have without the judge's appointment. For her part, Ms. ███ verdict may have been based on her perceptions and observations of the judge during trial. Stated differently, if Ms. ███ perceived the judge's rulings on objections and motions to have been against Mr. Pelletier, this might have influenced her to vote for a guilty verdict. Ms. ███ could have taken a mundane ruling that was adverse to Mr. Pelletier and conveyed to the jurors that the ruling was proof of guilt (notwithstanding any instruction to the contrary). The jurors, cognizant of Ms. ███ favored position, would naturally be inclined to adopt her reasoning.

Mr. Pelletier is cognizant that ther is no federal statute, rule, or case that forbids the practice of a judge appointing the foreperson and that district judge's in the First Circuit routinely select the foreman. See United States v. Cannon, 903 F.2d 849, 857 (1st Cir. 1990) (no error for the judge to select foreperson **at the close of evidence** and taking judicial notice that is customary for district judges in the

-28-

circuit to do so).  Mr. Pelletier, however, submits that there is no federal statute or rule that expressly authorizes the practice.

Cannon is inapposite to the instant case for a variety of reasons.  First, Cannon did not advance Pelletier's arguments.  Also, unlike the district judge in Cannon, Judge Woodcock appointed Ms. ███ before the jury was even sworn, long before the other jurors could evaluate her character without benefit of the judge's seeming favortism.  The judge's early selection of Ms. ███ amounted to, in the jury's eyes, a voucher of her character, wisdom, and judgment.[13]

Pelletier further argues that defense counsel's failure to object to the judge's appointment deprived Petitioner of due process and a fair trial.  Counsel's failure to object constituted a waiver of the issue and deprived Mr. Pelletier of meaningful appellate review of the issue on his direct appeal.  The trial judge invaded the province of the jury when he appointed Ms. ███ as the court's surrogate, and reasonable competent counsel would not have failed to interpose an objection.

---

[13]The jury selection proceedings were not transcribed. Mr. Pelletier presently is unable to comment on her qualifications to sit as a juror much less as the forelady.  He therefore reserves the right to comment on her qualification if discovery is necessary to traverse the Government's reply.

Naturally, Mr. Pelletier is aware that federal law expressly allows a district judge to appoint one **grand juror** as foreperson and another **grand juror** as deputy foreperson in a grand jury proceeding. See Fed. R. Crim. P. 6(c). However, the grand jury is an accusatory body and not an adjudicatory body. See In re Grand Jury Proceedings, 219 F.3d 175, 189 (2nd Cir. 2000) (observing that the grand jury "is an accusatory body under the (almost) complete control of the prosecutor").

Because Mr. Pelletier was denied his Fifth Amendment right to due process and his Sixth Amendment rights to a fair trial with the effective assistance of counsel, the court should grant him a new trial.

<u>ISSUE II</u>

Whether or not Mr. Pelletier was denied his
Fifth Amendment right to due process and his
Sixth Amendment right to a fair trial when
the district judge permitted the jurors to
seperate on multiple occasions (including
overnight and over a weekend) without extra
admonishment.

---

Before the festivities commenced, Judge Woodcock gave
the jurors exhaustive instructions on how they should conduct
themselves throughout the trial.  The jury was admonished:
(1) not to talk about the case or anyone involved in the case
amongst themselves until they retired to deliberate; (2) not
to talk about the case with anyone else; (3) not to let anyone
talk about the case with them; (4) not to speak to any of the
parties, the lawyers, or the witnesses; (5) not to listen to
or read any articles or stories or articles about the case;
(6) not to conduct any research about the case; (7) not to
directly speak to the judge; (8) to listen closely to the
testimony; and (9) to keep an open mind until all of the evi-
dence has been received.  (518:17-19)

After Kendra Cyr testified, Judge Woodcock pointed out
that there was a reporter for the <u>Bangor</u> <u>Daily</u> <u>News</u> present
in the courtroom.  (399:190)  The judge again admonished the
jury not to conduct research or listen to or read any news
accounts of the trial.  (399:190-91)  The judge then told
the jury:

Now, I'm not going to every night go
through this.  You've already heard
what I've had to say about your obli-
gations as jurors, your obligation
not to talk about the case, and that's
what I'm going to tell you each day.
Keep an open mind, that's what I'm
going to tell you.  Don't do any re-
search.  Don't read the <u>Bangor Daily</u>
<u>News</u> or listen to the radio, or if
begin to hear on the radio, turn it
off.  If it's reported on the TV, shut
it off, quick mute.  I'm not going to
say this to you every day.

(399:192)

True to his word, t he judge permitted the jurors to sep-

erate on at least **nine** occasions (including once overnight and

for a whole weekend) without further admonishment.  (307:259;

308:50, 56, 174; 311:64; 312:232; 335:90, 98, 203)

Mr. Pelletier respectfully submits that he was denied

his Fifth Amendment right to due process and his Sixth Amend-

ment right to a fair trial when the judge failed to admonish

the jurors in similar fashion as he first admonished them (518:

17-19) when they separated, especially for the overnight (312:

232) and weekend (307:259) recesses.

There is of course no <u>per se</u> constitutional right for a

trial judge to admonish a jury not to discuss the case or

avoid media reports of the proceedings.  <u>Meggs v. Fair</u>, 621 F.

2d 460, 463 (1st Cir. 1980) (citations omitted).  However,

"[f]or more than a century it has been a common law principal

that it is improper for jurors to discuss a case prior to its

submission to them, a practice that safeguards the defendant's entitlement under the Fifth and Sixth Amendments to the Constitution to a fair trial [by] an impartial jury." United States v. Jadlowe, 628 F.3d 1, 5 (1st Cir. 2010); cert. denied, Jadlowe v. United States, 2011 U.S. LEXIS 2638 (U.S. April 4, 2011).

The First Circuit enumerated several reasons why jury admonishment protects a defendant's rights, Jadlowe, 628 F.3d at 18 (citations omitted), then nicely summarized its reasoning:

> The jury's deliberative process--the collective, objective review of the evidence of record, evaluated as a whole, and guided by the court's instructions--may be compromised as a result of prematurely formed impressions.  The potential harm is unlike the erroneous introduction of a piece of evidence or a flawed instruction that misstates or omits an element of the crime....  [P]remature discussion raises the possibility that the jurors will view all of the evidence through a distorted lens, much like what occurs when the jury is improperly instructed on reasonable doubt....  Where the possibility exists that premature jury discussions shifted to the defendant the burden of changing by evidence the opinion thus formed, the possibility exists that the trial was an unreliable vehicle for determining guilt or innocence.

Jadlowe, 628 F.3d at 20 (collecting Supreme Court cases) (brackets and ellipses added).[14]

Mr. Pelletier allegedly was the head of what was possibly

the largest marijuana conspiracy in Maine history (to hear Hafford tell it).  The newsworthy charges against Pelletier and his six-day trial, conviction, and sentencing were covered nationally by the fourth estate.  See samples of the coverage in the newspapers, attached hereto and incorporated by reference as Petitioner's Exhibit 3 (PE 3).  Mr. Pelletier submits that the judge's failure to admonish the jurors each time they separated (especially overnight and for the weekend), coupled with the judge's conflicting and confusing initial instructions (518:17-19), permitted the jury to believe they were allowed to conduct computer research on the case and talk about it with their family members and friends, who in turn interjected their thoughts and opinions into the juror's deliberative process.  These impermissible trespasses caused the jurors to form premature conclusions about the case and resulted in impermissible burden shifting.  The prejudice to Mr. Pelletier should be presumed since he did not testify on his own behalf and he was the only person who could have corrected the jurors misimpressions.

The judge's failure to continually admonish the jury was not harmless given that the Government's star witness, Adam Hafford, was a self-avowed liar whose perjured testimony went uncorrected (if not encouraged) by the prosecutor.

Under the facts established in Jadlowe, the First Cir-

cuit concluded that a defendant claiming juror bias must demon-
strate prejudice.  That showing must be made in an evidentiary
hearing, and "the district court acts with broad latitude in
determining the nature and scope of the inquiry it will conduct
into the matter." United States v. Rowe, 144 F.3d 15, 20 (1st
Cir. 1998) (citations omitted).

Mr. Pelletier asserts that defense counsel rendered in-
effective assistance by his failure to object to the judge's
failure to admonish the jury each time they separated, especial-
ly overnight and for the weekend.  Counsel's omission deprived
Mr. Pelletier of his Fifth Amendment right to due process and
his Sixth Amendment rights to a fair trial and effective assist-
ance of counsel.  Mr. Pelletier requests a new trial on this
claim.

## ISSUE III.

WHETHER OR NOT MR. PELLETIER WAS DENIED HIS
FIFTH AMENDMENT RIGHT TO DUE PROCESS    AND
HIS SIXTH AMENDMENT RIGHT TO A FAIR    TRIAL
BY ONE JUROR'S NONDISCLOSURE, THE    TRIAL
JUDGE"S FAILURE TO EXCUSE AN AILING    JUROR,
AND DEFENSE COUNSEL"S FAILURE TO ACT    ON
BOTH OCCASIONS.

Two alternate jurors were selected for this trial.

