# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

MICHAEL PELLETIER,            )
                             )
            Petitioner,       )
                             )
    v.                        )        1:06-cr-00058-JAW
                             )        1:13-cv-00202-JAW
                             )
UNITED STATES OF AMERICA,     )
                             )
            Respondent        )

## RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION

In this action, Petitioner Michael Pelletier, pursuant to 28 U.S.C. § 2255, seeks to vacate, set aside or correct his conviction and sentence of life imprisonment, which were entered following a trial on various counts relating to the importation, possession, and distribution of marijuana. In addition to Petitioner's initial section 2255 motion (ECF No. 682), the matter is before the Court on Petitioner's motion to amend his initial section 2255 motion (ECF No. 690), an amended motion (ECF No. 691), and a second motion to amend (ECF No. 710). [1]

In his section 2255 motion, Petitioner asserts sixteen grounds, many of which grounds focus on claims of ineffective assistance of counsel regarding the quantity of drugs involved in Petitioner's underlying conviction and sentence. The Government does not separately object to Petitioner's initial motion to amend, but argues that certain claims in the amended motion are new and are time-barred. (Response, ECF No. 703 at 41-42.) The Government also argues that the second motion to amend is waived, time-barred, and fails on the merits. As to Petitioner's

---

[1] Where reference is made to the initial motion (ECF No. 682), it is referred to as such, and the amended motion (ECF No. 691) is referred to as "the motion."

substantive claims, the Government contends that Petitioner's claims lack merit, are procedurally barred, or are not cognizable in a section 2255 motion. The recommendation is that the Court grant both motions to amend, deny the requested relief, and dismiss the amended motion.[2]

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Following a six-day jury trial in July 2007, Petitioner was found guilty of conspiracy to import and distribute marijuana, money laundering, conspiracy to engage in money laundering, Social Security fraud, conspiracy to engage in Social Security fraud, and arranging a truck purchase to evade financial institution reporting requirements.[3] *United States v. Pelletier*, 666 F.3d 1, 3 & n.1 (1st Cir. 2011). (Jury Verdict, ECF No. 280.) Petitioner was found guilty of all of the charges against him except for one charge that had been dismissed.[4] (Jury Verdict; Order, ECF No. 276.) The jury found that the amount of marijuana associated with Petitioner's participation in the importation and distribution conspiracies was 1,000 or more kilograms. (Jury Verdict at 2.) The Court sentenced Petitioner to life imprisonment on the distribution count (count 2) (Judgment, ECF No. 384 at 3); to 240 months on the importation count (count 1), the counts for conspiracy to engage in money laundering (counts 5, 10), and one money-laundering count (count 11); and to 120 months on the remaining counts for money laundering (counts 3, 6, 12), structuring

---

[2] Petitioner has also filed a motion to conduct discovery. (ECF No. 708.) If the Court adopts the recommendation and dismisses Petitioner's section 2255 motion, the motion for discovery would be dismissed as moot.

[3] Petitioner was one of six individuals indicted on the distribution count; two were convicted following a joint trial, and the others pled guilty. *United States v. Pelletier*, 666 F.3d 1, 3 n.1 (1st Cir. 2011).

[4] Count 4, a money-laundering charge, was dismissed based on the government's representation that although there was evidence of the transaction on which the charge was based, the indictment identified the wrong financial institution. The Government moved to dismiss the charge, and the Court granted the motion. (Trial Tr., ECF No. 413 at 28-29; Order, ECF No. 276.)

(count 7), and Social Security fraud (counts 13, 15).  The terms of imprisonment were to be served concurrently.  (Judgment at 3.)[5]

Petitioner's section 2255 motion focuses in large part on the trial testimony of Adam Hafford, who testified for the Government pursuant to an agreement to reduce his sentence on an unrelated firearms offense.  (Trial Tr., ECF No. 308 at 52-55.)  Hafford testified that he first met Petitioner in 2001, when both men were incarcerated together, and that Petitioner offered him unspecified work when Hafford was released from jail.  (Trial Tr., ECF No. 308 at 67-68, 139, 179.)  When Hafford was released in June 2004, he went to Petitioner, who arranged for him to work carrying marijuana while swimming across the St. John River from Canada to Maine from June to November 2004.  (Trial Tr., ECF No. 308 at 68-71, 82.)  On a couple of occasions, Hafford carried bags of money when swimming from Maine to Canada.  (Trial Tr., ECF No. 308 at 81, 167.)

Hafford also testified that he met Petitioner's co-defendant, Michael Easler, while Easler and Hafford were incarcerated together.[6]  (Trial Tr., ECF No. 308 at 68.)  Hafford and Easler were again incarcerated together in 2007, and at that time Easler told Hafford that he had worked for Petitioner in the same capacity as Hafford (i.e., ferrying marijuana in from Canada by swimming across the river), and that he had stolen money from Petitioner.  (Trial Tr., ECF No. 308 at 109, 115-17.)  Hafford further testified that he saw Petitioner hand Ricky Daigle $50,000 in cash to buy

---

[5] Petitioner was also sentenced to a term of ten years of supervised release on Count 1 and to three years of supervised release on counts 3, 5, 6, 7, 10, 11, 12, 13, 14, and 15.  All of the supervised release terms were to be served concurrently.  (Judgment, ECF No. 384 at 4.)

[6] Michael Easler was indicted on the importation and distribution counts, as well as money laundering, conspiracy to engage in money laundering, and other counts.  (Indictment, ECF No. 1 at 1-7.)  Easler pled guilty to all counts against him; there was no plea agreement.  (ECF No. 202; Rule 11 Tr., ECF No. 348 at 36.)

real estate.[7]  (Trial Tr., ECF No. 308 at 98-99.)  The real estate transaction was the subject of three of Petitioner's money-laundering convictions (Counts 10-12).

At the sentencing hearing, the Court noted that it considered the presentence investigation report, and determined that the total offense level was 38 and that the criminal history category of VI applied, yielding a guideline range prison term of 360 months to life.  (Sentencing Tr. at 14-15, ECF No. 521.)  The Court found no basis for a departure from the guidelines range of sentence. The Court explained that based on the conviction of conspiracy to distribute 1,000 kilograms or more of marijuana (count 2) and the Petitioner's prior convictions, the Court must sentence Petitioner to life in prison, pursuant to 21 U.S.C. § 841(b)(1)(A), U.S.S.G. § 5G1.1(b).  (Sentencing Tr. at 15-17.)[8]

Petitioner unsuccessfully appealed the conviction.  *Pelletier*, 666 F.3d at 3.  On appeal, the First Circuit addressed several evidentiary issues, the jury instructions, and the drug quantity finding.  More specifically, the Court held that the trial court did not err in admitting Hafford's testimony that Petitioner was in jail "'for drug charges,'" or in admitting the cross-examination testimony of another witness about Petitioner's criminal past, *id.* at 5;[9] that the trial court did not abuse its discretion in admitting Easler's hearsay statements to Hafford, because the statements

---

[7] Ricky Daigle pled guilty to a money-laundering charge in a separate prosecution.  (Trial Tr., ECF No. 311 at 223.)

[8] Title 21 U.S.C. § 841(b)(1)(A)(vii) is the penalty provision that applies to distribution offenses, pursuant to 21 U.S.C. § 841(a)(1), where the amount involved 1,000 kilograms or more of marijuana.  Section 841(b)(1)(A) states in pertinent part: "If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."  Petitioner had four prior state felony aggravated drug trafficking convictions, two of which were in 1994 and two in 2001.  (Information, ECF No. 181.)  Section 5G1.1(b) of the Sentencing Guidelines states: "Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."

[9] The First Circuit concluded that this evidence did not violate Fed. R. Evid. 403 or 404(b) because cross-examination of the Government's witnesses opened the door to the introduction of Petitioner's prior convictions.  *Pelletier*, 666 F.3d at 5 (noting abuse of discretion standard of review as to Hafford's testimony and plain error standard of review as to the testimony of the other witness).

were admissible as sufficiently corroborated statements against penal interest, pursuant to Fed. R. Evid. 804(b)(3), *id.* at 7-9; that Easler's statements to Hafford were not testimonial hearsay and, therefore, were not subject to the Confrontation Clause of the Sixth Amendment to the United States Constitution, *id.* at 9-10; that because the evidence of Petitioner's knowledge and intent as to both importation and distribution of marijuana was "overwhelming," the trial court did not err when it did not instruct the jury that the importation had to have been knowing and intentional and that the Government had to prove that Petitioner knew that the marijuana came from outside the United States, *id.* at 10-11; and that "[s]ufficient evidence existed for a reasonable jury to have found beyond a reasonable doubt that Pelletier conspired to import and possess with the intent to distribute 1,000 kilograms or more of marijuana," *id.* at 12. The Supreme Court denied Petitioner's petition for a writ of certiorari on May 29, 2012. *Pelletier v. United States*, 132 S. Ct. 2683 (2012).