(      ) One juror was excused after he voiced his concerns

about his community's possible reaction to him sitting as  a

juror. (399.4-9) That left one alternate.

Juror ███████████ had back problems and a note from her

doctor asking her to be excused. The trial judge explained

that there was one alternate left and he asked her to   re-

main on the jury. Ms. ████████ agreed after the Judge promised

to take frequent stretching breaks, a promise that the Judge

kept. (307:6-12)

Later, an unnamed juror disclosed for the first time

that he knew Kendra Cyr's father. (308:6-7) The trial Judge

failed to ask the juror anything, notably, whether the jur-

or's association with Ms. Cyr's father would affect    his

ability to remain fair and impartial. The whole problem

was simply swept under the carpet with no inquiry   from

the attorney's. Id

A juror must be physically and mentally fit for jury

service or the juror must be excused. See 28 U.S.C. § 18-

65 (B)(4). The jury selection and Service Act sets  forth

five specific reasons a summoned juror may be excused by the court. Relevantly, a juror may be excused based on his inability to render impartial service (e.g., the unknown juror who knew Ms. Cyr's father) or when the court determines a juror's service would be likely to adversely affect the integrity of the jury deliberations. 28 U.S.C. § 1866 (c). No motion by counsel is required. 28 U.S.C. § 1866 (c)(2). The right to due process is satisfied as long as a criminal defendant is tried "before a qualified jury composed of individuals not challengeable for cause." Rivera v. Illinois, 556 U.S. 148,157, 129 S.Ct. 1446, 173 L. Ed.2d. 320 (2009).

With respect to allegations of nondisclosure, a party seeking a new trial must demonstrate actual bias or prejudice. The burden of proof must be sustained not as a matter of speculation but as a demonstrable reality. United States v. Levy-Cordero, 67 F.3d. 1002, 1016 (1st Cir.1995) (internal quotations and citations omitted). A defendant making a claim of juror bias must demonstarte actual bias, proof of which usually requires an evidentiary hearing. See Smith v. Phillips, 455 U.S. 209, 215-18, 102 S.Ct. 940, 71 L.Ed. 2d. 78 (1982).

Mr. Pelletier's attorney did not insist that juror ████ be excused because of her medical problems, something Mr. Pelletier would have insisted upon had he known that was an option. Common sense dictates that a person who

is in enough pain as to seek out a note from her doctor is in too much pain to focus fully on the facts, the evidence, and the witnesses.

Likewise, defense counsel wholly failed to ask the court to inquire of the unknown juror how he knew Ms. Cyr's father, the juror's feelings about Ms. Cyr's father, and whether this association would affect the juror's ability to remain fair and impartial, among other things. These omissions deprived Mr. Pelletier of a fair trial and his right to the effective assistance of counsel. He is entitled to a new trial on this issue.

## ISSUE IV

Whether the United States deliberately elicited
perjured testimony from Adam Hafford or will-
fully permitted such testimony to go uncorrect-
ed knowing it was false.

————————————————————————————

AUSA Joel B. Casey represented the United States at all
proceedings relevant to the instant petition.  AUSA Casey placed
Adam Hafford before the grand jury; examined Hafford during
Archie Ladner's trial and Pelletier's trial; and was intimately
familiar with every facet of Hafford's testimony.  Mr. Pelletier
alleges that AUSA Casey deliberately elicited testimony from
Mr. Hafford that the Government knew or should reasonably have
known was perjurous or willfully permitted such false testimony
to go uncorrected, thereby depriving Mr. Pelletier of a fair
trial.  Pelletier's attorney was ineffective for failing to
point out Hafford's material misrepresentations to the court
and jury.

It is not humanly possible for one person to catch every
lie, half-truth and inconsistency Hafford uttered to the various
tribunals, but here follows some of the most material and egreg-
ious.

Let us begin with Hafford's grand jury transcript (PE 1).

In this version, Hafford testified that he and Pelletier
were in the Windham jail together.  Pelletier told Hafford that
he could put him to work doing something once Hafford got out
of jail.  (PE 1:5)

Within three days of being released from jail, id.,
Hafford met Mr. Pelletier at a Presque Isle Wal-Mart. (PE 1:6)
Pelletier offered him a job swimming marijuana across the St.
John river. id. Hafford swam the river for the first time the
very next night. (PE 1:7)

Hafford had been working for Pelletier for about two
months when he began swimming the river both ways. (PE 1:10)
Of course, during Pelletier's trial, Hafford switched up and
said it was during the last two months before Pelletier went
to jail, following his near miss with the Customs agents, that
Hafford began making the roundtrip. (308:80-82) Defense
counsel failed to cross-examine Hafford on this point, and
the Government felt no need to correct this inconsistency.

Hafford told the grand jury that he was making the trip
to Canada at least once a week and as often as seven days a
week. (PE 1:11) We now know that this was an "exaggeration."
(308:165-66)

Hafford told the grand jury that he had smuggled between
2000-2500 pounds of marijuana for Pelletier (PE 1:15), but by
the time Pelletier went to trial, the United States got Haf-
ford down to a more credible 1000-1500 pounds (the weight need-
ed for a sentence enhancement), some of which was Hafford's
owm weed. (308:83)

Mr. Hafford claimed to have been present when Pelletier
gave Rick Daigle $50,000 in cash to purchase the Lavurtu settle-

ment property (PE 1:25-26).  In this version, the money changed
hands in the parking lot, and the lawyer handling the deal was
named Pelletier.  (PE 1:26)  Not only was the lawyer's name
not Pelletier, but no one--especially the realtor, lawyer,
Rick Daigle, or Mr. Pelletier--ever testified that Hafford was
present when this deal went down.

The lies became more damning when Hafford testified at
the Ladner trial (PE 2).  Hafford testified that he met Pelle-
tier while they were doing time at Windham.  Pelletier told
Hafford that he could "work for him and pretty much sell mari-
juana" when he got out of jail.  (PE 2:15)  By the time of Pel-
letier's trial, Hafford admitted that the conversations he had
in jail with Pelletier did not involve drugs.  (308:138-39)

Hafford looked Pelletier up when he got out of jail.
they met at the Presque Isle Wal-Mart.  Kendra Cyr was with
Pelletier, but she went inside the store.  (PE 2:15-16)
Archie Ladner was with Hafford.  (PE 2:16)  Hafford told Ladner
that Pelletier was supposed to put him to work doing something,
but he didn't know what kind of work he would be doing. (PE 2:17)
Ladner went inside the store to use the bathroom while Hafford
and Pelletier talked.  (PE 2:17-18)

They talked about a guy named Mike Easler and the possi-
bility of Hafford muling weed across the border.  Pelletier need-
ed someone to swim the river.  Pelletier wanted to find Easler
because he had stolen a lot of money from Pelletier.  (PE 2:18)

Ladner returned from the bathroom and was introduced to
Pelletier.  Mr. Ladner (who is now deceased) was not present

when Hafford and Pelletier were discussing Hafford's employment opportunities. (PE 2:20) Hafford related Pelletier's pot smuggling proposal to Ladner on the way back to Ladner's house. (PE 2:21)

Hafford was crossing the river with marijuana at least once every week and sometimes more than once a week. (PE 2:29)

Mr. Pelletier would hide drug money in the depths of his wheelchair cushion, where it would then be driven into Canada and exchanged for the drugs Hafford would swim back into the United States. That practice was changed after Customs agents searched Pelletier's vehicle. (How Pelletier, a four-time loser, was not taken into custody for trying to cross the border was not explained.) Following the search, Hafford began swimming the money into Canada then swam the drugs back into the United States. (PE 2:32-33)

Hafford claimed that he was present when the property deal went down and that he was also present when Pelletier purchased purebred showhorses for cash. (PE 2:50-51; cf., 308:98-99)

During the time Hafford worked for Pelletier, Hafford was smoking a lot of marijuana and methamphetamine. (PE 2:75) This drug usage undoubtedly contributed to Hafford's inability to recall what he might have told law enforcment personnel and the grand jury. (PE 2:89-96) Nevertheless, Mr. Hafford had total recall about the conversations that allegedly transpired

between himself and his "coconspirators" three years earlier while smoking marijuana and meth on a regular basis. (PE 2:97)

In an unforgiveable display of ineffectiveness, defense counsel failed to cross-examine Hafford about the most remarkable claim Hafford made during the Ladner trial: There, Hafford testified under oath that Pelletier never told him that he (Pelletier) had other people swimming the river before Hafford came along, "because [Pelletier] never used to do it that way before." (PE 2:97) At Pelletier's trial, of course, Hafford testified that Michael Easler used to work for Pelletier as a swimmer. (305:115) Indeed, it was allegedly Easler's old wetsuit that Hafford wore until Mr. Pelletier bought him a new one. (308:77, 116) Mr. Pelletier never bought any swimming equipment for Hafford.  Pelletier owned a large lake, and the equipmment he purchased was for his personal use.

When asked how Mr. Pelletier used to smuggle marijuana into the country before Hafford came along, he serenly replied, "I have no idea. He just was talking about selling a lot of dope." (PE 2:98) The Government, of course, made no effort to correct this obviously perjured testimony when it was served up at Pelletier's trial.