Petitioner signed his initial section 2255 motion on May 24, 2013, and it was filed on May 30, 2013. (Motion, ECF No. 682.) The Government agrees that the initial motion was filed timely.[10] (Response, ECF No. 703 at 41.) The Government, however, argues that two new claims in the amended motion were not included or alluded to in the initial motion and, therefore, were not timely filed. (Response at 42.) The two claims that the Government challenges as time-barred are (a) that counsel failed adequately to investigate and cross-examine witness Kendra Cyr, and (b) that counsel failed to object to witness-vouching by the Government and the Court. (Response at 42.)

Petitioner also argues that counsel was ineffective for failing to move for dismissal of the indictment based on the fact that the conspiracy counts contained in the indictment failed to allege conspiratorial agreements. (Reply, ECF No. 709 at 1, 7, 27.) In support of his motion, Petitioner

---

[10] (Response at 1-2 & n.2.) *See* Rule 3(d) of the Rules Governing Section 2255 Proceedings.

filed his own affidavit and an affidavit signed by co-defendant Michael Easler. (Affidavits, ECF Nos. 709-2, 709-3.) Both affiants assert that there was no conspiratorial agreement.

Petitioner's second motion to amend was filed May 19, 2014, and Petitioner argues in the motion that the Supreme Court's ruling in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), applies retroactively and entitles him to a jury determination that he committed the prior felonies that resulted in a mandatory life sentence. (Motion to Amend, ECF No. 710 at 3.)

## II. DISCUSSION

### A. Standard of Review

A person may move to vacate his or her sentence on one of four different grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction" to impose its sentence; (3) "that the sentence was in excess of the maximum authorized by law"; and (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); *see Knight v. United States*, 37 F.3d 769, 772 (1st Cir. 1994). Here, given that Petitioner alleges ineffective assistance of counsel, and given that Petitioner's right to counsel is guaranteed by the Sixth Amendment, Petitioner argues that the sentence was imposed in violation of "the Constitution or laws of the United States."

The burden is on the section 2255 petitioner to establish by a preponderance of the evidence that he or she is entitled to section 2255 relief. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998); *United States v. DiCarlo*, 575 F.2d 952, 954 (1st Cir. 1978). When "a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993).

A habeas petition is not a substitute for an appeal. *Berthoff v. United States*, 308 F.3d 124, 127 (1st Cir. 2002). "Accordingly, a defendant's failure to raise a claim in a timely manner at trial or on appeal constitutes a procedural default that bars collateral review, unless the defendant can demonstrate cause for the failure and prejudice or actual innocence." *Id.* at 127-28. An allegation of ineffective assistance of counsel can excuse a procedural default, but only if the petitioner demonstrates that counsel's representation fell below an objective standard of reasonableness and prejudiced the petitioner's defense. *Owens v. United States*, 483 F.3d 48, 63 (1st Cir. 2007). Procedural default is an affirmative defense. *Sotirion v. United States*, 617 F.3d 27, 32 (1st Cir. 2010).

To succeed on an ineffective assistance of counsel claim, a petitioner "must establish both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Turner v. United States*, 699 F.3d 578, 584 (1st Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The two prongs of the ineffective assistance test are commonly referred to as the "cause" and "actual prejudice" tests. *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011). A district court reviewing such claims need not address both prongs of the test because a failure to meet either prong will undermine the claim. *Strickland*, 466 U.S. at 697.

As for the "cause" test, the court must be "'fairly tolerant'" of counsel's performance because the Constitution does not guarantee a perfect defense. *Moreno-Espada v. United States*, 666 F.3d 60, 65 (1st Cir. 2012) (quoting *Scarpa v. Dubois*, 38 F.3d 1, 8 (1st Cir. 1994)). The issue is whether counsel's performance was "'within the wide range of reasonable professional assistance' that a competent criminal defense counsel could provide under 'prevailing professional

norms.'" *Bucci*, 662 F.3d at 30 (quoting *Strickland*, 446 U.S. at 688-89). "Judicial scrutiny of the defense counsel's performance is 'highly deferential,' and the defendant must overcome a 'strong presumption . . . that, under the circumstances, the challenged action "might be considered sound trial strategy."'" *Id.* (quoting *Strickland*, 446 U.S. at 689).

The "actual prejudice" test requires a showing "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The court must consider "the totality of the evidence before the judge or jury" when measuring the prejudicial effect. *Stephens v. Hall*, 294 F.3d 210, 218 (1st Cir. 2002). Factors that are commonly considered include the strength of the prosecution's case, the effectiveness of the defense presented at trial, and the potential for new evidence and new avenues for cross-examination to undermine the credibility of Government witnesses. *Turner*, 699 F.3d at 584.

"Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted. An evidentiary hearing 'is not necessary when a [§] 2255 petition (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case.'" *Moreno-Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003) (citation omitted) (quoting *DiCarlo*, 575 F.2d at 954 (quotation marks omitted)). In determining whether an evidentiary hearing is required, the court must "take as true the sworn allegations of fact set forth in the petition 'unless those allegations are merely conclusory, contradicted by the record, or inherently incredible.'" *Owens*, 483 F.3d at 56 (quoting *Ellis v. United States*, 313 F.3d 636, 641 (1st Cir. 2002)). Summary dismissal of a motion is permitted when the allegations are "'vague, conclusory, or palpably incredible,'" even "'if the record does not conclusively and expressly belie [the] claim.'" *David*, 134 F.3d at 478 (quoting *Machibroda v. United States*, 368 U.S. 487, 495

(1962)).  The Court can reasonably require a petitioner to supply the court with salient details of the claim prior to permitting discovery or a hearing.  *Id.* (holding that "the district court did not abuse its discretion in refusing to license a fishing expedition").

## B.  Grounds Asserted and Analysis

Petitioner's motion contains sixteen numbered grounds for relief, all of which grounds contain claims of ineffective assistance of counsel.  A principal area about which Petitioner complains is the nature and quality of the evidence of the drug quantity involved.  In essence, Petitioner maintains that Hafford provided perjured testimony, and that his counsel did not effectively challenge the testimony.  Petitioner contends that Hafford's credibility as to the drug quantity is of critical importance because the large drug quantity in this case, together with Petitioner's prior felony convictions, led to his life sentence.[11]

### 1.  Claims Relating to the Drug Quantity

#### a.  Hafford's alleged perjury (Grounds IV, XVI)[12]

Petitioner argues that the Government deliberately elicited perjured testimony from Hafford or willingly permitted false testimony to remain uncorrected, and that his counsel was ineffective for failing to emphasize the misrepresentations.  (Motion at 40.)  As support for his contention, Petitioner cites inconsistencies in Hafford's testimony offered on three occasions: the June 2006 grand jury testimony preceding Petitioner's indictment (ECF No. 682-2); the April 2007 trial of Archie Ladner (ECF Nos. 682-3, 682-4);[13] and the July 2007 trial of Petitioner.  The alleged

---

[11] As quoted above, *supra* note 8, the penalty provision that applies to a violation of 21 U.S.C. § 841(a)(1) provides that when the drug quantity was 1,000 kilograms or more of marijuana, and the defendant has two or more prior convictions for a felony drug offense, there is a mandatory sentence of life in prison.  21 U.S.C. § 841(b)(1)(A).

[12] Grounds identified in Roman numerals in parentheses are as numbered in Petitioner's amended section 2255 motion.

[13] Archie Ladner was charged separately with marijuana importation and distribution conspiracies.  His first trial was by jury and ended in a mistrial; he was acquitted following a second jury trial.  (*United States v. Ladner*, No. 1:06-cr-00079-JAW, ECF Nos. 1, 58, 77.)

inconsistencies involve the following: (1) a jailhouse conversation between Petitioner and Hafford about Hafford working for Petitioner after they were released; (2) Hafford's work for Petitioner, particularly the cross-border swims; (3) Hafford's cocaine smuggling, which Hafford testified did not involve Petitioner and for which Petitioner was not charged; (4) Hafford's personal drug use; and (5) Hafford's observation of Petitioner giving $50,000 in cash for real estate.

When a prosecutor "knowingly use[s] perjured testimony or, equivalently, knowingly fail[s] to disclose that testimony used to convict the defendant was false," the conviction is deemed "'fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Rodriguez*, 162 F.3d 135, 146 (1st Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995)); *see also Moreno-Morales*, 334 F.3d at 148. As the First Circuit explained in *Rodriguez*, the standard was articulated in *United States v. Agurs*, 427 U.S. 97, 103 (1976) and is "more favorable to the defendant" than the standard, set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), that applies "when the prosecution suppresses material evidence that is favorable to the accused." *Rodriguez*, 162 F.3d at 146 (quotation marks omitted). In a section 2255 petition, the burden is on the petitioner to demonstrate "that the Government knowingly used perjured testimony to convict him." *Moreno-Morales*, 334 F.3d at 148. Even if the Government commits misconduct, due process is not offended if there is ample untainted evidence on which to support the conviction. *See id.* at 148-49.