And let's not overlook the fact that Hafford testified at Ladner's  trial that Pelletier agreed to put him to work selling weed while they were in jail together (PE 2:99), but testified to the exact opposite at Mr. Pelletier's trial. (308:138-39)

Hafford admitted that he told police that Pelletier had been sitting on $180,000 in cash when he had his close encounter with Customs, but in real life, Hafford had no idea how much money Pelletier had been sitting on . (PE 2:100)

Hafford claimed that he crossed the border with Pelletier eight to ten times. (PE 2:103) During one of these smuggling excursions, Hafford took 25 pounds of cocaine across the border into Canada, for which he claims he was paid half a pound of coke.  Or something.

> Q  Okay. Did you exchange the coke for pot?
> A  No.
>
> Q  What did you get in return for the coke?
> A  That wasn't my deal.
>
> Q  Who--
> A  I did that for somebody else.  That was for Steve

from Conneticut, the guy I did the first couple of runs for, and I was just going over to get dope for Mike [Pelletier], and I had made extra money taking the coke across. (PE 2:104-05)

At Pelletier's trial, without Government correction, Hafford testified that he traded some of the cocaine for mari-juana, then took the rest, put it in a bowl, and had a party. (308:   ) Defense counsel failed to cross-examine Hafford on this point.

Alas, Mr. Hafford's memory clouded up again when discussing who might have rehearsed his trial testimony using his grand

jury testimony. (PE 2:135-38)

Hafford told the Ladner jury that Pelletier was on the
Canadian side of the border each and every time Hafford went
over to pick up marijuana. (PE 2:157) We now know, however,
that this testimony was not consistent with his testimony in
Pelletier's trial.

Hafford never lied about how many guns Ladner had.
(PE 2:171-72)

At Ladner's trial, Mr. Pelletier never provided Hafford
with any maps so he would know how to locate people.  Indeed,
Pelletier never gave Mr. Hafford any maps at all. (PE 2:183)
By the time of Pelletier's trial, Mr. Pelletier allegedly pro-
vided Hafford with maps so detailed as to be the envy of Google.
(308:    ) Naturally, the Government did not bother to correct
this inconsistent testimony, and defense counsel never crossed
Hafford on the point.

A prosecutor's knowing use of perjured testimony is one
of "the classic grounds for the issuance of a writ of habeas
corpus." Rose v. Lundy, 455 U.S. 509, 544, 102 S. Ct. 1198,
71 L. Ed. 379 (1982) (Stevens, J., dissenting).  If the prose-
cution case included prejured testimony that the Government
knew or reasonable should have known was false, and that false
testimony was material to the issue of the defendant's guilt or
innocence, the prosecutor's failure to correct the perjured test-
imony will result in a new trial.  See Ouimette v. Moran, 942

F. 2d 1, 11 (1st Cir. 1991) and the Supreme Court cases cited therein.

Here, the same prosecutor was present for Hafford's testimony before the grand jury and the Ladner and Pelletier trials. AUSA Casey knew or should reasonably have known that Hafford was lying tet failed to make even one single correction or clarification. Mr. Pelletier was denied a fair trial by the Government's misconduct as well as defense counsel's failure to catch the glaring inconsistencies.

Of additional concern is the fact that Hafford's testimony was used to calculate drug weight, which in turn led to Mr. Pelletier receiving a life sentence. When drug quantity is used to obtain an enhanced sentence, the quantity of the drugs becomes an element of the offense. Jones v. United States, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999); Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). An enhanced sentence cannot stand when it is based on the perjured testimony of a Government witness. Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). The court has already recognized that Hafford's lies necessitated resentencing in John Pascucci's case, 664 F. Supp. 2d 128, and it should do no less for Mr. Pelletier following any unsuccessful retrial. In the interim, because Hafford testified pursuant to an agreement that resulted in a re-

duced sentence or two, and Hafford clearly failed to fulfill

his obligation to testify truthfully, the court and the

United States may wish to consider resentencing in his case

as well.

ISSUE V.

Whether defense counsel rendered ineffective
assistance when he failed to object to  the
introduction of tape transcripts and record-
ings.

---

The United States introduced, without defense object,
taped conversations purporting to be between Mr. pelletier and
MDEA Agent John Darrell Ouellette. The conversation was    in
French. Agent Ouellette was pretending to be a person who sto-
len marijuana from Mr. Pelletier, not realizing who the drugs
belonged to and, now armed with that knowledge, wanted  to do
the right thing and return the drugs. (311:121-26)

The government provided what purported to be English
language translations of the conversations. Defense counsel
never had his own transcripts made. He did not question the
accuracy of the government's transcript. There was no mention
of whom made the translation and under what conditions, what
the translator's qualifications were, and the transcripts
were not authenticated. The transcripts accompanied the jury
during their retirement to deliberate without objection. De-
fense counsel rendered ineffective assistance.

The use of a transcript as a jury aid is left to the
sound discretion of the trial judge. United States v. DeLeon,
187 F. 3d. 60,65 (1st Cir. 1999)(citation omitted) The First
Circuit has recognized the importance of ensuring that a
transcript offered for use as a jury aid be authenticated by
testimony as to how they were prepared, the sources used,
and the qualifications of the person who prepared them. Id.

(citations omitted) " We will not require trial judges to
screen transcripts and to make objections where the parties
themselves have raised none; we leave such advocacy to coun-
sel." Id. (footnote omitted)

Defense counsel's passive acceptance of this evidence
was not in the least harmless. The point of introducing these
transcripts and the recordings was to stack inference  upon
inference to prove Pelleiter's guilt. The United States  in-
tended to show the jury that Pelletier went to the rendezvous
set up by Agent Ouellette in order to retrieve the marijuana
allegedly stolen from him, thus showing Pelletier had    a
propensity for selling pot, thus, he must be in a conspiracy
to traffic marijuana.

The tapes were of a conversation in French. It is  not
known how many of Mr. Pelletier's jurors spoke or understood
French, but he would be willing to wager that not all of
them did. Defense counsel permitted the government to intro-
duce its own translation of what the conversation was about
with no effort to contradict the United States. Indeed, Mr.
Pelletier does not know if defense counsel even bothered to
read the transcript prior to trial. No reasonable attorney
would have allowed such damaging testimony to go unremarked
without at least obtaining his own translation of the
tapes. Mr. Pelletier is entitled to a new trial on this
issue.

-49-

VI.

COUNSEL WAS INEFFECTIVE BY HIS FAILURE TO IN-
VESTIGATE THE LAW GOVERNING INTRODUCTION   OF
HEARSAY TESTIMONY UNDER FED.R.EVID.,RULE   804
(b)(3) AND FOR CONCEDING ERRONEOUSLY      THAT
MICHAEL EASLER WAS UNAVAILABLE TO TESTIFY   AT
PELLETIER'S TRIAL.

The government's investigation into Michael Pelletier
was initiated by Adam Hafford ("Hafford") following his   ar-
rest for shooting two Moose illegally. Hafford was subseqently
charged by federal authorities as a 'Felon in Possession   of
a firearm' in violation of 18 U.S.C. § 922 (g)(1). Because he
is a repeat offender with at least three (3) qualifying   pre-
dicate ("violent felonies and/or controlled substance")   of-
fenses, his sentence exposure on the firearm offense increased
from zero to ten (0-10) years to a mandatory minimum of fifteen
(15) years to LIFE. To avoid this stiff penalty, it was   Haf-
ford's decision that he would cooperate with federal author-
ities. He began his cooperation by providing information that
he was a major player in a international drug smuggling   oper-
ation managed by Michael Pelletier (Hereinafter "Pelletier" or
"movant").  Hafford appeared before and testified to the grand
jury concerning the smuggling operation and the quantity  of
drugs smuggled. Hafford testified later under examination
that his grand-jury testimony regarding the amount of  drugs
he smuggled was exaggerated ( 308 :165 )

The crux of this issue is that Hafford was allowed to
testify as to the hearsay of what he claimed Michael Easler

-50-

revealed to him concerning his part in the charged conspiracy
while they were in jail together. Specifically and relevant to
this issue is what Hafford testified that Easler told him dur-
ing a jailhouse conversation.

Counsel objected to the hearsay testimony under a claim
that the statements were not made by Easler in furtherance of
the conspiracy. The government clarified it's position was  to
introduce the hearsay under the exception that it was a "state-
ment against penal interest" under Fed.R.Evid.,Rule 804 (b)(3)
and cited UNited States v. Barone, 114 F.3d. 1284 (1st Cir.19-
97). (308  :110 ) Counsel effectively abandoned his objection
following the colloquy concerning Barone supra, and failed to
assert a new objection against the introduction of the hearsay
as a statement against interest. During the discussion  as  to
the applicability of Rule 804 (b)(3), the Judge's law clerk
interjected that for the rule to apply the witness had to be
unavailable (308 : 113). In response, the government pled that
Michael Easler ("Easler") was unavailable because he was   in-
voking his Fifth Amendment right against self-incrimination,
and that he had e-mails from Easler's defense attorney to this
effect. Counsel completely abandoned Pelletier at this  stage
of the proceedings by conceding that Easler was unavailable
because he was invoking his privilege under the Fifth Amend-
ment. The government in support of it's position that Easler
was unavailable stated to the court that Easler would "refuse
to testify, refuses to waive his Fifth Amendment privilege ,

and I have confirmatory email from [Easler's attorney] from last week on this very point, and that **constitutes unavailability under the meaning of [Fed.R.Evid.,Rule 804 (b)(3)], Your Honor.**" (308:113)(emphasis added) Counsel was ineffective at this juncture of the proceedings by his abandonment and/or his lack of knowledge of the law relevant to this proceeding, and his failure to assert an objection to this flawed legal theory.