### i. The jailhouse conversations

Petitioner argues that Hafford's testimony constitutes perjury because Hafford testified before the grand jury that during a conversation that he had with Petitioner in jail regarding work

after their release from jail, Petitioner did not mention selling marijuana, but in the Ladner trial, Hafford testified that drugs were discussed. (Motion at 40-42.)

The record reflects that at the grand jury, Hafford was not asked drug-specific questions. His grand jury testimony, therefore, is not in conflict with his trial testimony that "[t]here was some weed involved" in the jailhouse conversation. (Grand Jury Tr., ECF No. 682-2 at 4; Trial Tr., ECF No. 308 at 67.) In fact, when examined by Petitioner's counsel at trial, Hafford acknowledged that when they spoke, Petitioner was not clear whether he intended to provide Hafford with a job that involved drug trafficking. (Trial Tr., ECF No. 308 at 139.) Petitioner has thus failed to demonstrate that Hafford's testimony was perjured, or that the performance of Petitioner's counsel was substandard. *See Strickland*, 466 U.S. at 687.

Petitioner also asserts that Hafford falsely testified when he stated in the Ladner trial that Petitioner never told him in their jailhouse conversation that Petitioner previously had engaged Easler to swim the river. (Motion at 44, 79.) Petitioner maintains that Hafford testified differently in his trial, and that his counsel did not effectively cross-examine Hafford on this point.[14]

Petitioner misconstrues Hafford's testimony regarding the jailhouse conversation. Hafford testified in the Ladner trial that his conversation with Petitioner occurred when he was in jail in 2001 and possibly into early 2002. Hafford's testimony is not inconsistent, given that Easler's swims for Petitioner occurred after Petitioner's incarceration in 2001 and 2002. (Trial Tr., ECF No. 308 at 179.) That is, the record reflects that Hafford learned about Easler's relationship with Petitioner in or around June 2004. (Ladner Tr., ECF No. 682-3 at 16, 19; Trial Tr., ECF No. 308

---

[14] Petitioner specifically cites Hafford's testimony in the Ladner trial, when counsel asked Hafford on cross-examination: "Now, while you were in jail with Pelletier, he told you that he'd had other people swim the river for him with drugs, didn't he?" Hafford replied: "No he didn't, because he never used to do it that way before." Hafford was then asked: "How'd he do it before?" Hafford replied: "I have no idea. He just was talking about selling a lot of dope." (Ladner Tr., ECF No. 682-4 at 4-5.)

at 68-70)[15]  The 2001-2002 jailhouse conversation, therefore, occurred before Easler started to work with Petitioner.  Accordingly, Petitioner's contention that the Government presented perjured testimony, or that Petitioner's counsel was ineffective, must fail.

### ii.    The cross-border smuggling trips

Petitioner asserts that Hafford's testimony regarding several aspects of the smuggling trips was perjured testimony.  First, Petitioner cites Hafford's testimony regarding the amount of money that he had when he was stopped at customs.  According to Petitioner, Hafford told police that Petitioner had $180,000 when he was stopped by customs, but actually Hafford did not know how much money Petitioner had at that time.  (Motion at 45.)  Contrary to Petitioner's contention, Hafford did not testify in the Ladner trial that Petitioner had a certain amount of money.  Rather, Hafford testified that Petitioner told him that he had $180,000 inside the seat of his vehicle, and although Hafford did not believe that the seat could accommodate that much cash, Hafford shared the information with law enforcement.  (Ladner Tr., ECF No. 682-4 at 7-8.)  In other words, Hafford testified as to information that he obtained from Petitioner, and did not testify as to the amount of money that Petitioner actually had in his possession.

Petitioner also argues that Hafford's testimony is inconsistent regarding the time that Hafford started to make the swims,[16] whether Petitioner was always on the Canadian side with

---

[15] Although Hafford may or may not have differed on whether he learned about Easler shortly before he was released from jail or shortly afterwards, the time frame is approximately the same, i.e., just before or after Hafford's release in June 2004.

[16] Hafford testified before the grand jury that he started working for Petitioner two or three days after he was released from jail in June 2004, when he met Petitioner at a Wal-Mart parking lot in Presque Isle.  (Grand Jury Tr., ECF No. 682-2 at 4.)  Hafford testified that he started to swim the river "the next night."  (Grand Jury Tr., ECF No. 682-2 at 5.)  He testified that he started swimming in both directions, i.e., round trip from Maine to Canada and back to Maine, about two months after he started swimming for Petitioner.  (Grand Jury Tr., ECF No. 682-2 at 7.)  Hafford testified at Petitioner's trial that about a week after the Wal-Mart parking lot conversation, Hafford met with Petitioner and Archie Ladner at Petitioner's house, and it was either that day or within a few days that he actually started swimming. (Trial Tr., ECF No. 308 at 70-73.)  At the Ladner trial, Hafford testified that the meeting at Petitioner's house took place on a Friday of the same week in which he met Petitioner at the Wal-Mart parking lot.  (Ladner Tr., ECF No.

12

Hafford at the time of the swims,[17] the frequency with which Hafford participated in the swims, and the amount of marijuana that he carried during the swims. Assuming, *arguendo*, that some inconsistency exists in Hafford's testimony, the inconsistencies are not material because the record contains an abundance of evidence that Petitioner himself crossed the border to import marijuana; these instances include one occasion when Hafford hid in the back of Petitioner's truck and another occasion when Petitioner was stopped and searched at customs. (Trial Tr., ECF No. 308 at 73, 142-43.)

Hafford's grand jury testimony about his trips for Petitioner differed to some degree from his trial testimony. Indeed, at Petitioner's trial, Hafford admitted that when he testified before the grand jury he exaggerated the frequency of his swims, the number of times he went across the river, and the amount of drugs that he carried. (Motion at 41; Trial Tr., ECF No. 308 at 165-66.)[18] Despite Hafford's exaggerations, the record is devoid of evidence that the Government knowingly presented perjured testimony, or that Petitioner's counsel was deficient in his representation of Petitioner on the issue.

<hr>

682-3 at 22.) On cross-examination at Petitioner's trial, Hafford testified that the Wal-Mart parking lot conversation occurred "closer to two weeks" after he was released from jail. (Trial Tr., ECF No. 308 at 168.)

[17] Petitioner asserts that Hafford testified in the Ladner trial that Petitioner was on the Canadian side of the border every time Hafford went over to pick up marijuana, and that this testimony may have been inconsistent with his testimony in Petitioner's trial. (Motion at 46.) Hafford testified in the Ladner trial that Petitioner was on the Canadian side every time that Hafford went over to pick up drugs, even on trips when Hafford took the money over. (Ladner Tr., ECF No. 682-4 at 64.) Petitioner asserts that this is inconsistent with Hafford's testimony in Petitioner's trial, but Petitioner provides no citation in support. (Motion at 24, 46.)

[18] Hafford testified before the grand jury that he hauled between sixty and 220 pounds per week, and a total of 2,000 to 2,500 pounds of marijuana between June and November 2004, but at trial, he testified that he hauled a total of about 1,000 to 1,500 pounds during that time. (Grand Jury Tr., ECF No. 682-2 at 5-6, 9; Trial Tr., ECF No. 308 at 83.) Similarly, before the grand jury, Hafford testified that he made the trip at least once a week, and sometimes seven days a week, whereas at trial, he testified that he made the trip once every week or every two weeks. (Grand Jury Tr., ECF No. 682-2 at 6; Trial Tr., ECF No. 308 at 82.) Before the grand jury, Hafford testified that he swam money from the United States to Canada about ten times, whereas at trial, he testified that he swam money over just two times. (Grand Jury Tr., ECF No. 682-2 at 8; Trial Tr., ECF No. 308 at 145.)

Petitioner also asserts that in the Ladner trial, Hafford did not testify that Petitioner gave him maps to use, but in Petitioner's trial, Hafford testified that Petitioner gave him maps. (Motion at 46.) The record reflects that another witness testified that Petitioner provided him with maps and other information in Petitioner's effort to recruit that witness to import marijuana. (Trial Tr., ECF No. 312 at 115-16.) In other words, the Government presented evidence separate from Hafford's testimony to establish that Petitioner supplied maps to those who worked with him.

Finally, Petitioner's arguments regarding Hafford's testimony as to the number of guns that Ladner had are not convincing. Petitioner's counsel cross-examined Hafford on the discrepancies between his trial testimony and other proceedings about the number of guns that Ladner had. (Response at 29.) Hafford testified in Petitioner's trial that he had not exaggerated when he testified that Ladner had more than 100 guns; rather, Hafford testified that the numbers had changed because Ladner had a different number of guns at various times. (Response at 29; Trial Tr., ECF No. 308 at 184-85.)