Counsel knew or should have known that the assertion of the Fifth Amendment privilege against self-incrimination does not axiomatically exonerate Easler from testifying. It is the court's duty to determine that the statement was in fact against his interest. This determination is not one of-- one size fits all, it must be determined from the circumstances of each case. See United States v. Lang, 589 F.2d.92 (2nd.Cir. 1978 ). The Lang court set forth an analysis to be used in determining the admissibility of challeneged statements against interest:

1. Was the determination made by the court that the statement was against interest? It must be made from the circumstances of each case.

2. Does the "Firsthand Knowledge" requirement  of Fed.R.Evid.,Rule 602 apply to the person introducing   the statement? Third Party?

3. Firsthand knowledge has always been inherent in

the statement against interest exception, and is assured by
Rule 602.

Id.

The First Circuit in United States v. Barrett, 539 F.2d.
244 (1st Cir.1976) has also enunciated a two-stage analysis:

1. Do the offered remarks come within the hearsay
exception as a "statement against interest" and,

2. If they do, is there sufficient corroboration
to clearly indicate trustworthiness?

It is unequivocal that Counsel abandoned movant at this
very critical stage of the proceedings and that he failed to
conduct an independent legal investigation concerning the law
to be applied and the procedures relevant to the introduction
of hearsay testimony. It is equally clear that Hafford's testi-
mony concerning Easler's role in the charged conspiracy was not
only in support of the drug quantity determination, but also
to bolster Hafford's finger pointing at Michael Pelletier. It
is also relevant and noteworthy that Easler's statements were
consistent with naming Pelletier as a compatriot. See D. Daven-
port, The Confrontation Clause and the Coconspirator Exception
in Criminal Prosecutions, A Functional Analysis, 85 Harv.Law
Rev. 1378, 1396 (1972):

> "Nonetheless, the naming of another as a compat-
> riot will almost never be against the declarant's
> own interest and thus will contain little  assur-
> ance of reliability on this ground...The invocat-
> ion of a name may be gratuitous, may be deliber-
> ately false in order to gain advantages for  the
> declarant greater than those that would flow from

> naming a real participant or no one at all,
> may be a cover for concealment purposes (an-
> other kind of 'advantage), or may represent
> an effort to **gain some kind of personal re-
> venge**." [footnote omitted] (emphasis added)

The record in this case would support that Easler's
statements to Hafford, knowing Hafford was testifying against
Pelletier may exact severe revenge on him by inflating  the
size of the alleged conspiracy. This in conjunction with the
inconsistencies and out right lies of Hafford should have
been enough for counsel to conduct an investigation into the
law governing this particular area of evidence instead  he
relied on the government's investigation. See Strickland v.
Washington, 466 U.S. 668 (1984). It is irrefutable that the
government was not put to its proof and counsel's deficient
performance at this stage ultimately led to movant being held
accountable for a drug quantity that was inflated by hearsay
testimony that was inadmissible. Had counsel performed  as
counsel guaranteed by the Sixth Amendment of the United States
Constitution, he would have required that Easler be brought
in and the court determine whether his silence was in fact
justified by the Fifth Amendment. See Hoffman v. United States,
341 U.S. 479,486,95 L.Ed. 1118 (1957):

> A witness is not exonerated from answering
> merely because he declares that in so do-
> ing he would incriminate himself. It is for
> the court to say whether his silence is jus-
> tified, and to require him to answer if it
> clearly appears to the court that he is mis-
> taken.

But this protection must be confined to
instances where the witness has reasonable
cause to apprehend danger from a direct
answer.

The Fourth Circuit has had opportunity to address this
crucial issue. In United States v. Bumpass, 60 F.3d.1099,1102
(4th Cir.1995) in pertinent part developed the following  in
analyzing the exception:

1. Whther declarant had at the time of making the
statement pled guilty or was still exposed to prosecution
for making the statement, 2.) the declarant's motive  in
making the statement and whether there was a reason for the
declarant to lie, 3.) whether declarant repeated the state-
ment and did so consistently, 4.) the party or parties  to
whom the statement was made, 5). the relationship of  the
declarant with the accused, 6.) the nature and strength of
independent evidence relevant to the conduct in question.

Counsel clearly abandoned his client at this stage of
the proceedings. He knew or should have known that the law did
not support the declarant invoking the Fifth without having
been determined by the court that his silence was justified,
and, counsel knew or should have known that Hafford was  a
witness of dubious credibility himself and could not have
personal knowledge of the substance of his hearsay testi-
mony. See United States v. Lang, 589 F.2d. 92 (2nd Cir.    );
United States v. Tropeano, 252 F.3d. 653 (1st.Cir. 2001); see
also, Fed.R.Evid., Rule 602-Firsthand Knowledge- 4 Weinstein's
Evidence P. 804 (b)(3)(02)(1977), McCormick Evidence §§  10,
276 (1972), V. Wigmore, Evidence § 1471 (a)(Chadbourne Rev.
1974).

The court further indicated in it's finding that Easler's statement would be allowed under the "statement against interest" exception, that the alleged conversation between Easler and Hafford was a casual conversation between two inmates. The error in this determination is that the fact of Easler and Hafford being inmates housed together having a conversation is not relevant to whether or not Easler's alleged statements were against his penal interest. See United States v. Lang, 589 F.2d 92 (2nd Cir. 1978). It is also noteworthy to the determination that Hafford was testifying that "Easler previously worked for Pelletier in the same capacity (swimming marijuana across the St.John river) as he," that in the related trial of Archie Ladner, Hafford, testified that noone before him used to swim the river for Pelletier. (PE 1: 34)

Counsel's performance at this stage of the proceedings was clearly deficient and the deficient performance resulted in the ultimate prejudice; that is, the hearsay was the basis for the drug quantity determination being inflated and which anchored a mandatory Life sentence. But for, the introduction of the hearsay testimony that Easler allegedly admitted to smuggling marijuana for Pelletier ("to Hafford") while Hafford and Easler were jail mates, it is irrefutable that no other evidence was presented to which could be relied on for determining the drug quantity as assessed and attributed to Pelletier via 'hearsay' testimony by Adam Hafford.

It is of further interest that this court should take

-56-

notice that in this proceeding regarding the admissibility of
the hearsay otherwise inadmissible, the court relied on  the
sole testimony of Adam Hafford. In a related and subsequent pro-
ceeding, United States v. Pascucci, 664 F.Supp.2d. 128, 135 (D.
ME 2009), this court having become more familiar with  the
overall case and Adam Hafford stated in pertinent part:

> " The court is reluctant to rest it's findings
> on Mr. Hafford's testimony alone."

The irony of the statement above is that the court  was
referring to the drug quantity determination in that case.  It
is equally clear that movant's counsel failed to object to the
introduction of the hearsay as a statement against interest and
to base that objection on relevant and positive law as referred
to herein. Counsel further abandoned his client when he  con-
ceded in error that Easler was "unavailable." Having made this
concession, the road to a mandatory LIFE term was paved.   It
is unequivocal that counsel failed to object and that by  his
own admission he was unfamiliar with the law regarding  State-
ments against Interest. Clearly, his failure to familiarize
himself with relevant law is deficient performance as he  ef-
fectively abandoned his client, and, his deficient performance
resulted in prejudice of a life term. The two-prongs of  the
test enunciated in Strickland v. Washington, 466 U.S. 668 (19-
84) are met and movant is deserving of a new trial and/or  a
new sentencing proceeding.

## VII.

COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT
TO AND/OR ASSIGN AS ERROR ON APPEAL    THAT
THE COURT'S DETERMINATION OF THE DRUG QUANT-
ITY WAS NOT IN ACCORDANCE WITH CIRCUIT AUTHOR-
ITY.