### iii. Hafford's separate cocaine smuggling

Petitioner asserts that Hafford gave perjured testimony regarding a cocaine run that Hafford made. (Motion at 45.) In the Ladner trial, Hafford testified that to make some extra money, he took twenty-five pounds of cocaine into Canada for someone named "Steve" from Connecticut. (Ladner Tr., ECF No. 682-4 at 11-12.)[19] Hafford asserted that Petitioner did not know about the cocaine run and that the cocaine smuggling was unrelated to Petitioner's marijuana operation. (Ladner Tr., ECF No. 682-4 at 13.) Hafford testified in the Ladner trial that he did not exchange the cocaine that he smuggled into Canada for marijuana. (Ladner Tr., ECF No. 682-4 at 11.) On

---

[19] In Petitioner's trial, Hafford testified that the amount was twenty-five kilograms rather than twenty-five pounds, but the discrepancy appears to be simply a mistake, as Hafford was being asked in Petitioner's trial about his testimony in the Ladner trial. In any event, the discrepancy has no bearing on Petitioner's trial or his arguments here. (Ladner Tr., ECF No. 682-4 at 11-12; Trial Tr., ECF No. 308 at 153-54.)

his return run from Canada to Maine, Hafford carried Petitioner's marijuana. (Ladner Tr., ECF No. 682-4 at 11.) "Steve" paid Hafford in kind for the cocaine delivery by giving him half a kilogram of cocaine; this transfer was made when both "Steve" and Hafford were back at Petitioner's camp. (Ladner Tr., ECF No. 682-4 at 12-13.) At Petitioner's trial, Hafford testified that of the half-kilogram that he had received in payment, he traded some for marijuana and used some of it at a party. (Trial Tr., ECF No. 308 at 155.)

Petitioner argues that Hafford's testimony was false because Hafford testified in the Ladner trial that he did not exchange the cocaine for marijuana. Contrary to Petitioner's argument, Hafford's testimony is not inconsistent. He testified regarding two different instances involving his contact with cocaine. Hafford first testified regarding the cocaine that he ferried across the river, and then testified about the cocaine that he received as payment for that smuggling. The record thus does not support Petitioner's claims of prosecutorial misconduct or ineffective assistance on this issue.

### iv. Hafford's observation of a cash transfer to purchase real estate

Petitioner asserts that Hafford testified falsely that he was present when Petitioner gave Rick Daigle $50,000 in cash to buy certain real estate. (Motion at 41-42; Trial Tr., ECF No. 308 at 100.) Although the transaction at issue was one of the subjects of the money-laundering charges, Petitioner apparently argues that inconsistencies in Hafford's testimony on this issue impact Hafford's credibility for purposes of calculating the drug quantity. (Motion at 41-42.)

Petitioner's allegation of perjury is based on the fact that no other witnesses testified that Hafford was present at the time of the transaction. Importantly, regardless of who was present at the time, Petitioner has not disputed that he participated in the cash-for-real estate transaction. (Motion at 11; Response at 58.) Furthermore, Hafford testified to substantially the same facts

before the grand jury, at the Ladner trial, and at Petitioner's trial, concerning the real estate transfer.[20]  The evidence of record, therefore, does not support Petitioner's contention that the Government presented perjured testimony, or that the performance of Petitioner's counsel was substandard.

### v.    Hafford's drug use and memory issues

Petitioner alleges that Hafford's ability to remember events appeared to be inconsistent. Specifically, Petitioner argues that although marijuana and methamphetamine "undoubtedly contributed" to Hafford's inability to recall what he told law enforcement agents and the grand jury, he had "total recall" about the conversations with his co-conspirators three years earlier, even though he also was smoking marijuana regularly at the time.  (Motion at 43-44.)

Given the number of incidents in which Hafford was involved, Hafford's lack of memory on certain points is not unusual and cannot support Petitioner's perjury claim.  In addition, at trial, Petitioner's counsel cross-examined Hafford on his use of illegal drugs.  (Trial Tr., ECF No. 308 at 97-98, 155, 172.)  Petitioner's counsel, therefore, presented evidence upon which the fact finder could critically evaluate Hafford's testimony.

### vi.    The use of Cyr's testimony to enhance Hafford's credibility

Petitioner claims that counsel failed to investigate Petitioner's former girlfriend, Kendra Cyr, before she testified at trial, and that her testimony was "vital to the prosecution because she

---

[20] Before the grand jury, Hafford testified that he saw Petitioner give Daigle approximately $50,000 in cash. (Grand Jury Tr., ECF No. 682-2 at 14.) The cash transfer from Petitioner to Daigle took place in the parking lot outside an attorney's office in Caribou. (Grand Jury Tr., ECF No. 682-2 at 14.) Hafford testified similarly at the Ladner trial that he witnessed Petitioner pay $50,000 cash for the property, and testified that Petitioner bought the property in Daigle's name. (Ladner Tr. 682-3 at 51.) Hafford testified that he was in Petitioner's pickup truck, Daigle was in the pickup truck next to Petitioner's truck, Petitioner gave Daigle $50,000, and Daigle went into a lawyer's office "to talk to the lawyer." (Ladner Trial Tr. 682-3 at 51-52.) At Petitioner's trial, Hafford's testimony was substantially the same. (Trial Tr., ECF No. 308 at 98-100.) Daigle and Hafford both testified that they had met previously at Daigle's store. (Trial Tr., ECF No. 308 at 99.) Daigle testified that he had a gas station and restaurant, and that it was there he met the same man he later saw in Petitioner's truck when Petitioner handed Daigle the cash. (Trial Tr., ECF No. 311 at 222, 231-32; ECF No. 312 at 11-12.)

was the only witness who could give any 'credibility' to the testimony of Adam Hafford." (Motion at 89.) Petitioner argues that Cyr was biased and her testimony should have been impeached because (1) her attorney made a demand of $50,000 for property subject to forfeiture; (2) Cyr "took police officers and commandeered the two snowmobiles that were to be left;" (3) Cyr admitted to the Government that she stole $5,000 from Petitioner and then admitted that she had stolen $10,000; and (4) counsel should have known that Cyr was having affairs with men other than Petitioner, including Daigle. (Motion at 88.)

The Government preliminarily argues that this claim is time-barred. In particular, the Government contends that Petitioner raised the issue for the first time in the amended petition, which was filed after the expiration of the one-year limitations period set forth in 28 U.S.C. §2255(f).[21] The Government also contends that the ineffective-assistance claim fails on its merits because during the cross-examination of Cyr, Petitioner's counsel elicited numerous inconsistencies between Cyr's grand jury testimony and her trial testimony. (Response at 52.)

Petitioner did not include a claim of ineffective assistance in connection with the testimony of Cyr in the initial section 2255 motion. On this record, whether the amended petition was filed within the one-year limitations period is somewhat unclear. The amended motion and accompanying motion to amend were docketed on July 15, 2013, which was more than a month after the May 30, 2013, expiration of the one-year limitations period.[22] However, under Rule 3(d)

---

[21] The Government also maintains that the proposed amendment does not relate back to the filing of the original petition as contemplated by Fed. R. Civ. P. 15(c). (Response at 51.) A petitioner may not use an amended petition as a way to circumvent the limitations period set forth in 28 U.S.C. § 2255(f). Claims filed after the limitations period are not allowed unless they "relate back" to claims contained in a timely-filed pleading. *See* Fed. R. Civ. P. 15(c)(2); *Turner v. United States*, 699 F.3d 578, 585 (1st Cir. 2012). "The relation back provision in habeas petitions is strictly construed." *Id.*

[22] The one-year limitations period started on May 30, 2012, which was the day after the date on which the Supreme Court denied the petition for certiorari, and it ended on the one-year anniversary of that date, i.e., May 30, 2013. *See* Fed. R. Civ. P. 6(a)(1)(A), (C); *Turner*, 699 F.3d at 582 (citing *In re Smith*, 436 F.3d 9, 10 (1st Cir. 2006)) (noting that a decision is final when the petition for certiorari is denied); *Lattimore v. Dubois*, 311 F.3d 46, 54 (1st Cir. 2002) (noting that the last day of a limitations period measured in years is the anniversary date of the start of the limitations

of the Rules Governing Section 2255 Proceedings, the relevant date for determining whether the motion has been filed timely is the date on which Petitioner deposited the filing in the institution's internal mailing system.