Counsel was ineffective by failing to object to the dis-
trict court's finding of the higher estimate of drug quantity
and imposing the maximum sentence based thereon. It is clear
that government witness, Adam Hafford, exaggerated the  drug
quantity that he smuggled into the United States. Adam  Haf-
ford (hereafter "Hafford") testified before the grand  jury
that he smuggled between "2,000-2,500 pounds" of marijuana.
(PE 1:15) In the trial of Archie Ladner who was first tried
of the charged conspiracy, Hafford testified as to the amount
of marijuana he smuggled being " a thousand to 1,500 pounds."
(PE 2: 35) At movant's trial, Hafford testified as to the
drug quantity smuggled as " Um, closest I can figure, some-
where probably around 1,500, maybe less." (308:83) Through-
out the trial, the government presented that Hafford smuggled
between 1,000 - 1,500 pounds of marijuana, and, the court
ruled on movant's 'Motion for Judgment of Acquittal' that
the jury could have attributed an equal amount of smuggled
drugs (marijuana) to Michael Easler ("Easler") The govern-
ment alleged that Hafford smuggled for Michael Pelletier
("movant") from June until November 2004. However, Hafford's
testimony in movant's trial was that he made a trip every
week or two weeks, or whenever needed. (308:82) The court

attributed to Hafford 453.60 kilograms of marijuana. The court
based on adopting the Presentence Report attributed   598.75
kilograms of marijuana to Easler. (PSR at ¶¶ 6,8) The "PSR"
was incorrect in it's quantity determination as to Easler
because the report found that ' Easler smuggled marijuana for
eleven (11) months at sixty (60) pounds twice a month.'[17] The
proof at trial was that Easler smuggled marijuana (60 pounds)
fro spring until there was ice in the water. (308:116)  The
court's independent finding was that Easler could be attri-
buted the same conduct as Hafford, that is, Hafford worked
from June 2004 until November 2004 smuggling marijuana  for
Pelletier. Thus, Easler would be accountable for smuggling
marijuana for an equal term. The "PSR" found that he worked
in his capacity for eleven (11) months, and the "PSR"  held
Easler accountable for more marijuana than Hafford.     The
only testimony regarding Easler's smuggling activities does
not support the PSR findings. The testimony that Easler did
his smuggling from "spring until there was ice in the water"
equates to a period of not more than 6-7 months, and   not
eleven (11) months as the PSR set forth. (308:116).    The
Presentence Report also set forth that Easler smuggled 60
pounds of marijuana twice a month. This finding is also in
error and counsel failed to object to these findings  that

17- The government in closing stated: " The evidence demonstrates
    that Mr. Easler was bringing in between 2003 and 2004 between--
    or approximately 60 pounds a month of marijuana"

18- It appears that Easler started in Winter and went to spring.

were incompatible with what was presented by the prosecution

to the jury:

> " The evidence demonstrates that Mr. Easler
> was bringing in between 2003 and 2004  bet-
> ween--or approximately 60 pounds a    month
> of marijuana."

(335: 163)(Closing Argument, AUSA Joel Casey, 07/19/2007)

However, the Presentence Report findings as to Hafford

was the "conservative estimate" of one-thousand pounds which

converted into 453.60 kilograms. Had counsel objected   to

the findings as to Easler, it is unequivocal that he would

have prevailed and the court would have been compelled  to

direct a verdict consistent with the evidence presented and

conceded to by the government. Id.

While the court was correct in stating that the jury

could have acceptted the higher estimate of the drug  quan-

tity (1,500 pounds), it is the district court's duty in ac-

crediting the jury's findings to " err on the side of  cau-

tion when choosing between plausible estimates of drug quan-

tity." See United States v. Marks, 365 F.3d. 101,105 (1st.

Cir.2004). But for, the lack of objection by counsel  to

the court's drug quantity determination in accrediting the

jury's verdict, it is indisputable that "reasonable jurists"

would find the issue debatable and requiring further    in-

vestigation. The First Circuit directs courts to "err   on

the side of caution" in determining drug quantity, and  in

this case, the court knew the jury's findings and the "PSR"

were flawed, and counsel himself should have objected.

-60-

## VIII.

### COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO DOUBLE COUNTING OF THE CASH-TO-DRUGS CONVERSION.

Counsel was ineffective at sentencing and on appeal for failing to properly object to, and assign as error on appeal, that movant's sentence exposure was manipulated based on the "cash-to-drug" conversion that amounted to double-counting on at least two (2) occassions:

1). The government alleged via cooperating witness, Adam Hafford, that Mike Easler (hereinafter "Easler" and "Hafford") had prior to himself "worked" for Pelletier (" movant") in the same capacity--smuggling marijuana from Canada by swimming the St. John River. Hafford also alleged that during the time when Easler was smuggling that he stole a large sum of cash. The amount was uncertain. In movant's trial Hafford testified in pertinent part:

> Mr. CASEY (AUSA):  Did Mr. Easler talk to you about ever stealing any money from Mr. Pelletier?
>
> ADAM HAFFORD:  Yes, he did.
>
> MR. CASEY (AUSA):  And what did he tell you in that regard?
>
> ADAM HAFFORD:  He had told me that he, ah, went across the border and got one of the shipments of pot and took that, and, ah, he had went down to Portland and collected 50,000 or somewhere right there--he said 50- something thousand, and they had taken off to Oklahoma to his mother's place.

(308:116-17)

In the initial statement that Hafford made before the
grand jury, he stated that the movant told him in pertinent
part:

> MR. CASEY (AUSA): So Mike Easler was doing your job
> for Mike Pelletier before you got out of jail?
>
> ADAM HAFFORD:  Yes.
>
> MR. CASEY:  How do you know that?
>
> ADAM HAFFORD:  When I started for Mike, he was act-
> ually looking for Mike Easler because he had ripped
> him off or [sic] 310 grand.
>
> MR. CASEY:  Mike Pelletier told you that?
>
> ADAM HAFFORD:  Yes.
>
> MR. CASEY:  Did Mike Pelletier tell you where Mike
> Easler had gotten this money?
>
> ADAM HAFFORD:  He had collected all the money from
> all the debts owed and, plus went over and got more
> weed across the border and never paid for nothing.

(PE 1:34)(emphasis added)

The district court ruled that the jury could have
reasonably attributed up to 140.61 kilograms of marijuana
to movant by converting the amount of money stolen   from
him by Easler (up to $ 310,000) into pounds of marijuana.

Counsel failed to properly object to the double -
counting and to assign as an error on appeal that utilizing
this formula was double-counting and manipulated the  true
sentence exposure into a mandatory Life sentence. The dis-
trict court denied movant's motion for judgment of acquit-
tal on the challenge to the sufficiency of the evidence

(drug quantity) based in part, that: " a rational jury could have found that the amount of marijuana attributable to Easler was the same as the amount attributable to Hafford." (Acquittal Order 3-4)[16] In addition, the district court ruled that " the jury could have reasonably attributed up to 140. 61 kilograms of marijuana to Pelletier **by converting the amount of money stolen from Pelletier by Easler** (up to $ 310, 000) into pounds of marijuana (at $ 1,000 per pound)." (Acquittal Order-5)(emphasis added) Counsel failed to object to this reasoning asserting that the amount of money stolen was in contention based on the inconsistent testimonies of Hafford, Fox and the admitted hearsay of Easler. The alleged stolen money represented marijuana already counted in  the importation evidence (1,000 to 1,500 pounds). The court further ruled as an alternative basis for upholding the jury's verdict that " the jury could generally use Pelletiers "substantial amounts of cash" as a basis to conclude that [he] was responsible for more than 1,000 kilograms of marijuana." Id.

---

[16] This finding is inconsistent with the Presentence Report and counsel failed to object and to request a special  instruction on how to convert cash into drugs (pounds of marijuana) and then into "kilograms of marijuana. The PSR at  ¶ 8 used a "conservative estimate" that Hafford smuggled  a total of 1,000 pounds, which converted to 453.60 kilograms. Thus, applying the same to Easler equals 907.20 kilograms . The cash to drug conversion erroneously inflated the  drug quantity over the one-thousand kilogram threshold and mandated a LIFE sentence.

It is clear that the court denied the Motion for Judgment of Acquittal on the basis previously mentioned. Counsel was ineffective by his failure to properly object to the basis of the double-counting. But for, counsel's failure to object to the double-counting, using inconsistent, and uncertain amounts of cash to inflate the drug weight is what pushed the drug quantity finding above the threhold of more than one-thousand kilograms of marijuana. When the court refers to the "cash" that was stolen by Easler and converting that into marijuana, the court overlooks the very fact that the testimony was that Easler collected money owed from the marijuana already counted in the importing; went to Canada and received a shipment of marijuana, which Hafford testified Easler said amounted to $110,000 (60 pounds of marijauna x $1,000 per pound + $50,000 collected from drug debts). To count the $ 50,000 or the $ 310,000 otherwise alleged stolen is double-counting of the marijuana already counted in Hafford's testimony. In another instance, it is clear that the jury finding and the court's finding that Pelletier was responsible for more than 1,000 kilograms is incompatible with the trial proof and the findings of the PSR.