In this case, the amended motion (ECF No. 691) was dated May 28, 2013. The new claim would have been filed timely if the amended motion and motion to amend had been deposited in the internal mailing system on or before May 30, 2013. The certificate of service that appears at the end of the motion to amend is dated June 28, 2013, which was after the expiration of the one-year limitations period. (ECF No. 690.) Because the dates on these filings generate an ambiguity as to whether Petitioner filed the motion to amend and the amended motion within the one-year limitations period, it is appropriate to assess the merit of the new claim before considering further proceedings regarding the limitations period. *See Ramos-Martínez v. United States*, 638 F.3d 315, 324-25 (1st Cir. 2011) (citing *Pough v. United States*, 442 F.3d 959, 965 (6th Cir. 2006)) (noting that the "issue of timeliness of [a] section 2255 motion may be bypassed and claims decided against [a] petitioner on the merits").

A review of the record reveals that the trial evidence included two of the impeachment issues identified by Petitioner. In particular, Petitioner's counsel questioned Cyr about whether she kept $5,000 or $10,000 of money that she collected for Petitioner, and he raised the issue again in closing argument. (Trial Tr., ECF No. 411 at 85, 146; ECF No. 413 at 181.) In addition, although the record suggests that Petitioner's counsel was not aware of Cyr's affair with Daigle until after Cyr was excused as a witness, after learning of the relationship, Petitioner's counsel questioned Daigle about the issue. (Response at 20 n.14, 52-53; Trial Tr., ECF No. 311 at 216-

---

period). As the government notes, the Supreme Court's subsequent denial of Petitioner's petition for rehearing did not extend the date. *See Smith*, 436 F.3d at 10 (holding that, pursuant to Supreme Court Rule 16.3, "a conviction becomes final for purposes of triggering the one-year limitations period of section 2255 when certiorari is denied, regardless of whether a petition for rehearing is filed or when such a petition is denied").

19.)  The Government also examined Daigle about the relationship.  (Trial Tr., ECF No. 311 at 227-28.)

Counsel also conducted an extensive cross-examination of Cyr, and elicited a number of additional inconsistencies in her statements and testimony.  The areas of inquiry included whether the amount of cash that Petitioner had was consistent or inconsistent with what he was receiving through Social Security (Trial Tr., ECF No. 411 at 121-24); whether Easler delivered money to Petitioner on ten to fifteen occasions or whether it was on twenty occasions (*id.* at 127-29); where Petitioner hid money (*id.* at 130-31); whether Easler brought money in small or large amounts (*id.* at 132-34); the number of times that Cyr helped Petitioner count over $20,000 (*id.* at 134-35); whether some of the money that Easler stole came from someone other than Petitioner (*id.* at 136-37); the amount that Petitioner paid for the Caron Road property (*id.* at 141); the number of times that Petitioner went to Portland to meet with Jeff Dubois for a marijuana transaction (*id.* at 145-46); and whether co-defendant Ben Dionne gave money to Petitioner (*id.* at 146-47).

Particularly given the many ways by which Petitioner's counsel questioned Cyr's credibility, the remaining points identified by Petitioner, a demand by Cyr's attorney and a decision that Cyr made regarding snowmobiles, would have been merely cumulative and would not have made a difference to the outcome.  *See Turner*, 699 F.3d at 584-85 (concluding that there was no support for the petitioner's argument that the Court, in conducting an analysis of *Strickland* prejudice, failed to consider the cumulative effect of the alleged errors).  Petitioner's argument regarding Cyr's testimony is thus unpersuasive.

### vii.    Hafford's testimony as to drug amounts

Petitioner complains that Hafford's perjured testimony was used as the basis for calculating the drug weight on which Petitioner's sentence was based.  (Motion at 47, 59.)  While Hafford

might have exaggerated the drug quantities and frequency of his trips in his testimony before the grand jury, this Court determined that the jury could accept Hafford's testimony as to the drug quantity despite the efforts of Petitioner's counsel to impeach Hafford's testimony. (Trial Tr., ECF No. 413 at 100-06.) In addition, this Court's finding of the drug quantity, which was based on Hafford's testimony, has been upheld on appeal. *Pelletier*, 666 F.3d at 12. Petitioner's claims of ineffective assistance and prosecutorial misconduct on the issue of alleged perjury by Hafford thus are unconvincing.[23]

### 2. Other Drug Quantity Claims

#### a. Easler's hearsay statements (Ground VI)

Petitioner also raised concerns about Hafford's testimony regarding his conversations with Easler when the two were in jail together. Petitioner claims ineffective assistance for his counsel's failure to continue a hearsay objection as to questions regarding the communications. (Motion at 51-52.) Petitioner argues that he was prejudiced because Easler's statements were used to support the Government's drug quantity determination, to bolster Hafford's testimony against Petitioner, and to support the sentence of life in prison. (Motion at 57.)

As the Government argues, Petitioner's claim fails for several reasons: (1) this issue was litigated in Petitioner's direct appeal, and the First Circuit ruled that, pursuant to Fed. R. Evid. 804(b)(3), Easler's jailhouse statements to Hafford were admissible as statements against

---

[23] Petitioner asserts that "Hafford's lies necessitated resentencing" in co-defendant John Pascucci's case. (Motion at 47.) Petitioner focuses on the Court's statement in Pascucci's sentencing order, *United States v. Pascucci*, 664 F. Supp. 2d 128, 136 (D. Me. 2009) that it was "reluctant to rest its findings" of the number of deliveries of marijuana to attribute Pascucci based on Hafford's testimony alone. The Court's sentencing findings in *Pascucci* are not relevant here because in this case, the jury expressly found that 1,000 kilograms or more of marijuana was attributable to Petitioner. (Sentencing Tr. at 17, ECF No. 521.) "In imposing the sentence, the court is required to apply the jury verdict and is bound by the prior convictions." (Sentencing Tr. at 17-18.) The Court's sentencing finding in *Pascucci* does not give rise to a claim of ineffective assistance.

interest;[24] (2) counsel objected to the admission of Easler's statements and argued the issue; (3) the law supported the admission of Easler's statements, and, therefore, counsel's representation was not deficient; (4) to establish that Easler was unavailable as a witness, counsel and the Court were entitled to rely on the representation of Easler's attorney that Easler would invoke his right not to testify;[25] and (5) because counsel's performance was not deficient, any prejudice that Petitioner suffered due to the increase in drug quantity attributed to Petitioner because of Easler's statement could not be attributed to ineffective assistance of counsel.

### b. Drug quantity calculation (Grounds VII, VIII, IX, XV)

Petitioner raises four other ineffective assistance claims that are relevant to the drug quantity calculation. First, Petitioner contends that counsel failed adequately to argue that the Court's determination of the drug quantity was not in accordance with First Circuit authority. (Motion at 59.) Second, Petitioner argues that counsel failed to object to double counting of some of the drugs. Petitioner maintains that the double counting occurred when the Court included in the calculation the money that Easler stole from Petitioner, despite the fact that that money represented marijuana that already had been included in the drug quantity calculation. (Motion at 62-63.) Third, Petitioner asserts that counsel was ineffective for failing to request a jury instruction on how to convert evidence of pounds into kilograms for purposes of determining whether Petitioner was responsible for 1,000 or more kilograms of marijuana. (Motion at 66, 68.) Fourth,

---

[24] Petitioner's underlying argument that Easler's statements were inadmissible hearsay was litigated in his appeal and decided against him. *Pelletier*, 666 F.3d at 7-9. Because his underlying arguments fail, the ineffective assistance claim, to the extent it relies on the flawed underlying arguments, also fails. *See Tse v. United States*, 290 F.3d 462, 465 (1st Cir. 2002) ("Since [the section 2255 petitioner's] claims fail on the merits, his related claims that counsel rendered ineffective assistance in failing to press the claims at trial or on appeal must also fail.").

[25] On Petitioner's appeal, the First Circuit held that Fed. R. Evid. 804(b) "also requires that the declarant be unavailable to testify. The parties so stipulated, as Easler's counsel had indicated that Easler would invoke his Fifth Amendment rights against self-incrimination, thus making him 'unavailable' within the meaning of the rule." *Pelletier*, 666 F.3d at 7 n.9 (citing and quoting Fed. R. Evid. 804(a)).

Petitioner argues that counsel was ineffective for failing to object to the drug quantity findings in the revised presentence investigation report. (Motion at 59-60.)