The court adopted the findings of the Presentence Investigation Report. The PSR at ¶ 8 found that Hafford was responsible for the conservative estimate of smuggling 1,000 pounds of marijuana, or 453.60 kilograms. It is indisputable that the court in denying movant's motion for judgment of acquittal held: " a rational jury could have found that the

the amount of marijuana attributable to Easler was the same
as the amount attributable to Hafford." (Acquittal Order 3-4) It
is now necessary to look at what the attributable drug weight
was to Hafford: The Presentence Report used the conservative
estimate that Hafford smuggled a total of 1,000 pounds, which
converted into 453.60 kilograms. (PSR ¶ 8) However, the PSR
erroneously found that Easler smuggled 60 pound loads of mari-
juana two times per month for 11 months, which totaled 1,320
pounds (598.75 kilograms. (PSR ¶ 6). The government even con-
ceded in closing that Easler smuggled 60 pounds once a month,
and the trial testimony also shows that it was from " the spring
until there was ice in the water." (Doc.#356) It is irrefutable
that movant can defeat the drug quantity based on the findings
of the PSR which movant can show is erroneous and in conflict
with the proof entered at trial. However, the jury verdict is
not reliable as being unanimous on a single set of facts.  It
is clear that the jury was given no instruction on converting
the trial proof that consisted of [pounds]  into the  verdict
to be based on "kilograms" of marijuana. The "cash-to-drugs"
conversion again was premised on the conversion of the alleged
stolen money into "[pounds]" of marijuana. The proof at trial,
however, presented a conversion for converting the [cash-into-
drugs] as $ 310,000 converted into 310 pounds ( $ 1,000 per
pound divided into $ 310,000 = 310 pounds). However, still
counsel failed to request a special instruction to the  jury

-65-

on how to convert "[pounds] into [kilograms]" of marijuana. It is further evidence of counsel's ineffectiveness that counsel also failed to poll the jury as to their conversion method. In this instance with so much at stake ("mandatory life sentence") it is indisputable that counsel performed deficiently--failed to perform at all in violation of movant's Sixth Amendment right to counsel. Strickland v. Washington, 466 U.S. 668 (1984); and counsel's omission in this isolated instance prejudiced the movant by the imposition of an otherwise avoidable  Life sentence. But for, counsel's omission to request a special in-struction to the jury on the proper conversion method for con-verting "pounds into kilograms," it is very likely-- nearly a certainty that at least one juror would not have found  that movant was responsible for **more than** one-thousand kilograms of marijuana. See Wiggins v. Smith, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d. 471 (2003)(prejudice where there was a "rea-sonable probability that at least one juror would have struck a different balance."; Strickland, 466 U.S. at 694.

IX.

COUNSEL WAS INEFFECTIVE BY FAILING TO RE-
QUEST A SPECIAL JURY INSTRUCTION       DIS-
TINQUISHING BETWEEN "POUNDS" AND       "KILO-
GRAMS" OF MARIJUANA.

The indictment in this case does not charge a specific drug quantity except to say " a detectable amount of  marijuana ." (Doc.# 1). Throughout the course of the trial  not one witness, including star witness, Adam Hafford, testified to the importation of "kilograms" of marijuana, or the  distribution of "kilograms" of marijuana. The testimony  relevant to the drug quantity referred to "pounds" of  marijuana. The government on appeal urged the First Circuit  to take into account that the jury on their own "without  instruction" would have converted 1,500 pounds to 681.82 kilograms.  (Gov't Brief on Appeal, at P. 30)(see footnote 7).

The government elicited testimony from Adam Hafford that he estimated the total amount of marijuana he  swam across the river to be"1,000 to 1,500 pounds." (Doc.# 356) In another instance, the court noted that " 1 pound equals .453-35924 kilograms and thus 1500 pounds equals 680.38 kilograms (Doc.# 356). The court further held that the jury was  " entitled to accept the higher estimate:" thus, Hafford's testimony alone produced 680.38 kilograms (Doc.# 356).

It is clear that counsel abandoned his client at this stage of the proceedings by failing to request a "special instruction" providing the jury with the pound to kilogram

-67-

conversion  ( 1 pound equals .45335924 kilograms or that a
kilogram equals 2.2 pounds). Counsel did not perform as  a
seasoned attorney would in this position. He had an obliga-
tion to protect his client ("Pelletier") from  a verdict ren-
dered by an uninformed jury, and should have requested   a
special instruction to the jury on how to convert "Pounds -
to- kioograms." Nonetheless, counsel failed to poll   the
jurors individually regarding their verdict on the  speci-
fics of their drug quantity finding. Because counsel failed
to perform at this stage of the proceedings, the record  is
lacking that the jury verdict was rendered based upon    a
correct mathmatical conversion of "pounds-to-kilograms"  of
marijuana. Considering that the trial testimony with   one
exception never referred to kilograms of marijuana, it   is
a near certainty that the jurors made their finding that
"Pelletier" was responsible for more than 1,000 kilograms of
marijuana on the trial testimony that Hafford  estimated he
brought over between 1,000 and 1,500 pounds of marijuana.
(308: 83)

     Counsel was ineffective where he failed to protect
movant's constitutional right to a ' fair trial' by failing
to ensure that the jury was informed that it would be asked
to render a verdict that would require them to convert the
evidence of "pounds of marijuana" into "kilograms of mari-
juana," and how to do so. It cannot be said that the jurors

-68-

were unanimous in their verdict that Pelletier possessed or
otherwise was responsible for "more than 1,000 kilograms" of
marijuana; however, in hindsight and knowing what is known
now, and "erring on the side of caution," Marks, 365 F.3d.
at 105, no reasonable jurist could conclude that Mr. Pelle-
tier was accountable for more than one-thousand kilograms
of marijuana. It is irrefutable that the governments proof
at trial consisting of a 'conspiracy involving 1,000    to
1,500 pounds of marijuana was confusing to the jury  when
asked to decide the case and render a verdict on   kilo-
grams. The lack of this request for a special instruction
by counsel undoubtedly resulted in the jury finding   that
Pelletier was responsible for more than 1,000 kilograms of
marijuana based on the proof that consisted of 1,000    to
1,500 pounds, and, that the jury did not make the necessary
conversion. However, what is crucial to this finding is
that without having given the jury an instruction on   the
conversion formula, it cannot be said with certainty   that
the jury found anymore than the one-thousand pounds which
converts into 453.60 kilograms (PSI ¶ 8). The evidence at
trial was that Easler and Hafford worked for Pelletier for
the same amount of time e.g. 'Easler swam the river from
spring until there was ice in the water and Hafford swam
from June 2004 until November 2004 approximately six months

each, the findings that each were accountable for the con-
servative one-thousand pounds would convert into 453.60 kilo-
grams of marijuana. But for, counsel failing to request   a
special instruction to the jury on how to convert pounds-to-
kilograms, it is uncertain as to whether the jury verdict
was unanimous and whether the jury actually found " Pelle-
tier responsible for more than 1,000 kilograms, or if they
rendered their verdict based on the trial proof consisting
of 1,000-1,500 pounds.

Clearly, counsel was ineffective at this stage of the
proceedings and his deficient performance prejudiced   the
movant with a mandatory Life sentence. See Strickland    v.
Washington, 466 U.S. 668 (1984); UNited States v. Cronic,
466 U.S. 648, 659 (1984)

## ISSUE X.

Whether defense counsel rendered ineffective assistance by failing to request a       jury instruction regarding the guilty pleas    of Mr. Pelletier's "coconspirators"?

Adam Hafford, Michael Easler, and others involved in this case pled guilty and decided to cooperate with the government, and their immunity letters and plea bargain agreements were entered into evidence. However, defense counsel never requested a special instruction at the close of   all the evidence that these guilty pleas and immunity letters should not be considered proof of Mr. Pelletier's guilt.

When a codefendant pleads guilty, the district court "may inform the jury that a codefendant has entered a plea of guilty, provided the jury is clearly instructed that such a plea cannot be considered as evidence of the guilt of the remaining defendant or defendants." United States v. Earley, 482 F.2d. 53, 58 (10th Cir.), cert denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L. Ed. 2d. 738 (1973). The importance of the instruction is to ensure the jury does not use the codefendant's guilty plea as evidence of the remaining defendant's guilt. United States v. Baez, 703 F.2d. 453,455 (10th Cir. 1983).

Mr. Pelletier submits that defense counsel's failure to request an instruction on this issue permitted the jury to infer Pelletier's guilt as a result of his codefendants' guilty pleas, depriving him of a fair trial and effective

assistance of counsel. Pelletier is entitled to a new trial on this issue.

ISSUE XI

Whether defense counsel rendered ineffective
assistance by his failure to request a mul-
tiple conspiracy jury instruction?

---

The indictment and the evidence presented at trial
demonstrated that there was at least two conspiracies going on:
one allegedly involving Mr. Pelletier and Adam Hafford, among
others, and another one involving Hafford and others selling
marijuana and other drugs while Hafford was muling pot for Mr.
Pelletier.  See grand jury indictment; compare with Hafford's
trial testimony in the Pelletier and Ladner trials.  There was
also a variance between the conspiracy alleged in the indict-
ment and the Government's evidence at trial in that alleged
transactions and events involving the sale and possession of
marijuana outside of the dates alleged in the indictment were
presented.

One prime example is Hafford's testimony that he was
muling cocaine clearly did not belong to Mr. Pelletier.
(308:155)

> It is true that a court should instruct on the
> issue [of multiple conspiracies] if, on the
> evidence adduced at trial, a reasonable jury
> could find more than one such illicit agreement,
> or could find an agreement different from the
> one charged.

-73-

United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004)
(internal quotation marks and citations omitted).