Petitioner's first argument fails because on Plaintiff's appeal, the First Circuit rejected his drug quantity challenge based on the established standard of review: "Our review . . . 'requires that we assume that the jury accepted the government's evidence and drew inferences in its favor.'" *Pelletier*, 666 F.3d at 12 (quoting *United States v. Santiago*, 560 F.3d 62, 65 (1st Cir. 2009)).[26] Applying this standard, the First Circuit upheld the Court's denial of Petitioner's motion for acquittal. (Order on Motion, ECF No. 356; First Circuit Opinion, Judgment, and Mandate, ECF Nos. 663-65.) *Pelletier*, 666 F.3d at 12. The First Circuit noted that this Court based its denial "primarily, but not exclusively, on Adam Hafford's testimony regarding both his and Michael Easler's smuggling efforts." 666 F.3d at 12. This Court had concluded that there was sufficient evidence for the jury to find that Hafford ferried between 1,000 and 1,500 pounds across the river for Petitioner, and that "the jury was entitled (although not required) to take the higher number, 1,500 pounds, which translates to 680.38 kilograms." *Id.* The First Circuit also determined "that the jury could reasonably conclude that Easler had smuggled the same amount of marijuana as did Hafford . . . ." *Id.* That brought the total to 1,360.76 kilograms. *Id.*

Petitioner's argument regarding the alleged double counting of drug quantities also fails. From the evidence at trial, the jury could have concluded that Easler stole somewhere between $250,000 and $310,000, which, when priced at the $1,000 per pound that Petitioner paid,

---

[26] Petitioner incorrectly contends that the appropriate standard of review is set forth in *United States v. Marks*, 365 F.3d 101, 105 (1st Cir. 2004). In that case, the First Circuit held that when the drug quantity is determined at sentencing, the government bears the burden of proving drug quantity by a preponderance of the evidence, and "[t]he district court may choose between plausible estimates of drug quantity but must 'err on the side of caution.'" *Id.* (quoting *United States v. Sklar*, 920 F.2d 107, 113 (1st Cir. 1990)). That standard is not applicable here because the drug quantity attributed to Petitioner was found by the jury at trial beyond a reasonable doubt, rather than by the Court at sentencing by a preponderance of the evidence.

represented between 250 and 310 pounds of marijuana, which in turn translated to 113.39 to 140.61 kilograms of marijuana. *Id.* The First Circuit understood that the money was used in the calculation and concluded that "[s]ufficient evidence existed for a reasonable jury to have found beyond a reasonable doubt that Pelletier conspired to import and possess with the intent to distribute 1,000 kilograms or more of marijuana." *Id.*

Petitioner's next argument - that counsel did not request an instruction to the jury as to how to convert pounds to kilograms for purposes of determining whether Petitioner was responsible for 1,000 or more kilograms of marijuana – cannot support Petitioner's claim for relief. (Motion at 68.) Petitioner argues that the jury may have found that Hafford and Easler each imported at the lower end of Hafford's estimate, i.e., 1,000 pounds each, and if that were so, the total amount imported may have been below the 1,000 kilograms required for the mandatory life sentence. (Motion at 70-71.) Petitioner contends that there is no way to know whether the verdict was based on drug quantity that had been measured in pounds rather than kilograms. (Motion at 71.)

At trial, three witnesses testified that one kilogram equals 2.2 pounds. Hafford testified to this conversion in reference to his cocaine smuggling (while at the same time testifying that Petitioner had nothing to do with the cocaine transaction.) (Trial Tr., ECF No. 308 at 154.) In addition, two law enforcement agents testified to the conversion formula for pounds to kilograms. (Trial Tr., ECF No. 311 at 88, ECF No. 413 at 90.)

Because the amounts of marijuana were discussed in pounds, Petitioner may have been entitled to an instruction on the conversion of pounds to kilograms. However, because three separate witnesses testified about the conversion ratio, Petitioner cannot demonstrate either that the failure to seek a jury instruction constitutes deficient performance by his counsel, or that he was prejudiced. *See Strickland*, 466 U.S. at 687; *United States v. Hunter*, 558 F.3d 495, 505 (6th

Cir. 2009) (holding that "[t]he district court's failure to instruct the jury on the conversion ratio for ounces to grams was not plain error" because the conversion ratio was not an element of the crime, it was the subject of testimony at trial, and failure to give the instruction did not substantially impair the defense) (quotation marks omitted).

Petitioner's fourth argument, which was that his counsel should have objected to the drug quantities in the revised presentence investigation report, is without merit.  As the Court explained at sentencing, "the jury expressly found that the amount of the marijuana attributable to the defendant equaled a thousand kilograms or more."  (Sentencing Tr. at 17.)  In other words, the jury verdict, not the presentence investigation report, determined the amount of drugs involved. Petitioner, therefore, has not demonstrated either deficient performance or prejudice.

### 3.  Other Claims

#### a.  Jury foreperson (Ground I)

On the first day of trial, the Court addressed the juror who served as foreperson (Juror A) as follows: "First, [Juror A], you are sitting in the forelady's seat, and there's a reason you are. I'm going to ask you to be the forelady.  Would you be willing to do that?"  (Trial Tr., ECF No. 519 at 2.)  Petitioner argues that the Court's selection of a particular juror to serve as foreperson bestowed a special status that gave that juror greater influence in deliberations, and that the foreperson "became a surrogate of the trial judge," in violation of Petitioner's Fifth Amendment right to due process and Sixth Amendment right to a fair trial.  (Motion at 29.)  He also asserts a claim of ineffective assistance for failure to object to the Court's selection of the foreperson. Petitioner does not assert any judicial bias as part of this claim; to the contrary, Petitioner asserts that the judge was "fair and impartial throughout the trial."  (Motion at 28.)

In *United States v. Cannon*, 903 F.2d 849 (1st Cir. 1990), in a direct appeal, the First Circuit rejected a challenge to the Court's selection of the jury foreperson:

> Defendant cites no rule, statute, or case law forbidding the district judge from selecting the jury foreperson. Indeed, we take judicial notice that it is customary in the district courts of this circuit for the judge to do so. Because there is no valid reason to prohibit a trial judge from appointing the foreperson, and because we find no evidence in the record that the selection of this foreperson prejudiced defendant's case, we hold that the trial court did not abuse its discretion in selecting the jury foreperson.

*Id.* at 857. Petitioner tries to distinguish *Cannon* because in that case, the Court selected the foreperson at the close of the evidence, whereas here, the Court made the selection before the jury was sworn. The timing of the selection was not material to the Court's analysis in *Cannon*. Petitioner's argument is thus meritless.

### b. Instruction to jurors not to discuss the case (Ground II)

Petitioner argues that the Court's instructions to jurors that they must refrain from discussing the case outside the courtroom, that they must refrain from conducting any research on it, and that they must refrain from reading or listening to news reports about the case, were insufficient because the Court did not repeat the warning every time the jury recessed. (Motion at 32-33.) Petitioner asserts that counsel was ineffective for failing to object to the Court's failure to repeat the instruction. (Motion at 36.)

A review of the record reveals that while the Court understandably did not provide an in-depth admonition at every break, the Court instructed the jury each day not to look at the news, not to discuss the case, and to follow the Court's prior instructions. (Trial Tr., ECF No. 411 at 189-92; No. 412 at 178, 259; No. 308 at 137, 201; No. 311 at 135, 237; No. 312 at 164, 232; No.

413 at 156.)[27]  The Court may presume that a jury follows its instructions.  *United States v. Rodriguez*, 675 F.3d 49, 63 (1st Cir. 2012).  Simply stated, Petitioner's claim fails on the merits and, therefore, also fails as a claim of ineffective assistance.  *Tse v. United States*, 290 F.3d 462, 465 (1st Cir. 2002).  Petitioner has failed to demonstrate cause and prejudice.

### c.  Retention of jurors (Ground III)

Petitioner argues that a juror who presented a doctor's note regarding the juror's pain issues should have been excused.  (Motion at 37-39.)  When questioned, the juror said that she could continue and that frequent breaks would help.  The Court informed the parties of its intent to try to accommodate the juror, and counsel did not object.  (Trial Tr., ECF No. 412 at 4-6.)  Petitioner now argues that a juror who is in enough pain to present a doctor's note could not be expected to be able to focus on the trial, and counsel was ineffective for failing to object to this juror's continued service.

Petitioner also argues that another juror should have been excused after she told the Court that she thought a certain witness was the daughter of someone whom she had known when she was a child.  (Motion at 37-39.)  Petitioner argues that this juror could not be expected to be impartial, and counsel was ineffective for failing to object to this juror's continued service.

Preliminarily, Petitioner has cited no record evidence to support his contention that the juror who informed the Court about her pain issues was unable to or failed to focus and fulfill her responsibilities as a juror.  The Court has wide discretion in deciding whether to remove an inattentive juror; "[t]he trial court is not required to remove a juror who has slept and is accorded considerable discretion in handling the matter."  *United States v. Fernández-Hernández*, 652 F.3d

---

[27] The Court said on the first day: "Now, I'm not going to every night go through this.  You've already heard what I've had to say about your obligation as jurors, your obligation not to talk about the case, and that's what I'm going to tell you each day."  (Trial Tr., ECF No. 411 at 192.)

56, 75 (1st Cir. 2011).  As to the juror who thought she knew the witness's father, she expressed only a remote connection with the witness's father.  There was no evidence of a connection between the juror and the witness, and no indication of juror bias.  Counsel was not deficient for failing to object, and Petitioner has not demonstrated any prejudice.