There is a substantial probability that the independent
acts of Adam Hafford and Michael Easler were attributed to Mr.
Pelletier to support the conspiracy conviction and undermined
Pelletier's ability to demonstrate that he was not responsible
for the amount of drugs that were attributed to him.  "There
is always reason for scrutiny when the government may appear
to be sponsoring at different times two different versions of
events," United States v. Pagan-Santini, 451 F.3d 258, 266
(1st Cir. 2006), and Hafford's contradictory, unchecked, "ex-
aggerated" testimony demanded a multiple conspiracy instruction.
Trial counsel's omission allowed Mr. Pelletier to be convicted
for the charges in his indictment through the use of evidence
accruing outside the indictment.  Mr. Pelletier is entitled to
a new trial on this issue.

## ISSUE XII

Whether Mr. Pelletier is entitled to the return of illegally forfeited property?

---

Midway through the trial, the United States dismissed Count relating to a garage allegedly purchased with drug proceeds. (335:28, 99)  Although the Government dropped that charge, Mr. Pelletier was still forced to surrender his property as forfeit.

Pursuant to Fed. R. Crim. P. 41(g), Mr. Pelletier asks the court to direct the United States to return his real property.  Alternatively, he asks the court to direct the Government to pay Mr. Pelletier the fair market value for his property if it was auctioned or otherwise sold.

Mr. Pelletier also asserts that his trial attorney rendered ineffective assistance by his failure to ask that this property be exempt from the forfeiture of his other real property as sentencing.  Had defense counsel moved for the return of this property, the motion would have been granted (or the denial would have been preserved for appeal) and Mr. Pelletier's property would not have been seized.

Finally, Mr. Pelletier notes that, in the record available to him, there is no special verdict form regarding this property or any other property that was forfeited.  Under Fed. R. Crim. P. 32.2(5)(B) the Government must submit a proposed

special Verdict Form listing each property subject to forfei-
ture. If there was no such form prepared, Mr. Pelletier sub-
mits that all of his forfeited property and cash should be re-
turned to him on the ground that he was denied due process.
Too, if no special verdict form exists, then Mr. Pelletier re-
ceived ineffective assistance of trial and appellate counsel
by his attorneys' failure to raise the issue before any court.
This omission resulted in the forfeiture of substantial amounts
of cash and real property that would not have occurred sans
appropriate argument.  Mr. Pelletier is entitled to a hearing
on this claim.  See United States v. Cardona-Sandoval, 518 F.
3d 13, 17 (1st Cir. 2008) (evidentiary hearing required to
determine disposition of seized property and appropriate remedy
for unlawful forfeiture) (citations omitted); United States v
Pierre, 484 F.3d 75, 85 (1st Cir. 2007) (a forfeiture verdict
must be supported by a preponderance of the evidence).

## ISSUE XIII.

Whether counsel's cumlative errors denied Mr. Pelletier of his Sixth Amendment right to the effective assistance of counsel and his Fifth Amendment right to a fair trial?

---

For his final argument, Mr. pelletier submits that his attorney's cumlative errors deprived the Petitioner of a fair trial and his right to have effective assistance of counsel. These omissions, set out in the preceding arguments, permitted the government to obtain a conviction and a life sentence against Mr. Pelletier that it would not otherwise have earned.

The Government, through all means fair and foul, proceeded against Mr. Pelletier with a drug-addicted rat whose testimony the prosecutor sculpted through the trial and error process that began with the grand jury, tested in the Ladner trial, and perfected through Pelletier's trial. The prosecutor, AUSA Joel Casey, was present at every one of the proceedings and knew or reasonably should have known that Mr. Hafford was perjuring himself yet failed to correct the false testimony. Rather tahn bring Hafford's lies to the court's attention, the government rewarded him with sentence reductions even after Hafford admitted that he "exaggerated" previous testimony. This false testimony violated the terms of his plea agreement and resulted in Mr. Pelletier receiving a sentence of life in prison. And defense counsel sat back and allowed it to happen with minimal intervention.

-77-

Mr. Pelletier does not lightly demean the integrity of a representative of the United States government, but he is forced to do so in this case. These were not minor inconsistencies that Hafford was spouting to the jury. These were monster lies, and Mr. pelletier can find no courteous way to say that the government not only knew that Mr. Hafford was lying but actually encouraged him to do so. One need only compare the Ladner and Pelletier trial transcripts to see what has been done to Mr. Pelletier. The government had a solemn duty to correct Mr. Hafford's perjury, and failed miserably.

The one lie that persistently nags Mr. Pelletier is Hafford's claim that noone swam the dope before he came along, but in Pelletier's trial, he complained that he inherited Easler's wetsuit and that it was too small for him. This complaint, he says, prompted Mr. Pelletier to provide Hafford with a sporting goods catalogue and unlimber his wallet to pay for new scuba gear and an underwater scooter. In truth, these items were purchased for the paralyzed petitioner's use on his large lake, and Hafford stole these items from Pelletier after he went to jail and sold them.

Adam Hafford told so many lies to so many people that he could not keep his story straight on his own. However, his friend the prosecutor was there to guide him through the perilous rapids of perjury and, with the assistance of defense counsel, safely guided him to the dry harbor of a sentence

reduction or two. This moose-shooting felon says he     was
regularly swimming heavy bags of weed across a river   after
he admitted he cannot swim. How he was able to make these
three-hour dope swims was never questioned.

Mr. Pelletier has set out in previous arguments the many
lies that the government failed to correct, and there is not-
hing to be gained here by parroting every lick and blow  and
salving them with the balm of bitter recrimination and   vit-
riol. Suffice it to say, a great injustice has been effectu-
ated by the government with the placid assistance of an   in-
different defense attorney, and Mr. Pelletier can only pray
that the court will rectify this travesty.

This is the opportune moment to note that none of these
arguments were raised on direct appeal. Claims of ineffective
assistance are not generally cognizable on direct appeal. Where
these argument otherwise could have been or should have  been
raised on direct appeal but were not, Mr. Pelletier submits
that he was denied his Sixth Amendment right to the effective
assistance of appellate counsel, and his arguments    should
be judged in that light.

XIV.

COUNSEL WAS INEˉFECTIVE BY FAILING TO
OBJECT TO THE GOVERNMENT'S    IMPROPER
VOUCHING FOR ITS WITNESSES        DURING
TRIAL; THE COURT AND GOVERNMENT IMPRO-
PERLY COMMENTED ON THE TRUTHFULNESS OF
THE GOVERNMENT WITNESSES;

The government paraded a line of cooperating witnesses
before the trial jury that were testifying pursuant to co-
operation and/or immunity agreements (302:29) The government
in opening improperly referred to the witnesses "truthfulness"
when explaining "immunity agreements:"

> "...nothing that this witness says in this court-
> room can be used directly against him or    her
> or indirectly against him or her unless that wit-
> ness does anything but tell the truth. He or she
> must tell the truth in order to maintain that im-
> munized status.

(302:30)

The government'simproper implication is that the wit-
nesses are testifying truthfully, or they would not be get-
ting immunity; thus, implicitly putting the prestiege of the
U.S. Attorney's Office behind the witnesses credibility. More-
over, and relevant to this point, is that the court improperly
commented on the veracity of the government witnesses during
the closing jury charge:

> "Some people in this position are entirely truth-
> ful when testifying."

(335:213)

The court did after making the above charge to the jury
give a somewhat cautionary charge: " Still, you should con-
sider the testimony of these witnesses with particular cau-

tion." (335:214). However, the improper comments on the wit-
nesses truthfulness so "poisoned the well" that the exclusive
remedy is a new trial. In United States v. Joyner, 191 F.3d.
47, 54 (1st Cir.1999), the First Circuit fashioned a  three-
part test to determine whether a prosecutor's comments   re-
quire a new trial. In this situation, the court will   con-
sider:

    1. Whether the prosecutor's conduct was isolated
and/or deliberate;

    2. Whether the trial court gave a strong and ex-
plicit cautionary instruction; and

    3. Whether it is likely that any prejudice surviving
the judge's instruction could have affected the outcome  of
the case.

Id. (emphasis added)

    The prosecutor was deliberate in conveying to the jury
the truthfulness of the witnesses testimony, by comments  that
the witnesses would do nothing "but tell the truth,"  and  the
witness, " must tell the truth." (302:30) Nonetheless,     the
court bolstered the witnesses credibility by improperly  com-
menting on the truthfulness:

        " Some people in this position are entirely
        truthful when testifying."

(335:213)

    It is unequivocal that movant was denied a fair trial
by the prosecutor and court's improper vouching--references to
the truthfulness of the government witnesses. See Joyner, 191
F.3d. at 54

-81-

Counsel was ineffective by his failure to object to the improper vouching. Any seasoned attorney would have objected to the improper comments on the veracity of the witnesses testimony. Counsel's performance was clearly deficient, and the deficient performance prejudiced movant in a most extreme way-- a Life sentence. But for, the court and prosecutor vouching for the witnesses credibility, no reasonable jurist would have accredited the testimony of Adam Hafford, and it is more likely than not the jurists would have disbelieved him after he admitted to "exaggerating" to the grand jury concerning the drug quantity. Nonetheless, his credibility was of serious concern after his consistent--inconsistent testimonies. The government with the aid of the court rehabilitated Hafford by improperly vouching for his credibility. (308:165-66)

The prosecutor's vouching wasn't an isolated incident that the soft and commercial instruction could cure. Besides vouching for his star witness, Adam Hafford, the prosecutor vouched for his whole team:

> " We brought in testimony of people like
> Colleen Woods and Diane Caron. Do   you
> think Diane Caron's going to come in here
> and say anything but the truth? You  got
> a good look at her. Avril Marin. Dan Eas-
> ler."