### d.  French conversation with English translation  (Ground V)

Petitioner argues that counsel was ineffective for failing to object to the Government's English-language translation of a conversation in French between Petitioner and an agent.  (Motion at 49.)  In that conversation, the agent posed as someone who had stolen marijuana from Petitioner, who had not realized that it was Petitioner from whom he had stolen the marijuana, and who wanted to return the marijuana to Petitioner.  (Motion at 49.)  The Government provided a transcript in English of that conversation; Petitioner complains that his counsel did not question the accuracy or authenticity of the Government's translation, did not question the credentials of the translator, and did not have another translation made.  (Motion at 49.)

Audio recordings in foreign languages must be translated into English if the recording is admitted in evidence, and the Court has the discretion to admit the transcript as well as the recording.  *United States v. Morales-Madera*, 352 F.3d 1, 4, 9 & n.4 (1st Cir. 2003) (citing *United States v. Rengifo*, 789 F.2d 975, 983 (1st Cir. 1986)) (noting that the Jones Act, 48 U.S.C. § 864, "requires proceedings to be conducted in English," and noting that "almost 20 years ago, this court approved the introduction in evidence of English transcripts for wiretaps of Spanish conversations, provided the reliability issues were worked out").  Here, as in *Morales-Mader*a, neither counsel at trial, nor Petitioner in this proceeding, raised a question regarding the accuracy of the transcription or the translation.  *See id.* at 8.  That is, Petitioner has failed to point to any inaccuracy in the transcript.  Furthermore, the audio recording and transcripts were merely cumulative evidence,

given that the essential facts about the conversations between the agent and Petitioner were in evidence through the testimony of the agents involved, as well as other witnesses. (Trial Tr., ECF No. 308 at 88-89, ECF No. 311 at 39-42, 119-24, ECF No. 411 at 56-58.) Petitioner has thus failed to provide any basis to support his argument that he was prejudiced by use of the transcript.

### e. Co-defendants' guilty pleas (Ground X)

Petitioner claims that counsel was ineffective because he failed to request that the Court instruct the jury that the co-defendants' guilty pleas cannot be considered as evidence that Petitioner was guilty. (Motion at 72.) Petitioner is concerned about the pleas of Hafford, Easler, and others.

A fair reading of the record establishes that counsel's decision not to request a cautionary instruction was reasonable because the Court's instruction was sufficient. The issue of a cautionary jury instruction was raised at sidebar before Daigle testified and at that point, counsel said he would like the instruction. (Trial Tr., ECF No. 311 at 220-21.) At the end of the trial day, the Court asked counsel whether he wanted the instruction, counsel answered: "I don't think there's any reason to do it . . . . I'll be talking to him . . . in cross-examination. That might be a good . . . time to do it." (Trial Tr., ECF No. 311 at 236.) The Court said it would await counsel's decision and then give the instruction if requested. There is no evidence that Petitioner's counsel subsequently made the request.

Although counsel did not make the request, the Court gave the following cautionary instruction in its final instructions:

> You have heard the testimony of Government cooperating witnesses. They either, one, provided evidence under agreements with the Government; two, participated in the crimes charged against Mr. Pelletier; or, three, testified under a grant of immunity.

Immunity means that the witness' testimony may not be used against them in any subsequent criminal proceeding. However, if they testified untruthfully, they could be prosecuted for perjury or making a false statement, even though they were testifying under a grant of immunity. Some people in this position are entirely truthful when testifying.

Still, you should consider the testimony of these witnesses with particular caution. They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves.

Under the circumstances of this case, the Court's instruction was sufficient. First, Hafford was not a co-defendant in this case; rather, he pled guilty to a firearm charge unrelated to Petitioner's drug trafficking. Although Easler was a co-defendant, he did not testify, and Petitioner has not shown that Easler's guilty plea was introduced to the jury. Cyr was not a co-defendant and did not plead guilty to any charge. Erica Fox and Dan Easler did not have agreements and were neither co-defendants nor co-conspirators. (Trial Tr., ECF No. 311 at 23, ECF No. 412 at 147-50.) Witnesses Jeff Dubois and Ricky Daigle were Petitioner's co-conspirators, Dubois on the drug charge and Daigle on the real estate transaction, but neither was a charged co-defendant.

To the extent that Petitioner contends that a further cautionary instruction was warranted as to co-conspirators Jeff Dubois and Daigle, Petitioner has failed to demonstrate prejudice due to independent evidence that Petitioner knowingly distributed marijuana and conducted the real estate transaction.

### f. Multiple conspiracy and variance (Ground XI)

Petitioner contends that because the Government presented evidence at trial of drug trafficking conspiracies that did not involve him, his counsel was ineffective for failing to request a multiple-conspiracy instruction because without such an instruction he had difficulty demonstrating that the drug amounts involved in the other conspiracies should not be attributed to him. (Motion at 74-75.) Petitioner argues that Hafford's cocaine importation was one such

conspiracy. (Motion at 74.) He alleges in the affidavit that his counsel told him that he would request a multiple-conspiracy jury instruction. (Affidavit, ECF No. 709-2 at 2.)

The First Circuit has held that "[a] multiple conspiracy claim ordinarily presents a question of fact for the jury to resolve. Thus, a court should instruct on the issue 'if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged.'" *United States v. Balthazard*, 360 F.3d 309, 315 (1st Cir. 2004) (quoting *United States v. Brandon*, 17 F.3d 409, 449 (1st Cir. 1994)) (citation and quotation marks omitted). In *Balthazard*, the trial court instructed the jury that the Government must prove beyond a reasonable doubt "'that the agreement or conspiracy specified in the indictment, and not some other agreement, or agreements existed, between at least two people to manufacture, possess, or distribute'" the amount of marijuana at issue in that case. *Id.* at 316. The First Circuit held that the trial court did not err in rejecting a proposed instruction that would have elaborated on this, because the proposed instruction would have been misleading. *Id.*

In Petitioner's trial, the Court's instructions as to conspiracy were similar to those given in *Balthazard*. The Court gave the following instruction in Petitioner's trial:

> For you to find Mr. Pelletier guilty of conspiracy, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt: First, that the agreements specified in the indictment, and not some other agreement or agreements, existed between at least two people to import marijuana and/or possess with the intent to distribute and distribute marijuana; and, second, that Mr. Pelletier willfully joined in those agreements.

(Trial Tr., ECF No. 413 at 218.) The instruction addressed the issue of uncharged conspiracies by advising the jury that it must consider "the agreements specified in the indictment, and not some other agreement or agreements." No further instruction was needed; Petitioner was not charged with a cocaine offense, the evidence was clear that he was not involved in cocaine importation, and both the indictment and the verdict form involved marijuana, not cocaine. The First Circuit's

conclusion in *Balthazard* is instructive: "As we have explained, multiple conspiracy is not a defense unless it creates a reasonable doubt about whether the defendant is guilty of the charged conspiracy." *Id.* at 316.  In this case, the evidence of Hafford's cocaine importation was unrelated to either of the two conspiracies and thus a further jury instruction was not warranted.

### g.  Forfeiture of property (Ground XII)

Petitioner argues that he is entitled to the return of the property that was the subject of Count 4, which was dismissed.  (Motion at 76.)  The property at issue in Count 4 was located on Main Street in Van Buren and was one of the properties listed in the forfeiture allegations. (Indictment at 3, 13-14.)  Petitioner also claims that the forfeiture of other assets was improper because no special forfeiture verdict form was returned, pursuant to Fed. R. Crim. P. 32.2(b)(5)(B). (Motion at 76-77.)

Claims for the return of property, and claims for ineffective assistance of counsel regarding the return of property, are not cognizable in a section 2255 motion.  *See Smullen v. United States*, 94 F.3d 20, 25-26 (1st Cir. 1996) (holding that the Court lacked jurisdiction to grant relief on the petitioner's restitution claim, and a claim of ineffective assistance on the issue of restitution likewise fails); *Rodriguez v. United States*, 132 F.3d 30 (1st Cir. 1997) (unpublished) (holding that a complaint for "relief from a monetary-type penalty" rather than release from confinement, is not cognizable in a section 2255 proceeding); *United States v. Allison*, 165 F.3d 20 (4th Cir. 1998) (unpublished) (dismissing without prejudice a forfeiture claim brought in the context of a section 2255 motion).  Petitioner thus is not entitled to the return of property in this action.

### h.  Cumulative errors (Ground XIII)

In his claim of cumulative errors, Petitioner repeats the arguments that he makes throughout his motion.  (Motion at 78.)  While "'*Strickland* clearly allows the court to consider

the cumulative effect of counsel's errors in determining whether a defendant was prejudiced,'" *Dugas v. Coplan,* 428 F.3d 317, 335 (1st Cir.2005) (quoting *Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir.1989)), Petitioner has not demonstrated that counsel's performance was deficient, and therefore his claim that counsel caused cumulative error lacks merit. *See United States v. Sampson,* 486 F.3d 13, 51 (1st Cir. 2007).