(335:207)

> " Now, folks, Adam Hafford told you  that
> he exaggerated in the grand jury. There is
> no disputing that, and I'm not going   to
> stand here and tell you otherwise. That's

-82-

> what he testified to. And he came in here,
> and he admitted that. And to a certain ex-
> tent, ladies and gentlemen, that ought  to
> bring some comfort because he didn't come
> in here and exaggerate the other way."

(335:206)

> " He admitted what he had done in the grand
> jury. He knows he did wrong."

(335:206)

It is clear that the prosecutor's comments cross the line and constitute improper vouching, and that between  the prosecutor's comments and the courts comment on the veracity of the government's witnesses ("some people in this position are entirely truthful when testifying")(335:213), the  comments "so poisoned the well" that a new trial is the exclusive remedy. See United States v. Joyner, 191 F.3d. 47,54 (1st Cir. 1999) Counsel's failure to object and to seek a strong  and explicit cautionary instruction is deficient performance  and the deficiency prejudiced the movant. See Strickland v.  Washington, 466 U.S. 668 (1984).

Counsel's ineffectiveness is clear where he failed to object to the improper vouching for witness credibility  by AUSA Joel Casey and the Court as set forth previously;  However, his ineffectiveness and abandonment is more obvious and prejudicial where he ("Matthew Erickson"- counsel") emphasized on the prosecutor's vouching:

> A. Truthfulness, complete--completeness, and
> reliability. USA Joel Casey reports  that
> all information provided by Adam Hafford has
> proven to be entirely truthful, complete, and
> reliable to the best of the knowledge of the
> government. Information admitted by Hafford
> concerning his firearms possession has  like-

-83-

wise been found to be truthful, complete, and reliable.

(308:129)

Counsel no doubt should have objected to the above statement as improper vouching, and pointed out to the jury the error in the government's statement. This statement is the "straw that broke the camel's back." The statement so poisoned the well that the minimal instruction given regarding excercising caution was tantamount to no instruction at all. In this particular instance, counsel's deficient performance was so egregious that 'prejudice can and should be presumed,' where in this case it is clear "counsel fail[ed] to subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648,659 (1984); United States v. Theodore, 468 F.3d. 52 (1st Cir. 2006)(the governments case had never been subjected to the crucible of meaningful adversarial testing). The government's improper vouching in conjunction with the Court, also, improperly commenting, and then counsel's failure to object and to replay the government's vouching to the jury is irrefutably a violation of movant's right to "due process" and a "fair trial" under the Fifth and Sixth Amendments of the United States Constitution.

## XV.

### COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO THE DRUG QUANTITY FINDINGS OF THE PRESENTENCE REPORT AS CONTRARY TO THE PROOF PRESENTED AT TRIAL.

Counsel was ineffective by failing to object to the Presentence Report findings as to the drug quantity that was attributed to Pelletier ("movant") from the conduct of Michael Easler. Counsel's failure to object specifically to the drug quantity attributed to movant from Easler led to the imposition of a mandatory Life sentence. The "PSR" reported that "Easler smuggled 60-pound loads two times per month for 11 months, which totaled 1,320 pounds (598.75 kilograms)(PSR ¶ 6). Counsel knew or should have known that this assessment was wrong. The proof at trial as conceded to by the government was that " The evidence demonstrates that Mr. Easler was bringing in between 2003 and 2004 between--or approximately 60 pounds a month of marijuana." (335:163)(emphasis added) The government's star witness, Adam Hafford, testified that Easler smuggled marijuana for movant from "spring until there was ice in the water." (308:116) The court found that the jury could have "added to the drug smuggling total an **amount equal to the amount Mr. Hafford smuggled in 2004**..." See United States v. Pelletier, 517 F.Supp.2d. 498, 500 (D.ME 2007) The court also found " A jury could have rationally concluded that  Mr. Easler was involved in smuggling marijuana for Mr. Pelletier **during the year before Mr. Hafford took over** the job." Id. at 500. The Presentence Report reflects  that

Easler "smuggled 60-pound loads two times per month **for  11 months.**" (PSR ¶ 6) Counsel failed to object to this  report and at sentencing the court adopted the presentence Report and based on the erroneous findings sentenced movant to  a Life term. It is irrefutable that counsel abandoned movant at this critical stage of the proceedings. Had counsel ob-jected to these findings and in support shown that    the government's presentation to the jury was that "Easler was bringing in between 2003 and 2004 between-- or approximately 60 pounds a month," it is more likely than not that the cor-rect finding would have held Easler and Hafford responsible for equal amounts and the jury's finding would have  been directed to a finding of one-hundred or more kilograms of marijuana; Thus, there would have been no mandatory life term. Hafford was given the conservative estimate that he smuggled 1,000 pounds, which converted to 453.60 kilograms, and, doubling this amount for Easler would have totaled  a significantly lower amount of 907.20 kilograms.

It is irrefutable from the record that counsel failed to object and defend against the imposition of  a mandatory life sentence. Clearly, counsel's performance was deficient and his deficient performance was prejudical in that his omissions resulted in a Life sentence. See <u>Strickland  v. Washington</u>, 466 U.S. 668 (1984)

## XVI.

COUNSEL WAS INEFFECTIVE BY FAILING TO EFFEC-
TIVELY CROSS EXAMINE, IMPEACH AND/OR     IN-
VESTIGATE KENDRA CYR AND THE SUBSTANCE    OF
HER TESTIMONY BEFORE TRIAL:

Counsel was ineffective and clearly abandoned his client at a critical stage of the trial proceedings, whereas, he failed to interview/investigate Kendra Cyr before she testified at trial. Had counsel investigated Kendra Cyr as movant requested that he do prior to trial, he would have found that Kendra Cyr was a biased witness and that her testimony could have  been impeached/discredited based on the following:

1.   Kendra Cyr's attorney presented movant with paper-work demanding fifty-thousand ($50,000) for property that was subject to forfeiture;

2.   During a recorded telephone conversation (' movant was an inmate in the county jail at the time of the conversation) Kendra Cyr asked movant to sign over a car (white cougar) to her daughter that she would take only two wave-runners and leave two snowmobiles. After doing such (signing over car) Kendra Cyr still took police officers and commandeered the two snow-mobiles that were to be left.

3.   Kendra Cyr admitted to the government that she stole five-thousand ($5,000) dollars from movant to move downstate. In further proceedings she admitted she lied that she stole ($10,000) dollars.

4.   Counsel could have shown that Kendra Cyr was having affair(s) with other men, i.e. "Rich Diagle."

It is clear that Kendra Cyr had motives to testify untruthfully against movant. Had counsel conducted an investigation into Kendra Cyr he would have been prepared to impeach her testimony, and, the jury hearing her infidelity, thefts of cash and requests for cash, and her exposure to prosecution were her motives for testifying untruthfully.

Counsel was ineffective at this stage where he knew or should have known that Kendra Cyr's testimony was vital to the prosecution because she was the only witness who could give any "credibility" to the testimony of Adam Hafford. But for, counsel's omissions as setforth above, it is irrefutable that counsel performed deficiently and that prejudice resulted in the form of a jury verdict that likely would have been different had counsel been prepared to effectively cross-examine Kendra Cyr. Add to this omission that Kendra Cyr actually had a longtime family friend on the trial jury--prejudice can be presumed. See Strickland v. Washington, 466 U.S. 668 (1984); United States v. Cronic, 466 U.S. 648, 659 (1984); see also United States v. Theodore, 468 F.3d 52 (1st.Cir. 2006)(the governments case was not subjected to the crucible of meaningful adversarial testing).

## CONCLUSION

Based upon the foregoing arguments and citation of authority, Mr. Pelletier prays that the court will grant him  a new trial.[17] Mr. Pelletier further prays that steps will  be taken to ensure that Adam Hafford's blatant perjury will  not go unpunished. Mr. Pelletier also prays for such other relief as may be just and proper.

Respectfully submitted,

/s/ *Michael Pelletier*

Michael Pelletier # 11109-036
United States Penitentiary
Post Office Box 33
Terre Haute, IN. 47808
**Petitioner, pro se**

## UNNOTARIZED OATH

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have read the foregoing and the facts stated in it are true. I also declare that this document and the  accompanying Appendix was placed in the hands of prisons  officials for mailing by U.S. mail on this _28_ day of   May 2013.

/s/ *Michael Pelletier*

Michael Pelletier, pro se

---

[17] Mr. Pelletier would be willing to consider resentencing should  the court offer a reasonable sentence. Given the extent and number of  lies told by Mr. Hafford, any reasonably competent attorney would be   able to shred his testimony on retrial. Any resentencing offer should    be generous and commiserate with Hafford and the Government's vile conduct during Mr. Pelletier's trial.