### i. Witness vouching (Ground XIV)

Petitioner claims that both the Government and the Court engaged in vouching for the credibility of witnesses, and that his counsel failed to object. (Motion at 81.) Petitioner points to the Government's opening statement and its rebuttal closing argument. In opening statement, the Government's attorney stated:

> [T]he nub of the immunity agreement is that nothing that this witness says in this courtroom can be used directly against him or her or indirectly against him or her unless that witness does anything but tell the truth. He or she must tell the truth in order to maintain that immunized status.

(Motion at 81; Trial Tr., ECF No. 411 at 29-30.) Petitioner complains about the following in the Government's rebuttal closing argument:

> Now, folks, Adam Hafford told you that he exaggerated in the grand jury. There is no disputing that, and I'm not going to stand here and tell you otherwise. That's what he testified to. And he came in here, and he admitted that. And to a certain extent, ladies and gentlemen, that ought to bring some comfort because he didn't come in here and exaggerate the other way. . . . He lowered that amount, and he admitted what he had done in the grand jury. He knows he did wrong.
>
> . . .
>
> We brought in testimony of people like Colleen Woods and Diane Caron. Do you think Diane Caron's going to come in here and say anything but the truth? You got a good look at her. Avril Marin. Dan Easler.

(Motion at 82-83; Trial Tr., ECF No. 413 at 206-07.)

Petitioner also complains about the Court's final cautionary instruction regarding Government witnesses who received immunity. (Motion at 81-82; Trial Tr., ECF No. 413 at 213-14.) Finally, Petitioner argues that counsel's performance was deficient because he asked Hafford on cross-examination to read the following, which was a representation made by the Government to the Court in the context of Hafford's own sentencing:

> Truthfulness, complete – completeness, and reliability. USA Joel Casey reports that all information provided by Adam Hafford has proven to be entirely truthful, complete, and reliable to the best of the knowledge of the Government. Information admitted by Hafford concerning his firearms possession has likewise been found to be truthful, complete, and reliable.

(Motion at 84-85; Trial Tr., ECF No. 308 at 129-30.) This was in the context of counsel's cross-examination of Hafford regarding his cooperation agreement with the Government.

Although this claim is arguably time-barred because Petitioner raises it for the first time in his amended petition, the claim can be addressed summarily on its merits. The First Circuit has held:

> A prosecutor may not vouch for one of her witnesses by making personal assurances about him; she likewise may not accomplish this goal by putting on another Government witness, such as an FBI agent, to make such assurances. This practice is prohibited because of its potential to shore up a witness's credibility by putting the prestige of the United States behind him and thereby inviting the jury to find guilt on some basis other than the evidence presented at trial.

*United States v. Vázquez-Botet*, 532 F.3d 37, 53 (1st Cir. 2008). Here, the Government's attorney simply provided an accurate statement of the nature of an immunity agreement, consistent with the Court's cautionary instruction. In addition, in the rebuttal argument about witnesses Woods, Caron, Marin, and Dan Easler, the Government's attorney did not vouch for the individuals. Instead, the prosecutor simply asked the jury to consider whether the witnesses would do anything other than tell the truth, and reminded the jury that they had the opportunity to assess the credibility of the witnesses as they testified. The law does not require that the Government's attorney refrain

from discussing the credibility of the witnesses. Indeed, trial counsel often focuses on witness credibility. The arguments of the Government's attorney constitute proper comment on factors that jurors might want to consider in assessing the credibility of the witnesses. Finally, there was no error in the Court's instruction. *See* First Circuit Pattern Jury Instruction 2.07; *United States v. Hernández*, 109 F.3d 13, 17 (1st Cir. 1997) (approving "with greater caution" instruction).

### j.   Failure to allege a conspiratorial agreement (Reply)

Petitioner argues for the first time in his reply that the indictment was flawed because it did not contain sufficient factual particularity regarding the "agreement" element of the crime of conspiracy. (Reply at 6.) [28] Petitioner argues that his counsel was ineffective for failing to move to dismiss the indictment on that basis. (Reply at 7, 9, 13.) Petitioner asserts that the Government presented facts at trial on the element of agreement although it had failed to present those facts to the grand jury. (Reply at 8.)

The issue is procedurally defaulted because it was not raised at trial or in the direct appeal. *See United States v. Gonzalez*, 915 F.2d 1557 (1990) (unpublished) (noting that "allegations of defects in an indictment may not be raised for the first time in a § 2255 petition unless exceptional circumstances are shown"). Furthermore, the claim for ineffective assistance on this issue fails because the underlying claim fails on the merits. *See Tse*, 290 F.3d at 465.

Fed R. Crim. P. 7(c) provides in pertinent part: "The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged

---

[28] The First Circuit has held that "[i]nformal reference to a new claim in a reply brief will not suffice to raise a claim if the district court does not address that claim in its order." *United States v. Barrett*, 178 F.3d 34, 57 (1st Cir. 1999). Furthermore, Petitioner's ineffective assistance argument might reasonably be characterized as a new ground for relief, subject to the limitations period of section 2255 and Fed. R. Civ. P. 15, rather than simply as a new argument. *See United States v. McCurdy*, 2013 WL 5431448, at *16 n.8, 2013 U.S. Dist. Lexis 138954, at *45-46 (D. Me. Sept. 27, 2013). The government has not had the opportunity to respond. In any event, however, the Court need not determine whether this is a new ground or a new argument, if it determines that the claim fails on the merits.

. . . ." The First Circuit has held that an indictment need not refer to particular terms if the indictment cites to the statute that the defendant is alleged to have violated, and the statute in turn incorporates the element of the crime at issue. *See United States v. Bunchan*, 626 F.3d 29, 33 (1st Cir. 2010) (holding that although the indictment did not use the term "obstruction of justice," the indictment referenced and incorporated the relevant statute). The indictment against Petitioner does not use the word "agreement" as to either of the conspiracy counts against him, but it alleges that he "knowingly and intentionally conspired" in violation of 21 U.S.C. §§ 963, 952(a) (count I) and 846, 841(a)(1) (count II). (Indictment, ECF No. 1.)[29] Contrary to Petitioner's argument, the indictment was sufficient to allege a conspiracy, and the Court instructed the jury that a conspiracy involved an agreement. (Trial Tr., ECF No. 413 at 218.)

### k. *Alleyne* and Petitioner's Second Motion to Amend

Petitioner's *Alleyne*-based argument fails because *Alleyne* is not applicable to this case. In *Alleyne*, the Supreme Court held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, --- U.S. ---, 133 S. Ct. 2151, 2155 (2013). However, as the First Circuit recently noted in *United States v. Paladin*, 748 F.3d 438 (1st Cir. 2014), the Supreme Court in *Alleyne* recognized that the Court is not required to submit to the jury a defendant's prior convictions in order to consider those convictions at sentencing. *Paladin*, 748 F.3d at 451 (noting that "a defendant's prior convictions need not be submitted to the jury even where those convictions form the basis for an increased

---

[29] Title 21 U.S.C. §§ 846 and 963, which were cited in Petitioner's indictment, criminalize conspiracy; both statutes state: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." To convict a defendant of conspiracy, the government must introduce evidence showing that the defendant "had entered into an agreement with one or more co-conspirators to commit" the offense. *See United States v. Ayala-Vazquez*, --- F.3d ---, 2014 WL 1810703, at *9, 2014 U.S. App. Lexis 8367, at *26-27 (1st Cir. May 2, 2014) (concerning conspiracy to commit money laundering). The Court further held that "[a]n agreement to enter into a conspiracy may be tacit or express." 2014 WL 1810703, at *9, 2014 U.S. App. Lexis 8367, at *27. This holding does not require that the word "agreement" appear in the indictment.

sentence"). *Paladin*, 748 F.3d at 451 (citing *Alleyne*, 133 S. Ct. at 2160 n.1). In *Alleyne*, the Supreme Court cited *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), in which it held that the indictment "need not set forth factors relevant only to the sentencing of an offender found guilty of the charged crime." *Almendarez-Torres*, 523 U.S. at 228 (cited in *Alleyne*, 133 S. Ct. at 2160 n.1). Based on the Supreme Court's declaration in *Alleyne* that it did not intend to revisit its holding in *Almendarez-Torres*, the First Circuit held that *Almendarez-Torres* is still considered good law. *Paladin* 748 F.3d at 451-52. Petitioner's argument that under *Alleyne* he is entitled to relief must fail.

## III.  CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2255 Cases. The recommendation is (1) that the Court grant Petitioner's two pending motions to amend, (2) that the Court dismiss Petitioner's amended motion for habeas relief under 28 U.S.C. section 2255, (3) that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2255 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2), and (4) that the Court dismiss Petitioner's motion for discovery as moot.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

June 17, 2014                                         /s/ John C. Nivison
                                                      U.S. Magistrate Judge